1   DAVID J. BERGER (Bar No. 147645)
    DOMINIQUE-CHANTALE ALEPIN (Bar No. 241648)
2   WILSON SONSINI GOODRICH & ROSATI
    650 Page Mill Road
3   Palo Alto, CA 94304
    Telephone: (650) 493-9300
4   Facsimile: (650) 493-6811
    dalepin@wsgr.com
5
    JENNY L. DIXON (Bar No. 192638)
6   WILSON SONSINI GOODRICH & ROSATI
    One Market Street
7   Spear Tower, Suite 3300
    San Francisco, CA 94105
8   Telephone: (415) 947-2000
    Facsimile: (415) 947-2099
9   jldixon@wsgr.com

10  Attorneys for Plaintiffs
    IRWIN UNION BANK AND TRUST COMPANY
11  and IRWIN HOME EQUITY CORPORATION

12

13                  UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION
14

15  IRWIN UNION BANK AND TRUST          )   CASE NO.:  C08-00472-PJH
    COMPANY AND IRWIN HOME EQUITY       )
16  CORPORATION,                        )   Action filed: January 22, 2008
                                        )
17          Plaintiffs,                 )   **DECLARATION OF JENNY L.**
                                        )   **DIXON IN SUPPORT OF**
18      v.                              )   **PLAINTIFFS' RESPONSE RE:**
                                        )   **DEFENDANT FREEDOM**
19  FREEDOM MORTGAGE COMPANY,           )   **MORTGAGE CORPORATIONS**
                                        )   **MOTION TO DISMISS OR STAY**
20          Defendants.                 )   **ACTION AND FOR AN ORDER**
                                        )   **COMPELLING ARBITRATION**
21                                      )
                                        )
22                                      )   Date:   April 30, 2008
                                        )   Time:  9:00 a.m.
23                                      )   Courtroom: 3
                                        )   Hon. Phyllis J. Hamilton
24                                      )
                                        )
25  _____ )

26

27

28
    DECLARTION OF JENNY L. DIXON ISO                          3333948_1.DOC
    PLAINTIFFS' RESPONSE RE: DEF'S MOT.
    TO DISMISS OR STAY AND FOR ORDER
    COMPELLING ARBITRATION
    CASE NO. C08-00472-PJH

I, Jenny L. Dixon, declare:

1.    I am an attorney with the law firm of Wilson Sonsini Goodrich & Rosati, a Professional Corporation, counsel of record for Plaintiffs Irwin Union Bank and Trust Company ("Irwin Union") and Irwin Home Equity Corporation ("IHE").  I make this declaration in support of Plaintiffs' Response to Defendant Freedom Mortgage Corporation's ("Freedom") Motion to Dismiss or Stay Action and for an Order Compelling Arbitration.  I have personal knowledge of the facts set forth herein, and if called to testify, could and would testify competently thereto.

2.    On March 12, 2008, Freedom filed a Complaint and Jury Demand ("Freedom Complaint") in the United States District Court for the District of Delaware, Case No. 1:08-CV-00146-UNA.  Freedom asserts claims for specific performance, breach of contract and injunctive relief against Irwin Financial Corporation and Irwin Mortgage Corporation.  Attached hereto as Exhibit 1 is a true and correct copy of said filing (without exhibits).

3.    On March 12, 2008, Freedom also filed its Initial Claim for Arbitration with the National Arbitration Forum, which is referenced in Freedom's Mem. of Points & Auth. ISO Motion to Dismiss or Stay Action ("Freedom's Mot.") at 5.  Attached hereto as Exhibit 2 is a true and correct copy of Freedom's Initial Claim for Arbitration (without exhibits).  Simultaneous with the filing of its arbitration claim, Freedom requested that all proceedings be stayed.  Exhibit 2 at ¶¶ 10, 52.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own personal knowledge, and that this declaration is executed the 9th day of April 2008 at San Francisco, California

/s/ Jenny L. Dixon
Jenny L. Dixon

DECLARTION OF JENNY L. DIXON ISO
PLAINTIFFS' RESPONSE RE: DEF'S MOT.
TO DISMISS OR STAY AND FOR ORDER
COMPELLING ARBITRATION
CASE NO. C08-00472-PJH

-1-

3333948_1.DOC

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x
                               :

| | |
|---|---|
| FREEDOM MORTGAGE CORPORATION, | : Case Number: |
| | : |
| Plaintiff, | : |
| | : **COMPLAINT AND** |
| v. | : **JURY DEMAND** |
| | : |
| IRWIN FINANCIAL CORPORATION, and IRWIN MORTGAGE CORPORATION, | : |
| | : |
| Defendants. | : |
| | : |

------------------------------------------------------x

    Plaintiff Freedom Mortgage Corporation ("Freedom"), by its undersigned attorneys, for its complaint for breach of contract and for specific performance against defendants Irwin Financial Corporation ("Irwin Financial") and its subsidiary, Irwin Mortgage Corporation ("Irwin Mortgage") (collectively Irwin Financial and Irwin Mortgage are referred to as "Irwin") alleges as follows:

## NATURE OF THE ACTION

    1.    Freedom has been the victim of a bait and switch. In the Fall of 2006, the defendants sold to Freedom all of the assets of their business of originating and selling mortgage loans through retail, wholesale, direct lending and correspondent divisions (the "Business"). The sale included substantially all of the personnel and executives who had operated the Business. As part of that sale, defendants included the assignment to Freedom of a valuable contract between Irwin Mortgage and another Irwin Financial subsidiary, Irwin Home Equity Corporation ("IHE"). At the time of the sale, that

contract (the "IHE Agreement") contained valuable commercial terms which could not be obtained elsewhere in the industry.  For example, it obligated IHE to purchase from Freedom certain mortgage loans which had been underwritten according to guidelines which were not "industry standard," and it restricted the circumstances under which IHE could require that Freedom buy back loans.

2.     However, prior to the closing of the sale of the Business, without telling Freedom (and contrary to Irwin's obligations to Freedom) Irwin set into motion a secret plan to change the terms of the IHE Agreement.  The plan appears to have been continued even after the date of the sale closing.  For example, immediately after the closing of the sale, certain former Irwin executives had joined Freedom; however, for no discernable reason, except a possible loyalty to their old employer, they urged a Freedom manager to sign a so-called "Addendum" to the IHE Agreement.

3.     Simultaneously and apparently acting in concert with Irwin, IHE refused to honor its obligations under the IHE Agreement unless and until the Addendum was signed.  As part of the scheme, IHE wrongfully held millions of dollars worth of original collateral documents it had received in connection of the sale of loans to IHE under the pretense of honoring the IHE Agreement.  IHE then held those valuable collateral documents hostage to the execution of the Addendum. At that time, this action by IHE was especially coercive because market conditions were creating intense pressure for Freedom to sell the loans at issue, but IHE had made it impossible to do so unless the Addendum was signed.

4.    Faced with the combination of economic duress regarding the collateral and outstanding loans which IHE held, together with the apparently sincere insistence of the former Irwin executives, a manager who was misled signed the Addendum.

5.    Under the Asset Purchase Agreement ("APA") which governed the sale to Freedom of substantially all the assets of the Business, Irwin Financial specifically promised to use its position as indirect controlling shareholder of IHE to ensure that IHE gave to Freedom the full benefit of the IHE Agreement – in the form that such agreement existed prior to closing and prior to the Addendum (APA Section 9.1(g): "… the Seller and Shareholder shall, and shall cause their respective Affiliates to … provide Buyer, at no cost to Buyer, with all of the rights and benefits (subject to all of the obligations) under any such Contract.…"). A true copy of the APA (without most schedules) is annexed to this complaint as Exhibit A.

6.    After Freedom received repurchase demands from Irwin Mortgage, Freedom disputed the validity of the demands. Freedom and Irwin have engaged in extended negotiations concerning their disputes, but the matters of Irwin's obligations under the APA, and Freedom's contention that the Addendum to the IHE Agreement is invalid and void or voidable, have not been resolved. Irwin eventually referred Freedom to its lawyers.

7.    Accordingly, Freedom brings this action to compel specific performance by Irwin Financial to require its wholly-controlled subsidiary, IHE, to honor the IHE Agreement in its original form as required by the terms of the APA. Freedom also seeks damages for breaches of the APA by the defendants.

## PARTIES

8.    Plaintiff Freedom Mortgage Corporation ("Freedom") is a corporation organized under the laws of the State of New Jersey, with its principal place of business in Mt. Laurel, New Jersey.  Freedom is a signatory to the APA.

9.    Defendant Irwin Financial Corporation ("Irwin Financial") is a corporation organized under the laws of the State of Indiana, with its principal place of business in Columbus, Indiana.  Irwin Financial is a signatory to the APA.

10.    Defendant Irwin Mortgage Corporation ("Irwin Mortgage") is a corporation organized under the laws of the State of Indiana, with its principal place of business in Columbus, Indiana.  Irwin Mortgage is a signatory to the APA and is the entity whose assets – in particular, substantially all of the assets of the Business – were sold to Freedom under the terms of the APA.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship of the parties, and the amount in controversy as set forth below, in the Demand for Relief, far exceeds the sum or value of $75,000, exclusive of interest and costs.

12.    Venue is proper in this Court because the parties to the APA, which are all of the parties to this action, in Section 11.7 of the APA, consented to the mandatory, exclusive jurisdiction of the Federal and State courts of Delaware "with regard to any action or claim arising out of or relating to [the APA] or the transactions contemplated hereby."  In that same section of the APA, the parties also submitted to personal jurisdiction in the State of Delaware for any such action.

- 4 -

**RELATED PROCEEDINGS**

13.     There is presently pending in the United States District Court for the Northern District of California, Oakland Division, Case No. C08-00472 (PJH), a related action (the "IHE Action") with Freedom as defendant, and IHE and another member of the Irwin family of companies, Irwin Union Bank and Trust Company, as plaintiffs. Neither Irwin Financial nor Irwin Mortgage is a party to the IHE Action.

14.     The IHE Action concerns the IHE Agreement.  In specific, IHE alleges, among other things, that Freedom breached the IHE Agreement by failing to repurchase loans from IHE.  A copy of the IHE Agreement is attached to this Complaint as Exhibit B.

15.     The IHE Agreement contains an arbitration clause.  (IHE Agreement Section 8.09).

16.     Simultaneously with the commencement of this action, Freedom is commencing an arbitration pursuant to the terms of the IHE Agreement (the "IHE Arbitration").  Also simultaneously, Freedom is moving in the IHE Action for dismissal and/or stay of that action on the grounds of the arbitration clause, and to compel arbitration in the IHE Arbitration.

17.     In the IHE Arbitration, Freedom will request that the arbitrators abstain from any proceedings until the instant action's claim for specific performance is resolved. The grounds for such abstention will be that if this Court upholds Freedom's claim, and orders specific performance of Section 9.1(g) of the APA, then Irwin Financial (which controls IHE) will require IHE to disavow the Addendum and to honor the IHE

Agreement as it was written on the day of the closing of the sale under the APA, so that Freedom will receive the benefit of the bargain it made.

18.    There is no arbitration provision in the APA, and Freedom has not consented to any arbitration of the APA claims. Accordingly, the IHE Arbitration cannot be consolidated with this action.

## ALLEGATIONS COMMON TO ALL COUNTS

19.    On May 15, 2006, Freedom and Irwin signed a letter of intent (the "LOI").

20.    Thereafter, Freedom undertook due diligence concerning Irwin Mortgage's Business.

21.    Between the date of the execution of the LOI, and the date of the closing of the APA, the parties negotiated the terms of the asset purchase agreement ("APA").

22.    The APA was executed on August 6, 2006 and was dated "as of" August 7, 2006. The closing of the sale pursuant to the APA (the "Sale") took place in two stages: The first closing of the Sale, which concerned the Operating Assets of the Business (as defined in the APA), took place effective as of September 18, 2006. The second closing of the Sale, which concerned the Warehouse Assets (as defined in the APA), took place effective as of September 26, 2006.

23.    Pursuant to the APA, Freedom purchased substantially all of the assets of the Business of Irwin Mortgage, as the term "Business" is defined in Section 1.1 of the APA.

**The IHE Agreement**

24.     Under the APA, Section 2.1(a), Irwin Mortgage assigned to Freedom the IHE Agreement.  The IHE Agreement was a "Purchased Asset" specifically listed on Schedule 1.1(b)(iii).

25.     The assignment of the IHE Agreement was a material term of the APA.

26.     The IHE Agreement was a valuable contract.  The IHE Agreement, as it existed on the date of execution of the LOI, on the date of execution of the APA, as well as on the date that Irwin Mortgage assigned the IHE Agreement to Freedom, included an obligation on the part of IHE to purchase from Irwin Mortgage certain mortgage loans which had been underwritten according to underwriting guidelines which were not "industry standard" guidelines.  The underwriting guidelines contained in the IHE Agreement were more favorable to Irwin Mortgage (and therefore to Irwin Mortgage's assignee, Freedom) than industry standard guidelines.

27.     Also at the time that Irwin Mortgage assigned the IHE Agreement to Freedom, the IHE Agreement contained limited circumstances under which IHE might require Irwin Mortgage (or Freedom) to repurchase nonperforming loans.

**Irwin Secretly Planned A Material Amendment**

28.     At and prior to the time of the assignment of the IHE Agreement to Freedom, on information and belief, Irwin and IHE together had plans to materially change the terms of the IHE Agreement, which changes would materially deprive Freedom of the full benefits of the IHE Agreement as it existed at the time of the APA closing.

29.     The changes secretly planned by Irwin and IHE were to be incorporated into a document styled as an "Addendum."

30.     Under the terms of the Addendum prepared by Irwin and IHE, the Irwin companies proposed that the IHE Agreement be revised so that, among other things, loans with nonstandard underwriting could no longer be sold to IHE and so that there were materially different, broader grounds for IHE to demand that Freedom repurchase loans.

31.     Prior to the closing of the APA, Freedom was not told of these plans. Irwin intentionally withheld from Freedom the fact that Irwin had agreed, or was negotiating to agree, with IHE to materially change the terms of the IHE Agreement.

**Irwin Represented That There Were No Material Amendments or Negotiations**

32.     In the APA, both Irwin Financial (defined as the "Shareholder" in the APA)  and Irwin Mortgage (defined as the "Seller" in the APA) represented and warranted to Freedom, as of the closing date, as follows:

    a.     Pursuant to Section 4.5 of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that except for certain scheduled items not relevant to this action, "since the date of the Latest Balance Sheet, the Business has been conducted in the ordinary course and there has not occurred: (i) any event or condition which has had, or would reasonably be expected to result in, a Seller Material Adverse Effect, or (ii) any acquisition, sale, transfer or encumbrance, other than a Permitted Encumbrance, of any of the Purchased Assets not in the ordinary course of business."

      b.     Pursuant to Section 4.5 of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that among other things Irwin Mortgage has not:

          i.    "instituted or permitted any material change in the conduct of the Business, or any change in its method of purchase, sale, lease, management, marketing, promotion or operation." (APA 4.5(j)).

         ii.    "negotiated or entered into any agreement to do any of the things described in any of the preceding clauses." (APA 4.5(k)).

      c.     Pursuant to Section 4.8 (c) of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that "[t]he sale, transfer and assignment of the Purchased Assets as contemplated by this Agreement will give Buyer possession of, and the right to use, all of the Assets and Properties...required for the conduct of the Business as presently conducted in all material respects."

      d.     Pursuant to Section 4.10 (b) of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that "[e]ach such Contract is in full force and effect and has not been further amended."

      e.     Pursuant to Section 4.19(d) of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that "[e]ach Company Mortgage Loan is a Marketable Loan."

f.      Pursuant to Section 4.19(f) of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that "[Irwin Mortgage] has complied in all material respects with all applicable Mortgage Loan Regulations with respect to the Company Mortgage Loans. The Seller has timely filed all reports required in respect of Company Mortgage Loans by any Investor, any Insurer, and the Mortgage Loan Regulations."

g.      Pursuant to Section 4.25 of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that schedule 4.25 "sets forth an accurate and complete list of all Contracts, understandings, transfers of assets or liabilities or other commitments or transactions, whether or not entered into in the ordinary course of business consistent with past practice, to or by which Seller, on the one hand, and any Affiliate of the Seller, on the other hand, are parties and that are currently pending or in effect and relate to or affect the business of the Seller or any of the Purchased Assets or Assumed Liabilities."

h.      Pursuant to Section 4.20 of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that "[t]he Seller has not authorized or implemented any plans or practices that would cause any Approved Pipeline Loan to be processed and underwritten to guidelines any less stringent in any material respect than those applied to Company Mortgage Loans. The Seller has complied in all material respects with all contractual obligations which relate to any of the Approved Pipeline Loans."

i.      Pursuant to Section 4.26 of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that:

> <u>Representations Complete</u>.   *None of the representations* or warranties made by Seller and Shareholder herein, subject to the exceptions contained in the Disclosure Schedules, and none of the statements, representations or warranties contained in the Seller Disclosure Schedule or in any certificate, list or other writing furnished to Buyer by Seller pursuant to this Agreement or any of the Ancillary Agreements, when all such documents are read together in their entirety, contains any untrue statement of material fact, or *omits to state any material fact necessary* in order to make the statements contained herein or therein, *in light of the circumstances under which made, not misleading*.

(Emphasis added).

33.     Pursuant to Section 6.1(b)(i) of APA Article VI, both Irwin Financial and Irwin Mortgage covenanted and agreed that prior to the Closing:

    a.   Seller would conduct its business in the ordinary course consistent with past practice.  (APA 6.1(b)(i)).

    b.   Seller would not "terminate, cancel or *request any material change in, or agree to any material change in, any Assigned Contract*, Shared Assigned Contract; or enter into, amend, modify, extend, substitute, supplement or renew any material Contract."   (APA 6.1(b)(xii))(emphasis added).

    c.   Seller would "not agree to do, authorize or enter into any contract or otherwise make any commitment to do any of the foregoing...."  (APA (b)(xvii).

34.     Pursuant to Section 6.3(b) of APA Article VI, both Irwin Financial and Irwin Mortgage covenanted and agreed "to obtain as promptly as practicable all waivers, consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained by Seller from any third party."

**Irwin's Deceit**

35.    The APA contemplated that some consents would not have been obtained by the time of the closing.  Accordingly, the APA provides a mechanism for Irwin to obtain such consents after the closing.  Thus, for example, pursuant to Section 9.1(f) of the APA, both Irwin Financial and Irwin Mortgage were required to "use commercially reasonable efforts to obtain as promptly as possible such third party consents as are required hereunder with respect to the transfer of the Assigned Contracts," including the IHE Agreement.

36.    The closing of the sale under the APA in fact took place without Irwin having previously obtained the consent of IHE to the assignment of the IHE Agreement.

37.    After the closing, when Freedom sought to sell mortgages to IHE, IHE initially refused to purchase them.  IHE received from Irwin Mortgage or Freedom tens of millions of dollars worth of original collateral documents for loans which had already been funded by Freedom (or by Irwin Mortgage prior to the closing of the Sale).  But despite having received those loan documents, IHE refused to pay for the loans.  Freedom then demanded that the collateral documents be returned so that Freedom could attempt to sell them to another investor.

38.    IHE improperly refused to honor its consent unless and until Freedom had executed the Addendum.

39.    At this time, Freedom was placed at great risk by IHE's decision to hold the loans hostage to the Addendum.  Not only was the market rapidly deteriorating and placing millions of dollars at risk, but underwriting standards were being revised negatively, so that it was possible that due to IHE's intransigence, the loans at issue could

no longer be sold to any other investor.  Furthermore, on information and belief, IHE knew that Freedom did not have readily available alternative investors for loans of this character under such timing constraints.  In other words, IHE knew that it had Freedom over a barrel, and deliberately proceeded to take unfair advantage.

40.   On information and belief, this was a set-up.  Irwin intentionally planned for the Addendum to slip through the cracks at the heat of the moment, in the processing of documents relating to the closing.  Irwin deliberately took advantage of Freedom to exercise upon its pre-meditated power play to shift the economic advantage of the IHE Agreement from Freedom, an outsider to the Irwin family, and back to its subsidiary IHE.

41.   Irwin required a manager at Freedom, April Schneider, who at the time held the title Senior Vice President, Capital Markets, to sign an "Addendum" to the IHE Agreement, which purported to have the effect of depriving Freedom of certain of the benefits of the IHE Agreement as they existed as of the closing of the APA.

42.   By way of example, under the IHE Agreement that existed at the time of closing, Irwin Mortgage (and consequently its assignee Freedom) was only required to repurchase a loan from IHE if the Mortgagor failed to make the first Monthly Payment due after the Sale Date, as set forth in Section 6.01(d) of the IHE Agreement.  However, the Addendum purports to broaden the repurchase obligation by requiring a repurchase if the Mortgagor fails to make any of the first, second or third payments due after the Sale Date, as set forth in Section D of the Addendum.

43.   At the time that IHE refused to either purchase the loans or return the collateral, IHE – a subsidiary of Irwin Financial – knew or should have known that it was obliged to purchase the loans on the terms in place prior to the Addendum, pursuant to

the IHE Agreement as it existed as of the closing of the APA.  IHE also knew or should have known that its ultimate parent, Irwin Financial, had agreed to require IHE to consent to the assignment of the IHE Agreement without amendment.  However, notwithstanding this knowledge by IHE, IHE nevertheless falsely represented to Freedom's manager, that IHE could and would refuse to purchase the loans, and that IHE could and would refuse to return the collateral documents, unless Freedom executed the Addendum.

44.    Faced with a catastrophic stoppage of business unless the Addendum was signed, and in light of intentionally misleading statements by IHE and other Irwin personnel that IHE could and would refuse to accept the loans or return the collateral documents, Freedom's manager signed the Addendum under sheer duress.

45.    Irwin knew that the Addendum would deprive Freedom of valuable and material benefits of the IHE Agreement.

46.    IHE was, and still is, the an "Affiliate" of Irwin Financial as that term is defined in Section 1.1 of the APA, and an agent of Irwin Financial, because IHE is under the dominion and control of Irwin Financial.  Irwin Financial indirectly owns and possesses the full economic interest in IHE.  IHE reports its financial results on a consolidated basis with Irwin Financial.

**Irwin Is Bound To Compel IHE To Honor The Original IHE Agreement**

47.    Pursuant to Section 9.1(g) of Article IX of the APA, Irwin Financial and Irwin Mortgage are required to cause Affiliates (including IHE) to take actions as follows:

> . . . Seller and Shareholder shall, and shall cause their respective Affiliates to, use commercially reasonable efforts, to assist Buyer at no cost to Buyer to obtain promptly any such approval, consent or waiver...

- 14 -

> [Seller and Shareholder] shall commencing on the Closing
> and prior to obtaining any such approval, consent or waiver,
> ***provide Buyer***, at no cost to Buyer, with ***all of the rights and
> benefits*** (subject to all of the obligations) ***under any such
> Contract***, through the term of such Contact ***including enforcement
> for the benefit of Buyer of any and all rights of the Seller***,
> Shareholder or its Affiliates against any other party arising our of
> any breach or cancellation of any such Contract by such other
> party and, if requested by Buyer, acting as an agent on behalf of
> Buyer or as Buyer shall otherwise reasonably require.

(Emphasis added).

48.     Pursuant to Section 9.1(g) of the APA, Irwin Financial and Irwin Mortgage are each required to use commercially reasonable efforts to obtain IHE's approval to the assignment of the IHE Agreement to Freedom.

49.     Section 9.1(g) also, separately and additionally, requires Irwin Financial and Irwin Mortgage, at no cost to Freedom, to provide Freedom all of the rights and benefits under the IHE Agreement as it existed on the date of closing.

50.     Irwin has failed to provide the benefits of the IHE Agreement to Freedom.

**Irwin Is Obligated To Indemnify Freedom**

51.     Pursuant to Section 10.2 of Article X of the APA, Irwin Financial and Irwin Mortgage shall jointly and severally indemnify, defend and hold harmless Freedom from and against any and all costs, losses, liabilities, obligations, damages, lawsuits, deficiencies, claims, demands, and expenses, as set forth in Section 10.2 (a) (a "Loss"), directly or indirectly based upon, arising out of, resulting from or relating to, for example:

a. Any misrepresentation or inaccuracy in or breach of any of the representations or warranties given or made by Irwin Financial or Irwin Mortgage in the APA. (Section 10.2 (a)(i)).

b. Any breach of or default in connection with any of the covenants or agreements. (Section 10.2 (a)(ii)).

c. Any failure of Irwin Mortgage to service mortgage loans in accordance with the provisions of the Transition Services Agreement. (Section 10.2 (a)(ii)).

52.    Freedom's losses resulted from intentional misconduct by Irwin Mortgage or its Affiliates and, as a result, the Indemnity Threshold in Section 10.2(b) does not apply.

**Irwin Is Obligated to Repurchase Loans**

53.    Pursuant to Section 10.2(c), Irwin Financial and Irwin Mortgage are obligated to repurchase from Freedom any Covered Company Loans, as defined in the APA, which IHE demands that Freedom repurchase.

54.    IHE has demanded that Freedom repurchase Covered Company Loans and, as a consequence, Irwin is obligated to repurchase them from Freedom.

55.    Pursuant to Section 10.2(d) of Article X of the APA, Irwin Financial and Irwin Mortgage are required to required to repurchase from Freedom Company Mortgage Loans, as defined in the APA, as follows:

> In the event that, for the first due date for a Company Mortgage Loan on or subsequent to the Closing Date, the initial monthly payment is not made within thirty (30) days of such due date, or for the second or third due dates following the Closing Date, the related monthly payment is not made within thirty (30) days of such due date, then the Seller or the Shareholder shall repurchase

such Company Mortgage Loan at the Repurchase Price upon demand of the Buyer.

56.     Freedom has demanded that Irwin repurchase Company Mortgage Loans, and Irwin is obligated to repurchase them from Freedom.

57.     Notwithstanding Freedom's demand, Irwin has refused to repurchase the loans.

58.     Irwin's intentional misconduct in concealing the negotiations and agreement to the Addendum, and in compelling that it be signed, has permeated the APA, and it is anticipated that additional representations and provisions breached by Irwin may be identified.

### AS AND FOR A FIRST CAUSE OF ACTION
(Specific Performance)

59.     Plaintiff realleges and incorporate the foregoing paragraphs as if fully set forth herein.

60.     The APA is a valid and enforceable contract.

61.     Plaintiff has performed all of its obligations under the APA.

62.     Pursuant to Section 9.1(g) of Article IX of the APA, Irwin Financial and Irwin Mortgage are required to cause their Affiliate IHE to honor the IHE Agreement with plaintiff as written as of the date of the APA closing and, in specific: (a) provide plaintiff with all of the rights and benefits under the IHE Agreement, and (b) enforce for the benefit of plaintiff any and all rights of Irwin Mortgage under the IHE Agreement.

63.     Irwin Financial has refused to take steps to ensure that its subsidiary, IHE, honors the IHE Agreement as written as of the date of the APA closing.

64.    Irwin Mortgage has refused to take steps to ensure that its Affiliate, IHE, honors the IHE Agreement as written as of the date of the APA closing.

65.    Pursuant to Sections 10.2 (c) of the APA, Irwin Financial and Irwin Mortgage are obligated to repurchase from Freedom Covered Company Loans.

66.    Pursuant to Section 10.2 (d) of the APA, Irwin Financial and Irwin Mortgage are obligated to repurchase from Freedom Company Mortgage Loans.

67.    Irwin has refused to repurchase the Covered Company Loans, and Irwin has refused to repurchase the Company Mortgage Loans.

68.    Pursuant to Section 10.2 of the APA, Irwin Financial and Irwin Mortgage shall jointly and severally indemnify, defend and hold harmless Freedom from and against Losses arising from, among other things, (a) any misrepresentation or inaccuracy in or breach of any of the representations or warranties given or made by Irwin Financial or Irwin Mortgage in the APA, and (b) any breach of or default in connection with any of the covenants or agreements given or made by Irwin Financial or Irwin Mortgage in the APA.

69.    Irwin Financial and Irwin Mortgage made misrepresentations and inaccuracies, including by failing to disclose that they had reached an informal "understanding" with IHE that Section 6.01(d) would be amended to permit IHE to require Irwin Mortgage to buy back EPDs beyond the first 30 days after the sale of the underlying property.

70.    Irwin Financial and Irwin Mortgage breached covenants and agreements they made in the APA, as set forth herein, including by failing to use commercially reasonable efforts to obtain IHE's approval to the assignment of the IHE Agreement to

Freedom, and by failing to provide Freedom with all of the rights and benefits under the IHE Agreement as it existed on the date of closing.

71.    As a result, Freedom has suffered Losses including but not limited to the IHE Action, any further claims by IHE, and all associated costs and expenses.

72.    The balance of equities favors an order of specific performance.

73.    Plaintiff has no adequate remedy at law.

## AS AND FOR A SECOND OF ACTION

(Breach of Contract)

74.    Plaintiff realleges and incorporate the foregoing paragraphs as if fully set forth herein.

75.    The APA is a valid and binding contract.

76.    Plaintiff has performed all of its obligations under the APA.

77.    Irwin has breached Section 9.1(g) of the APA by failing to use commercially reasonable efforts to obtain IHE's approval to the assignment of the IHE Agreement to Freedom.

78.    Irwin has breached Section 9.1(g) of the APA by failing to provide to Freedom all of the rights and benefits under the IHE Agreement as it existed on the date of closing.

79.    Irwin has breached the representations in Sections 4.5, 4.8 (c), 4.10 (b), 4.19 (d), 4.19 (f), 4.20, 4.25 and 4.26 of the APA by failing to disclose that Irwin Mortgage had been negotiating and entering into an agreement (and by in fact negotiating and entering into such an agreement) with its subsidiary, IHE, to materially change the terms of the IHE Agreement that Irwin was assigning to Freedom in order to benefit

Irwin's subsidiary, IHE, at the expense of Freedom. These constitute Seller Material Adverse Effects as defined by the APA.

80.     Irwin has breached Section 6.1(b)(i) of the APA by deviating from conducting business in the ordinary course by negotiating a deal whereby Irwin would divest itself and consequently its assignee Freedom, of the benefits of the IHE Agreement.

81.     Plaintiff has been damaged by Irwin's breaches of the APA, in that, among other things: (a) Freedom is compelled to defend itself against the IHE Action; (b) Freedom faces buy-back demands that it should not have received; and (c) Freedom has lost the availability of this unique contract.

82.     As a result of Irwin's breach of contract, plaintiff has been damaged in an amount to be determined at trial but believed to be in excess of $8,000,000, and plaintiff is entitled to judgment in such amount, together with interest thereon.

<u>**DEMAND FOR RELIEF**</u>

WHEREFORE, Plaintiff Freedom Mortgage Corporation demands judgment as follows:

A.     On the first cause of action, ordering specific performance of the APA, and thereby requiring defendants, jointly and severally:

1.     to compel IHE (a) to abandon further attempts to enforce the Addendum, (b) to acknowledge that the Addendum is void, voidable or rescinded, (c) to concede the IHE Arbitration on the grounds that the Addendum is void, voidable or rescinded, and (d) to reaffirm the terms of the IHE Agreement as it existed at the closing of the sale of the Business;

2.    to repurchase relevant Company Covered Loans and Company Mortgage Loans as required by the APA; and

3.    to indemnify Freedom against the IHE Action and any further claims by IHE; and

B.    On the second cause of action, awarding Plaintiff actual damages against defendants, jointly and severally, in an amount to be determined at trial but reasonably expected to exceed $8,000,000, together with interest thereon; and

C.    Granting Plaintiff such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Freedom Mortgage Corporation demands trial by a jury on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNEL LLP

*William M. Lafferty*

William M. Lafferty (#2755)
Theodore Kittila (#3963)
Karl G. Randall (#5054)
1201 N. Market Street
Wilmington, Delaware  19801
(302) 658-9200

*Attorneys for Plaintiff Freedom Mortgage Corporation*

OF COUNSEL:

ZUKERMAN GORE & BRANDEIS, LLP
John K. Crossman
875 Third Avenue
New York, New York 10022
(212) 223-6700

March 12, 2008

- 21 -

# EXHIBIT 2

BUTY & CURLIANO LLP
Jason J. Curliano
383—4th Street, Third Floor
Oakland, California  94607
Telephone:    510/267-3000
Facsimile:    510/267-0117
Email:        JasonC@ButyCurliano.com

ZUKERMAN GORE & BRANDEIS, LLP
John K. Crossman
Frank C. Welzer
875 Third Avenue
New York, New York 10022
Telephone:    212/223-6700
Facsimile:    212/2223-6433
Email:        jcrossman@zgbllp.com

*Attorneys for Claimant*
*Freedom Mortgage Corporation*

### BEFORE THE NATIONAL ARBITRATION FORUM

```
--- ------------------------------------------------ x
                                                    :
FREEDOM MORTGAGE CORPORATION,                       :
                                                    :
                    Claimant,                       :
                                                    :
        - against -                                 :   INITIAL CLAIM
                                                    :   FOR ARBITRATION
                                                    :
IRWIN HOME EQUITY CORPORATION and                   :
IRWIN UNION BANK AND TRUST COMPANY,                 :
                                                    :
                    Respondents.                    :
-- ------------------------------------------------- x
```

NOTICE TO RESPONDENTS:

    This is an arbitration Claim filed against you with the National Arbitration Forum for

money or other relief.  You have <u>thirty (30) days</u> to deliver to the Claimant and file with the

Forum a Written Response and/or file a Counter Claim, Cross-claim or Third Party Claim in

accord with the Code of Procedure.  If you <u>do not</u> Deliver to the Claimant and file with the

Forum a Written Response within thirty (30) days, an Award may be entered against you.  You

can obtain a free copy of the Code of Procedure from the Claimant or the Forum.

## Summary of the Dispute

1.   Claimant Freedom Mortgage Corporation ("Freedom" or "Claimant") is the victim of

a bait and switch.  Respondent Irwin Home Equity ("IHE") is a member of the Irwin family of

companies.  That family also includes Irwin Mortgage Corporation ("IMC") and Irwin Financial

Corporation ("Irwin Financial").  Freedom contracted with IMC and Irwin Financial to buy

substantially all of the assets of a business of IMC, including assignment of valuable rights under

a contract between IMC and IHE as it existed on the date of closing (the "IHE Agreement" or

sometimes the "pre-'Addendum' IHE Agreement").  However, unbeknownst to Freedom, prior

to the assignment, IHE and IMC had secretly agreed to modify the IHE Agreement to deprive

Freedom of its essential benefits, through a so-called "Addendum" that IHE later would force

upon Freedom through unfair means.  Freedom seeks an order declaring the "Addendum" void,

voidable and rescinded.

## The Parties

2.   Claimant Freedom Mortgage Corporation is a corporation organized under the laws

of the State of New Jersey, having an address at 907 Pleasant Valley Avenue, Suite 3, Mt.

Laurel, New Jersey, 08054.  Freedom is an assignee of the rights of Irwin Mortgage Corporation

("IMC"), which is a signatory to the IHE Agreement.  The IHE Agreement contains an

arbitration clause, which is set forth below.

2

3.  Respondent Irwin Home Equity Corporation ("IHE") is a corporation organized under the laws of the State of Indiana, having an address at 12677 Alcosta Blvd., Suite 500, San Ramon, California, 94583. IHE is a signatory to the IHE Agreement.

4.  Respondent Irwin Union Bank and Trust Company ("IUB") is a corporation organized under the laws of the State of Indiana, having an address at 500 Washington Street, Columbus, Indiana, 47201. IUB is a signatory to the IHE Agreement.

### The Arbitration Agreement

5.  This arbitration claim is based on the agreement of the parties to arbitrate as found in the IHE Agreement, which states in part as follows:

Section 8.09    Arbitration

Upon written request by either party that is submitted according to the applicable rules for arbitration, any claim, demand or cause of action, which arises out of or is related to this Agreement (collectively "Claims"), may be resolved by binding arbitration in the State of California, in accordance with (i) the Federal Arbitration Act; (ii) the Code of Procedure ("Code") of the National Arbitration Forum ("Administrator" or "NAF") and (iii) this Agreement which shall control any inconsistency between it and the Code.

(IHE Agreement, attached as Exhibit A, at § 8.09).

6.  The claims asserted herein arise out of and relate to the IHE Agreement, and are therefore arbitrable at Freedom's election.

### Related Lawsuits

7.  On January 22, 2008, IHE and IUB (collectively "Respondents" or "Irwin") filed a Complaint in the U.S. District Court, Northern District of California (the "IHE Action"). Irwin's Complaint asserts that Freedom breached the IHE Agreement. A copy of Irwin's Complaint in the IHE Action is attached as Exhibit B.

3

8.   Simultaneously with the filing of this Claim, Freedom is moving in the IHE Action for dismissal and/or stay of that action on the grounds of the arbitration clause, and to compel arbitration herein, in the IHE Arbitration.

9.   Also simultaneously with the filing of the Claim, Freedom is commencing an action in the U.S. District Court, District of Delaware (the "Injunction Action"), against Irwin's parent, Irwin Financial, and IMC.   In that action, Freedom seeks specific performance compelling Irwin Financial to direct its wholly-controlled subsidiaries, IHE and IUB, to cease pursuing the claims that are subject of the IHE Action.   Freedom also seeks an order compelling Irwin Financial to buy back loans that Respondents are demanding Freedom repurchase.   A copy of Freedom's Complaint in the Injunction Action (without exhibits) is attached as Exhibit C.

10.   The Injunction Action seeks to compel Irwin Financial to require its wholly-controlled subsidiaries to abandon the IHE Action and to concede the IHE Arbitration on grounds that the "Addendum" is void.   Accordingly, at the outset of this arbitration, Freedom will request that the Panel abstain from conducting further proceedings until the Injunction Action is resolved.   The outcome of the Injunction Action should result in the dismissal of this proceeding.

## Factual Allegations

### The IHE Agreement

11.   On or about December 11, 2003, Respondents entered into the IHE Agreement with Irwin Mortgage Corporation ("IMC").   IMC is a member of the Irwin family.   Like IHE and IUB, IMC is controlled by its parent, Irwin Financial.

4

12.   The IHE Agreement (Exhibit A, which does <u>not</u> include, and is not defined herein to include, the so-called "Addendum") is a correspondent loan purchase and sale agreement.  It confers upon IMC the right to sell mortgage loans to IHE under the terms and subject to the conditions set forth therein.

13.   The IHE Agreement contains several valuable commercial terms which IMC could not obtain from any other mortgage loan purchasers or "investors" in the market.   One of these terms relates to the limited ability of Respondents to demand that IMC repurchase a loan, under a condition referred to in the industry as an "early payment default" or "EPD."  In specific, Article VI of the IHE Agreement provides that

> Following the purchase of any Loan by [Respondents] pursuant to this Agreement, and notwithstanding the review of the Mortgage Loan Documents pursuant to Article II hereof, it will be deemed a "Defect" in the Mortgage Loan should any one or more of the following events occur in regard to a Mortgage Loan:

> (d) The Mortgagor fails to make the first Monthly Payment due to [Respondents] after the Sale Date within thirty (30) days of the Monthly Payment Due Date, regardless of whether such payment is subsequently paid by the Mortgagor or if any Monthly Payment in the form of a check is returned for insufficient funds thus causing the delinquency to occur

IHE Agreement, Section 6.01(d).  (Exh. A at pp. 13-14).

14.   Section 6.10(d) of the pre-"Addendum" IHE Agreement is a material term that confers tremendous value upon IMC.  It benefits IMC by only treating EPDs during the first 30 days (<u>i.e.</u>, the first monthly payment) after sale of the underlying property as "defects" triggering repurchase.  The EPD provision in the IHE Agreement was more favorable to IMC than EPD provisions offered by other investors, which sometimes treat EPDs during the first 90 days (<u>i.e.</u>, the first, second or third monthly payments) after sale as defects requiring repurchase.

5

15. The pre-"Addendum" IHE Agreement also requires Respondents to purchase certain mortgage loans which had been underwritten according to underwriting guidelines which were not "industry standard" guidelines. The underwriting guidelines contained in the IHE Agreement were more favorable to IMC than industry standard guidelines.

## The Irwin Companies' Secretive Negotiations and Agreement

16. In or about January 2006, Irwin Financial and IMC began to look for potential purchasers for IMC's business of originating and selling mortgage loans through retail, wholesale, direct lending and correspondent divisions.

17. Upon information and belief, in or about that same time period, IHE and IMC talked privately about making large-scale changes to key terms of the IHE Agreement. As a result, IHE and IMC reached an informal "understanding" -- not disclosed to Freedom -- that Section 6.01(d) would be amended to permit IHE to require IMC to buy back EPDs beyond the first 30 days after the sale of the underlying property. Such later EPDs would be considered as "defects" triggering IMC's repurchase obligation. They agreed to amend Section 6.01(d) to include EDPs within a time period of at least 90 days from the sale date.

18. This change would significantly increase the number of loans that IHE could reject as defective. As a result, the amendment would materially change the terms of the IHE Agreement; it would considerably reduce the value of the IHE Agreement to IMC and, consequently, to any assignee of IMC's rights and obligations, including Freedom.

## Irwin's Sale to Freedom

19. In April 2006, Freedom entered into discussions with IMC's parent, Irwin Financial, concerning an acquisition of IMC -- discussions which would lead eventually to Freedom's

purchase of IMC's Business (as later defined in the asset purchase agreement), and the assignment to Freedom of IMC's rights under the IHE Agreement.

20.    On May 15, 2006, Freedom and Irwin Financial entered into a Letter of Intent for a sale of the Business. Thereafter, Freedom undertook due diligence. During due diligence, IHE and IMC informed Freedom that IHE had never demanded a repurchase of any mortgage loan sold to it by IMC and represented that there were no IMC records concerning any such repurchase demands, and IHE and IMC failed to disclose their informal "understanding" set forth in paragraph 17.

21.    On August 7, 2006, Freedom, IMC and Irwin Financial entered into an Asset Purchase Agreement (the "APA") by which Freedom purchased from IMC and Irwin Financial substantially all of the assets of the Business, as defined in the APA. A copy of the APA Agreement (without most schedules) is attached as Exhibit D.

22.    The closing of the sale pursuant to the APA (the "Sale") took place in two stages: The first closing of the Sale, which concerned the Operating Assets of the Business (as defined in the APA), took place effective as of September 18, 2006. The second closing of the Sale, which concerned the Warehouse Assets (as defined in the APA), took place effective as of September 26, 2006.

23.    The IHE Agreement was one of the assets included in Freedom's purchase of the Business. The IHE Agreement was specifically listed (without reference to the "Addendum") as a "Purchased Asset" on schedule 1.1(b)(iii). Pursuant to the APA, Freedom was to be assigned all of IMC's rights under the IHE Agreement. As referenced in the APA, the terms of the IHE Agreement included neither the "Addendum," nor the informal "understanding" reached by IHE and IMC earlier in 2006.

24. The APA required that IMC obtain the approval and consent of third parties, including IHE, and that pending such approval and consent Freedom shall be entitled to all of the benefits of the assigned contracts including the IHE Agreement. APA Sections 6.3(b), 9.1(g).

25. During the entire time that IMC, Irwin Financial and Freedom were negotiating the sale, IMC continued to submit loans (totaling millions of dollars of unpaid principal balances) to IHE for purchase pursuant to the IHE Agreement. IMC submitted to IHE the original collateral documents ("Collateral Documents"), which any purchaser would require before funding a loan.

**The Irwin Companies' Misrepresentations**

26. In the APA, IMC (identified as the "Seller") and Irwin Financial (the "Shareholder") made numerous representations and warranties to the effect that the IHE Agreement had not been amended, and that they had not instituted or permitted any material change in the conduct of the Business. See, e.g., APA Sections 4.5, 4.8 (c), 4.10 (b), 4.19 (d), 4.19 (f), 4.20, 4.25 and 4.26.

27. IMC and its parent represented and warranted that they had not omitted any material fact required to make the statements in the APA not misleading (APA Section 4.26).

28. For the time period between August 7, 2006, to the date of the Closing, the APA required IMC to "use its commercially reasonable efforts to preserve its business intact ... and to preserve current relationships with ... others having business dealing with it." (APA Section 6.1(b)(iv)).

29. On September 18, 2006, IMC closed its sale of the Business operations to Freedom.

30. Prior to closing, without notice to Freedom, executives at IHE and IMC committed to reduce to writing, in a so-called "Addendum," their agreement to modify the terms of the IHE Agreement to the benefit of IHE and to the detriment of IMC. At the time, both IHE and IMC knew that this would prejudice Freedom as assignee of IMC's rights.

8

31.   On or about September 26, 2006, Edwin Corbin, Senior Vice President at IHE and Vice President Home Equity Lending at IUB, executed the "Addendum."

**The Pressure Mounts On Freedom**

32.   On September 28, 2006, the date of the Second Closing, Carolyn Dabrowski of IHE sent an email to Tim Nierste at Freedom indicating that "because [IMC] is now Freedom and we do not have a signed contract with Freedom," IHE had ceased providing weekly rate changes pertaining to pricing of mortgage loans.

33.   By this time, Freedom was awaiting IHE's response to the loans which had been submitted to IHE by IMC.  Freedom also wanted to submit additional loans to IHE for purchase, per the IHE Agreement.

34.   IHE was abnormally slow to complete its loan review process.  IHE appeared to be stalling.  This was a serious concern to Freedom.  Freedom's life-blood is funding, from a purchaser such as IHE, in order to continue the cycle of acquiring mortgage loans and packaging them for sale to investors.

35.   In light of IHE's delays, Freedom determined that it would seek to sell the loans to investors other than IHE.  Freedom sought the return of the Collateral Documents in order for it to sell the loans to other investors.

36.   IHE ignored Freedom's demands that IHE return the Collateral Documents.  Upon information and belief, IHE advised Freedom personnel that IHE would not return the Collateral Documents until it had received an executed copy of the "Addendum."

37.   By refusing to return the Collateral Documents, IHE prevented Freedom from selling the loans to other investors.  Moreover, even if IHE had returned the Collateral Documents to enable a resale to another investor, Freedom was exposed to losses on pricing.

9

Freedom had priced its loans to borrowers based upon IHE's pricing, which at the time was better than that available in the general market. The market was becoming volatile. This put Freedom in a precarious position due to variables inherent in the mortgage loan market, including fluctuating interest rates and revisions to underwriting guidelines. As these factors reduced the value of the loans on the market, IHE exposed Freedom to increasingly substantial losses.

38.   As a result of IHE's refusal to "fund or return," Freedom faced a liquidity crisis. The loans submitted to IHE consumed a portion of Freedom's warehouse line of credit. Freedom anticipated that IHE would purchase the loans, per the IHE Agreement, but because IHE would not fund them, IHE bottled up Freedom's line of credit. Freedom could not repay warehouse lines for these loans, and Freedom could not fund new loans.

39.   Time was not available to take any course of action other than to capitulate.

**The "Addendum" Is Forced Upon Freedom**

40.   On October 2, 2006, April Schneider, Freedom's Senior Vice President for Capital Markets, was presented with the "Addendum" by Wayne Throgmorton. Until September 18, Throgmorton was IMC's First Vice President. On September 18, Throgmorton became Freedom's First Vice President. Throgmorton indicated that he had received it from Wade Hinkle, who, as of September 18, 2006, was Associate Counsel at Freedom. Prior to that date, Hinkle worked for IMC.

41.   On information and belief, faced with a stoppage of business unless the "Addendum" was signed, Ms. Schneider signed the "Addendum." Ms. Schneider signed the "Addendum" under sheer duress.

10

42.   IHE sent Freedom letters dated February 21, 2007, April 19, 2007, May 11, 2007, June 14, 2007 and January 11, 2008, demanding that Freedom repurchase mortgage loans with unpaid principal balances totaling approximately $ 8.3 million, pursuant to the IHE Agreement "as amended by that certain Addendum..." (Copies of the demand letters are attached as Exhibits F, G, H, I and J to Irwin's Complaint in the IHE Action, which is attached as Exh. B).

43.   Freedom has demanded that IHE honor the IHE Agreement as it existed as of the time of Closing, without reference to the so-called "Addendum."

44.   In the event that the Panel denies Freedom's request to have the arbitration stayed pending the Injunction Action, Freedom asserts the following claims.

## Claim For Declaratory Judgment

45.   Freedom seeks a judgment declaring the "Addendum" to be declared void, voidable, and rescinded for the following reasons:

        a.   IHE obtained Ms. Schneider's signature on the "Addendum" through economic duress. Cal. Civ. Code § 1689(b)(1).

        b.   IHE obtained Ms. Schneider's signature on the "Addendum" by fraud. (Cal. Civ. Code § 1689(b)(1)).

        c.   IHE obtained Ms. Schneider's signature on the "Addendum" by negligent misrepresentation.  (Cal. Civ. Code § 1689(b)(1))

46.   Freedom seeks a judgment that the "Addendum" is void because it was not supported by adequate consideration.  (Cal. Civ. Code § 1698).

11

## Alternative Claims

47.  In the alternative, by pressuring and tricking Freedom into executing the "Addendum," IHE breached the covenant of good faith and fair dealing implied in the IHE Agreement that it would not frustrate Freedom's ability to exercise its rights under the IHE Agreement.

48.  IHE's misconduct amounts to misrepresentation and fraud.

49.  As a result, Freedom has sustained damages in an amount to be determined and reasonably believed to exceed $8 million.

## Third Claim

50.  IHE is wholly controlled by Irwin Financial, its parent, and is accordingly bound to accede to its parent's contractual obligations to Freedom under the APA.

## DEMAND FOR RELIEF

51.  Claimant Freedom seeks: (a) a declaration that the "Addendum" is rescinded, or a declaration declaring the "Addendum" to be null and void; (b) damages in an amount to be determined and reasonably believed to exceed $8 million; (c) prejudgment interest and postjudgment interest as provided by law; (d) costs and attorneys' fees as provided under Section 8.10 of the IHE Agreement and by law; and (e) any and all other relief which the National Arbitration Forum deems just and proper.

## REQUEST FOR STAY OF ARBITRATION

52.  On March 12, 2008, Freedom filed a Complaint in the United States District Court, District of Delaware, seeking an order enjoining Irwin Financial Corporation to compel its

wholly-controlled subsidiaries to cease pursuing the claims that are subject of the IHE Action. (See Complaint, attached as Exh. C). The outcome of that action could, and should, render this arbitration moot. As a result, in the interests of efficiency and judicial economy, Freedom seeks an order holding this arbitration in abeyance pending the outcome of the action currently pending in Delaware between Freedom and Respondents' parent company.

Dated:    New York, New York
          March 12, 2008

                                        Respectfully Submitted,

                                        ZUKERMAN GORE & BRANDEIS, LLP


                              By: _____
                                        John K. Crossman
                                        Frank C. Welzer
                                        875 Third Avenue
                                        New York, New York 10022
                                        212.223.6700

                                        - and -

                                        BUTY & CURLIANO LLP
                                        Jason J. Curliano
                                        383—4th Street, Third Floor
                                        Oakland, California 94607
                                        Telephone:510/267-3000
                                        Facsimile: 510/267-0117

                                        *Attorneys for Claimant*
                                        *Freedom Mortgage Corporation*

---

[1]     Application for admission *pro hac vice* pending.

### Claimant's Affidavit of Authenticity

I, Brian Simon, am Chief Operating Officer for claimant Freedom Mortgage Corporation. I have read the foregoing Initial Claim for Arbitration, which was prepared with the assistance of counsel. I am familiar with the contents, and subject to the right to supplement or amend should further information become available. I assert under penalty of perjury, that the facts supporting the Claim, the supporting Documents and the Arbitration Agreement are accurate and correct to the best of my knowledge, information and belief.

_____
Brian Simon

Sworn to before me
this 12 day of March, 2008

_____
Notary Public
Nicole M. DiCamillo
Notary Public of New Jersey
My Commission Expires Febuary 12, 2012

14