1   DAVID J. BERGER (Bar No. 147645)
    DOMINIQUE-CHANTALE ALEPIN (Bar No. 241648)
2   WILSON SONSINI GOODRICH & ROSATI
    650 Page Mill Road
3   Palo Alto, CA 94304
    Telephone: (650) 493-9300
4   Facsimile: (650) 493-6811
    dalepin@wsgr.com
5
    JENNY L. DIXON (Bar No. 192638)
6   WILSON SONSINI GOODRICH & ROSATI
    One Market Street
7   Spear Tower, Suite 3300
    San Francisco, CA 94105
8   Telephone: (415) 947-2000
    Facsimile: (415) 947-2099
9   jldixon@wsgr.com

10  Attorneys for Plaintiffs
    IRWIN UNION BANK AND TRUST COMPANY
11  and IRWIN HOME EQUITY CORPORATION

12

13              UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION
14

15  IRWIN UNION BANK AND TRUST          )   CASE NO.:  C08-00472-PJH
    COMPANY AND IRWIN HOME EQUITY       )
16  CORPORATION,                        )   Action filed: January 22, 2008
                                        )
17          Plaintiffs,                 )   **SUPPLEMENTAL DECLARATION**
                                        )   **OF JENNY L. DIXON IN SUPPORT**
18      v.                              )   **OF PLAINTIFFS' RESPONSE RE:**
                                        )   **DEFENDANT FREEDOM**
19  FREEDOM MORTGAGE COMPANY,           )   **MORTGAGE CORPORATIONS**
                                        )   **MOTION TO DISMISS OR STAY**
20          Defendants.                 )   **ACTION AND FOR AN ORDER**
                                        )   **COMPELLING ARBITRATION**
21                                      )
                                        )
22                                      )   Date:   April 30, 2008
                                        )   Time:  9:00 a.m.
23                                      )   Courtroom: 3
                                        )   Hon. Phyllis J. Hamilton
24                                      )
                                        )
25  _____ )

26

27

28
    SUPPLEMENTAL DECL. OF JENNY L.                          3342306_2.DOC
    DIXON ISO PLTFS' RESPONSE RE: DEF'S
    MOT. TO DISMISS OR STAY AND FOR
    ORDER COMPELLING ARB.
    CASE NO. C08-00472-PJH

1    I, Jenny L. Dixon, declare:

2    1.    I am an attorney with the law firm of Wilson Sonsini Goodrich & Rosati, a

3    Professional Corporation, counsel of record for Plaintiffs Irwin Union Bank and Trust Company

4    ("Irwin Union") and Irwin Home Equity Corporation ("IHE").  I make this supplemental

5    declaration in support of Plaintiffs' Response to Defendant Freedom Mortgage Corporation's

6    ("Freedom") Motion to Dismiss or Stay Action and for an Order Compelling Arbitration.  I have

7    personal knowledge of the facts set forth herein, and if called to testify, could and would testify

8    competently thereto.

9    2.    On April 15, 2008, the Case Coordinator for the National Arbitration Forum

10    notified the parties to the arbitration, *Freedom Mortgage Corporation v. Irwin Home Equity*

11    *Corporation & Irwin Union Bank and Trust Company*, File Number MX080300205823, that the

12    arbitration had been stayed pending resolution of court action.  A true and correct copy of the

13    notification has been attached as Exhibit 3 to this declaration.

14    3.    On April 23, 2008, Irwin Financial Corporation ("IFC") and Irwin Mortgage

15    Corporation ("IMC") filed a Motion to Dismiss, Stay or Transfer to Northern District California

16    ("Motion to Dismiss") in the related case *Freedom Mortgage Corporation v. Irwin Financial*

17    *Corporation and Irwin Mortgage Corporation*, 08-cv-00146-GMS (D. Del.).  A true and correct

18    copy of the Motion Dismiss and its supporting documents is attached as Exhibit 4 to this

19    declaration.

20    I declare under penalty of perjury under the laws of the State of California that the

21    foregoing is true and correct of my own personal knowledge, and that this declaration is executed

22    the 24th day of April 2008 at San Francisco, California.

23

24    /s/ Jenny L. Dixon
    Jenny L. Dixon

25

26

27

28

SUPPLEMENTAL DECL. OF JENNY L.                    -1-
DIXON ISO PLTFS' RESPONSE RE: DEF'S
MOT. TO DISMISS OR STAY AND FOR
ORDER COMPELLING ARB.
CASE NO. C08-00472-PJH

3342306_2.DOC

# EXHIBIT 3
# SUPP DIXON DEC

NATIONAL ARBITRATION
# FORUM.

April 15, 2008

Wilson Sonsini Goodrich & Rosati PC
David J. Berger & Jenny L. Dixon
One Market Street
Spear Tower, Suite 3300
San Francisco, CA 94105

Buty & Curliano LLP
Jason J. Curliano
383-4th St
Third Floor
Oakland, CA 94607
VIA EMAIL

Zukerman Gore & Brandeis LLP
John K. Crossman & Frank C. Welzer
875 Third Ave
New York, NY 10022
VIA EMAIL

Wilson Sonsini Goodrich & Rosati PC
David J. Berger & Jenny L. Dixon
650 Page Mill Rd
Palo Alto, CA 94304

**RE: Freedom Mortgage Corporation v Irwin Home Equity Corporation & Irwin Union
Bank and Trust Company
File Number: MX0803002058323**

Dear Parties:

The Forum is in receipt of a Notice from the Claimant stating that a court action has been filed
regarding the above referenced matter.

Pursuant to Rule 9F(2) of the Code of Procedure, the above case is now Stayed with the Forum
pending the resolution of the court action. The Parties are directed to keep the Forum apprised of
the outcome of the court action.

**NATIONAL ARBITRATION**
**FORUM**®

The Parties are reminded that all correspondence submitted to the Forum must also be delivered to all Parties in accord with Code of Procedure Rule 6D.

Sincerely,

Brock Peterson
Case Coordinator
1-800-474-2371 x6614
Fax: 1-866-695-1907

# EXHIBIT 4
# PART 1
# SUPP. DIXON DEC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FREEDOM MORTGAGE CORPORATION,          )
           Plaintiff,          )
                                    )
                                    )
        v.          )       C. A. No. 08-146-GMS
                                    )
IRWIN FINANCIAL CORPORATION, and          )
IRWIN MORTGAGE CORPORATION,          )
                                    )
           Defendants.          )
                                    )

## DEFENDANTS' MOTION TO DISMISS, STAY OR TRANSFER
## TO THE NORTHERN DISTRICT OF CALIFORNIA

        Defendants Irwin Financial Corporation ("IFC") and Irwin Mortgage Company ("IMC"),

by and through their undersigned counsel, move this Court for an order in the form attached

hereto to dismiss, or in the alternative stay or transfer this action. The grounds for this motion

are set forth in Defendants' Opening Brief in Support of Their Motion to Dismiss, Stay, or

Transfer to the Northern District of California and the Declaration of Dominique-Chantale

Alepin filed contemporaneously herewith.

OF COUNSEL:

David J. Berger
Dominique C. Alepin
Wilson Sonsini Goodrich & Rosati, PC
650 Page Mill Road
Palo Alto, California 94304-1050
(650) 493-9300

Jenny L. Dixon
Wilson Sonsini Goodrich & Rosati, PC
One Market Street
Spear Tower, Suite 3300
San Francisco, California 94105
(415) 947-2000

Raymond L. DiCamillo (#3188)
dicamillo@rlf.com
Richards, Layton & Finger
920 N. King Street
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2008, I caused to be served by electronic service and hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

William J. Lafferty
Theodore Kittila
Karl G. Randall
Morris, Nichols, Arsht & Tunnell, LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

I further certify that on April 23, 2008, the foregoing document was served by electronic service and Federal Express to the following:

John K. Crossman
Frank C. Welzer
Zukerman Gore & Brandeis, LLP
875 Third Avenue
New York, NY 10022

Raymond J. DiCamillo (#3188)
dicamillo@rlf.com

RLF1-3276189-1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FREEDOM MORTGAGE CORPORATION,   )
           Plaintiff,                                )
                              )
                              )
           v.                                       )        C. A. No. 08-146-GMS
                              )
IRWIN FINANCIAL CORPORATION, and   )
IRWIN MORTGAGE CORPORATION,        )
                              )
           Defendants.                              )

**DEFENDANTS' OPENING BRIEF IN SUPPORT
OF THEIR MOTION TO DISMISS, STAY OR TRANSFER
TO THE NORTHERN DISTRICT OF CALIFORNIA**

Raymond J. DiCamillo (#3188)
dicamillo@rlf.com
Richards, Layton & Finger
920 N. King Street
Wilmington, DE 19899
(302) 651-7700
*Attorneys for Defendants*

OF COUNSEL:

David J. Berger
Dominique-Chantale Alepin
Wilson Sonsini Goodrich & Rosati, PC
650 Page Mill Road
Palo Alto, California 94304-1050
(650) 493-9300

Jenny L. Dixon
Wilson Sonsini Goodrich & Rosati, PC
One Market Street
Spear Tower, Suite 3300
San Francisco, California 94105
(415) 947-2000

Dated: April 23, 2008

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ............................................................................................................... 1

NATURE AND STAGE OF PROCEEDINGS ................................................................... 2

SUMMARY OF ARGUMENT ........................................................................................... 2

STATEMENT OF FACTS .................................................................................................. 3

    A.    The Parties Involved In The Dispute ..................................................... 3

    B.    The Subject Of The Dispute ................................................................... 3

    C.    The Duplicative Proceedings ................................................................. 4

ARGUMENT ...................................................................................................................... 8

    I.    THE COURT SHOULD DISMISS, STAY OR TRANSFER THIS ACTION UNDER THE FIRST-FILED RULE ..................................... 8

        A.    The First-Filed Rule .......................................................................... 8

        B.    Because the California Action Is The First-Filed Action, The Delaware Action Should Be Dismissed, Stayed Or Transferred ............. 10

            1.    The Two Actions Are Duplicative ............................................... 10

            2.    A Complete Identity of Parties Is Not Required For Application Of The First-Filed Rule ............................................ 11

            3.    Minor Variances in Issues Do Not Prevent Application of the First-Filed Rule ................................................................. 14

            4.    The Circumstances Surrounding The Filing of This Suit Weigh In Favor Of The Dismissal, Stay Or Transfer Of This Action ................................................................................. 15

            5.    The California Action Is Progressing at a Faster Pace Than This Case Prompting Application of the First-Filed Rule ............. 16

CONCLUSION .................................................................................................................. 17

## TABLE OF AUTHORITIES

Page(s)

### CASES

*(888) Justice, Inc. v. Just Enters., Inc.,*
No. 06-CV-6410 (GBD), 2007 WL 2398504 (S.D.N.Y. Aug. 22, 2007)......................................8

*Abovepeer, Inc. v. Recording Industry Ass'n of America, Inc.,*
166 F. Supp. 2d 655 (N.D.N.Y. 2001), aff'd, sub. nom.
*BuddyUSA, Inc. v. Recording Indus. Ass'n of Am., Inc.,*
21 Fed. Appx. 52 (2d Cir. 2001) ..........................................................................................11

*Advanta Corp. v. Visa U.S.A., Inc.,*
No. Civ. A 96-7940, 1997 WL 88906 (E.D. Pa. Feb. 19, 1997) .........................................9, 11

*Alltrade, Inc. v. Uniweld Products, Inc.,*
946 F.2d 622 (9th Cir. 1991) ..............................................................................................8, 9

*Centocor, Inc. v. MedImmune, Inc.,*
No. C 02-03252 CRB, 2002 WL 31465299 (N.D. Cal. Oct. 22, 2002)....................................9

*Certainteed Corp. v. Celotex Corp.,*
No. Civ. A. 471, 2005 WL 217032 (Del. Ch. Jan. 24, 2005) ............................................6, 7

*E.E.C.O. v. Univ. of Pa.,*
850 F.2d 969 (3d Cir. 1988), *aff'd on other grounds,* 493 U.S. 182 (1990)......................... passim

*Ethypharm S.A. France v. Bentley Pharmaceuticals, Inc.,*
388 F. Supp. 2d 426 (D. Del. 2005)........................................................................................13

*Hanover Fire & Cas. Ins. Co. v. Sieron,*
No. Civ. A. 06-2758, 2007 WL 120058 (E.D. Pa. Jan. 9, 2007) ....................................9, 11, 14

*Lafferty v. St. Riel,*
495 F.3d 72 (3d Cir. 2007).......................................................................................................8

*Pacesetter Sys., Inc. v. Medtronic, Inc.,*
678 F.2d 93 (9th Cir. 1982) ......................................................................................................8

*Pearson v. Component Technology Corp.,*
247 F.3d 471 (3d Cir. 2001)....................................................................................................13

*Shire U.S., Inc. v. Johnson Matthey, Inc.,*
No. 07-CV-2958, 2008 WL 399333 (E.D. Pa. Feb. 14, 2008) ...........................................9, 10

*Time Warner Cable, Inc. v. GPNE Corp.,*
497 F. Supp. 2d 584 (D. Del. 2007)...................................................................................9, 10, 11

### STATUTES

28 U.S.C. § 1406(a) ...........................................................................................................2, 8

Fed. R. Civ. P. 12(b)(3)............................................................................................2, 8

Fed. R. Civ. P. 19....................................................................................................12

RLF1-3276209-1

## INTRODUCTION

This action is an attempt to defeat the first-filed action pending in the United States District Court for the Northern District of California (the "California action") that involves related parties litigating essentially the same subject matter and issues presented by this case. In an effort to avoid the first-filed rule, plaintiff in this case has transformed a straight-forward breach of contract action into a multi-headed hydra, complete with competing actions in parallel, cross-country litigations.

In the California action, Irwin Home Equity Corporation ("IHE") and Irwin Union Bank and Trust Company ("Irwin Union"), subsidiaries of defendant Irwin Financial Corporation ("IFC"), have sued plaintiff Freedom Mortgage Corporation ("Freedom") for breach of an agreement to repurchase particular defective mortgage loans. In this action, Freedom has sued IFC and another one of its subsidiaries, defendant Irwin Mortgage Company ("IMC"), under a different but related contract (an asset purchase agreement) seeking a determination that Freedom does not have an obligation to repurchase the loans that are the subject of the California action. Freedom contends that IFC and IMC are in breach of the asset purchase contract because IHE and Irwin Union have sought to enforce their contractual rights against Freedom in the California action. Freedom makes passing reference to the existence of these related proceedings but purports to distinguish the California action as involving claims concerning different parties and a different contract. The truth is that the cases are mirror actions of each other; indeed the substance of the relief that Freedom seeks in this action is that IFC compel its subsidiaries IHE and Irwin Union to abandon their claims against Freedom and perform the contract at issue in the California action. Simply put, Freedom has taken its affirmative defenses to the claims in the California action and asserted them as claims against IFC and IMC before this Court.

Freedom attempts to hide this reality by not specifically naming IHE and Irwin Union -- the plaintiffs in the California action -- as defendants in this action. However, IHE and Irwin Union are clearly necessary parties as this action will attempt to litigate whether acts by those parties were improper. Indeed, the claims brought in this case should have been filed as

counterclaims in the California action. This type of duplicative litigation and gamesmanship is precisely the behavior that the first-filed rule is designed to address and rectify.

As discussed below, the Court should dismiss or stay this action or order that it be transferred to the Northern District of California for consolidation with the California action.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff filed its Complaint on March 13, 2008. Pursuant to stipulation and an order entered by this Court on April 7, 2008, the date for responding to the Complaint was extended to April 23, 2008.

## SUMMARY OF ARGUMENT

Defendants move for an order dismissing, staying or transferring this action to the Northern District of California pursuant to the first-filed rule and under Fed. R. Civ. P. 12(b)(3) or 28 U.S.C. § 1406(a). Under the first-filed rule, subsequently filed, duplicative litigation is dismissed, stayed or transferred in favor of the first-filed litigation. Here, the Northern District of California first had possession of the subject matter of this action by virtue of the litigation filed by IHE and Irwin Union. The California action involves litigation of the same obligations and rights at issue here in this second-filed action. Plaintiff's attempt to plead around this action does not alter the fact that this action is duplicative of the California action and that its claims could have (and should have) been brought in the California action. The interests of judicial economy and comity dictate the dismissal, stay or transfer of this second-filed action.

## STATEMENT OF FACTS

### A.    The Parties Involved In The Dispute

Defendant IFC is a bank holding company which provides a broad range of financial services to consumers and small businesses.    Declaration of Dominique-Chantale Alepin ("Alepin Decl."), Ex. A; Request for Judicial Notice filed herewith at 2.    As a holding company, IFC is the owner (directly or indirectly) of several subsidiaries including defendant IMC, and non-parties Irwin Union and IHE.[1]    Alepin Decl., Ex. A.    Each of these Irwin Entities fulfills a specific purpose in the banking world.    Irwin Union provides commercial banking to consumers and small businesses in the Midwest and Western United States.    *Id.*    IHE originates and services first and second mortgages.    *Id.*    IMC was a national mortgage lender and loan service provider. *Id.*

Plaintiff Freedom is in the mortgage loan business.    Freedom's Complaint and Jury Demand ("Compl.") ¶ 1.    As discussed below, Freedom acquired IMC's mortgage origination assets through an asset purchase.    *Id.*

### B.    The Subject Of The Dispute

In May 2006, Freedom and IMC signed a letter of intent regarding the potential sale of certain IMC assets and Freedom began conducting due diligence on IMC's business.    Compl. ¶ 19.    After completing its due diligence, Freedom purchased certain assets, and assumed certain liabilities, from IMC in accordance with the Asset Purchase Agreement dated as of August 7, 2006.    *Id.* ¶¶ 22-23.    Among the assets assigned to Freedom under the Asset Purchase Agreement was a previously existing Correspondent Loan Purchase and Sale Agreement, dated as of December 11, 2003, as modified by the Addendum to Correspondent Loan Purchase and Sale Agreement (Third Party Originators) dated January 6, 2004, and the Addendum to Correspondent Loan Purchase and Sale Agreement (Non-Standard Loans) dated February 10,

---

[1]  Collectively, IFC, Irwin Union, IHE and IMC will be referred to as the "Irwin Entities".

2004 (together, the "Loan Purchase Agreement") between IHE and Irwin Union, on the one hand, and IMC, on the other hand.[2] Compl. ¶¶ 1, 24-27.

Under the Loan Purchase Agreement, IMC could sell mortgage loans to IHE and Irwin Union from time to time if the loans complied with specific guidelines. Compl. ¶ 26 and Exhibit B thereto; *see also* Alepin Decl. Ex. B (hereinafter referred to as the "Cal. Compl."). IMC (and subsequently, Freedom), however, were obligated to repurchase from IHE and Irwin Union any loans which were "defective." Compl. ¶ 27; Cal. Compl. ¶¶ 16-18. "Defective" loans included, among others, those on which the first payment had not been made. Compl. Exhibit B at 14; Cal. Compl. ¶ 17. After the asset purchase closed, Freedom executed an Addendum to Correspondent Loan Purchase and Sale Agreement (Termination of Non-Standard Loans and Other Modifications) dated as of October 2, 2006 (which Freedom refers to as the "Addendum") that expanded the definition of "defective" loans to include those on which the first, second and/or third payments had not been made. Compl. ¶¶ 41-42. Numerous loans that Freedom originated and sold to IHE and Irwin Union after the asset purchase closed were "defective" for one or more reasons either under the Loan Purchase Agreement or the Addendum. Cal. Compl. ¶¶ 29-36. IHE and Irwin Union made numerous requests throughout 2007 and into 2008 that Freedom repurchase these loans as required under the Loan Purchase Agreement. Compl. ¶ 6; Cal. Compl. ¶¶ 33-36.

Freedom has refused to repurchase these defective loans (Compl. ¶ 6) and now contends that the Addendum is void and unenforceable under a variety of legal theories. *Id.* at 20-21.

### C.    The Duplicative Proceedings

On January 22, 2008, IHE and Irwin Union filed suit in the United States District Court for the Northern District of California against Freedom based on the venue provision in the Loan Purchase Agreement. *See* Cal. Compl., Ex. A § 8.11 ("[a]ny action between the parties relating

---

[2] Freedom refers to the Loan Purchase Agreement as the "IHE Agreement." Compl. ¶ 1.

to or arising under this Agreement shall be tried in the federal or state courts located in Contra Costa County, California.").[3]  IHE and Irwin Union asserted two claims:  breach of the Loan Purchase Agreement and Addendum given Freedom's repeated refusals to repurchase defective loans (Cal. Compl. ¶¶ 38-44) and for negligence in that Freedom had made certain misrepresentations with respect to the condition of the loans submitted to IHE and Irwin Union for purchase (Cal. Compl. ¶¶ 45-53).  The terms of the Loan Purchase Agreement and Addendum were specific as to what constituted "defective" loans and what events gave rise to Freedom's obligation to repurchase such loans from IHE and Irwin Union.

Freedom had a range of options for responding to the claims by IHE and Irwin Union in the California action, including asserting affirmative defenses, such as the contention that the Addendum (which only covers a fraction of the loans that were subject to repurchase) was void or voidable, bringing counter-claims against IHE and Irwin Union, and any cross-claims against third parties, such as IFC and IMC, or moving to join IFC and IMC as necessary parties. Freedom however chose a more convoluted route designed to defeat IHE and Irwin Union's choice of forum for this first-filed action.

On March 12, 2008, Freedom simultaneously filed (i) an initial claim for arbitration in the National Arbitration Forum against IHE and Irwin Union and (ii) this action in the United States District Court for the District of Delaware against IFC and IMC.  By its Arbitration Claim, which is premised on the permissive arbitration provision in the Loan Purchase Agreement, Freedom seeks a declaration that the Addendum was signed under duress and is void or voidable, and damages for fraud in connection with the execution of the Addendum.  Alepin Decl., Ex. E

---

[3]  The Loan Purchase Agreement also contains a provision that states, in part "[u]pon written request by either party . . . any claim, demand or cause of action, which arises out of or is related to this Agreement . . . *may* be resolved by binding arbitration in the State of California . . . ." Cal. Compl., Ex. A, §8.09 (emphasis added); Compl. ¶ 15.  IHE and Irwin Union, both of whom were involved in the negotiation of the Loan Purchase Agreement and this particular provision, understood and intended that the parties could file suit or seek arbitration; arbitration was not mandatory.

(hereinafter referred to as the "Arbitration Claim").  At the same time, Freedom sought an order staying the arbitration proceedings in order to proceed with this action against IFC and IMC. Arbitration Claim ¶ 52.

The next day, Freedom filed a motion to dismiss or stay the California action and for an order compelling arbitration, which motion is currently set for hearing on April 30, 2008. Alepin Decl., Ex. C. Freedom requested that the Northern District dismiss the California action so that Freedom's Arbitration Claim seeking "a declaration of *all* rights concerning this action" could proceed.  *Id.* at 5 (emphasis added).  What Freedom neglected to mention to the Northern District, however, was that its Arbitration Claim contained a request that arbitration proceedings be stayed so that Freedom can obtain a resolution of its "action in the U.S. District Court, District of Delaware . . . against [IHE and Irwin Union's] parent Irwin Financial, and IMC." Arbitration Claim ¶¶ 9-10, 52.  The arbitration panel granted that request. Alepin Decl., Ex. F.  IHE and Irwin Union have opposed Freedom's motion to compel arbitration on the grounds that, while courts have found that contract provisions containing permissive language such as the term "may" can serve as the basis to compel arbitration in light of the presumption in favor of arbitration under the Federal Arbitration Act, the first-filed rule and the importance of judicial economy weighed in favor of the Northern District retaining jurisdiction of the California action. Alepin Decl., Ex. D.  This is particularly true given that Freedom obtained a stay of the very arbitration proceedings that it commenced and that it seeks to compel.[4]

The Complaint in this action essentially reads as Freedom's defense to the claims at issue in the California action.  *Compare* Compl. *with* Cal. Compl.  Freedom's only real claim[5] is for an

---

[4] IHE and Irwin Union's opposition to Freedom's motion to dismiss or stay the California action and for an order to compel arbitration makes clear that they would agree to arbitration, in one forum, of all of the parties' various claims. Alepin Decl., Ex. D.  But Freedom obtained a stay of the arbitration that it commenced.  Freedom's maneuvering would instead require litigation in two separate courts (California and Delaware).

[5] Freedom has asserted a claim for "specific performance," but this is an equitable remedy for breach of contract not a cause of action.  *Compare* Compl. ¶¶ 59-73 *with* Compl. ¶¶ 74-82; *see*
(continued...)

alleged breach of the Assignment Agreement by IFC for failure to disclose that IFC was negotiating a material change with IHE to the Loan Purchase Agreement (*i.e.* the Addendum). Compl. ¶¶ 69, 79. At first glance, this claim may appear slightly different from the claims in the California action because Freedom has packaged it as a claim against other Irwin Entities under a different, but related contract. The substance of Freedom's claim, however, remains what performance is required under the Loan Purchase Agreement and the Addendum – the very subject that is at issue in the California action.

More generally, Freedom's wide litany of relief requested and factual allegations demonstrates that the subject matter of the California action is the same as this action and if litigation were to proceed in two different federal district courts there would be a substantial overlap of issues and duplicative proceedings. For example, Freedom has requested that (1) IFC compel IHE to abandon attempts to enforce the Addendum as it is allegedly void, concede the California action on such grounds and reaffirm the original Loan Purchase Agreement; (2) IFC repurchase loans that Freedom is obligated to repurchase from IHE and Irwin Union; and (3) IFC indemnify Freedom for defense of the California action. Compl. at 20-21. In essence while Freedom purports to style this action as seeking relief from IFC, *i.e.*, compelling IFC to direct its subsidiaries to take action (*id.*; Compl. ¶ 63), the issues to be litigated focus on actions taken by IHE in connection with the signing of the Addendum including a claim that the Addendum, a contract establishing rights and obligations between IHE and Irwin Union, on one hand, and Freedom, on the other hand, is allegedly void or voidable due to alleged fraud or duress exerted by IHE over Freedom. *Id.* ¶¶ 1, 3-4, 36- 38, 42-44, 69, 79.

---

(...continued from previous page)
*Certainteed Corp. v. Celotex Corp.*, No. Civ. A. 471, 2005 WL 217032, at *6 (Del. Ch. Jan. 24, 2005) (holding that specific performance is an equitable remedy).

## ARGUMENT

I.    **THE COURT SHOULD DISMISS, STAY OR TRANSFER THIS ACTION UNDER THE FIRST-FILED RULE**

As discussed below, dismissal, stay or transfer of this action is warranted under the first-filed rule or under either Fed. Civ. R. 12(b)(3) or 28 U.S.C. § 1406(a).[6]  This action and the California action involve the same subject matter and are duplicative regardless of Freedom's convoluted attempt to differentiate the actions.  Contrary to what Freedom may contend, the first-filed rule does not require identical issues or parties but instead looks to whether the subject is the same and litigation of both actions would be duplicative.  Given that both actions involve purported rights and obligations under the Loan Purchase Agreement and the Addendum, the subject is the same and there will be substantial overlap of the issues.  Accordingly, duplicity of litigation and inconsistency of results is highly probable if this action is allowed to proceed.  The Court should dismiss or stay this action, or alternatively transfer it to the Northern District of California so that it and the California action can be tried together.

### A.    The First-Filed Rule

Courts within the Third Circuit and elsewhere have repeatedly recognized the importance of judicial economy and the problems that arise when cases containing common facts and parties are litigated in different forums.  *See E.E.O.C. v. Univ. of Pa.,* 850 F.2d 969, 971 (3d Cir. 1988), *aff'd on other grounds,* 493 U.S. 182 (1990); *see also Pacesetter Sys., Inc. v. Medtronic, Inc.,* 678 F.2d 93, 94-95 (9th Cir. 1982); *Alltrade, Inc. v. Uniweld Prods., Inc.,* 946 F.2d 622, 625 (9th Cir. 1991).  For this reason, courts have "adopted what has become known as the 'first-filed' rule."  *E.E.O.C.,* 850 F.2d at 971.  Under this policy of comity, "[i]n all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it."  *Id.*

---

[6] Any of these options is available to the Court at this juncture.  *Lafferty v. St. Riel,* 495 F.3d 72 (3d Cir. 2007); *(888) Justice, Inc. v. Just Enters., Inc.,* No. 06-CV-6410 (GBD), 2007 WL 2398504, at *7 (S.D.N.Y. Aug. 22, 2007) (dismissing the case for improper venue under 12(b)(3) or in the alternative §1406(a) as "original claims made in this case could have been filed as counterclaims in the first-filed Missouri action.").

(internal citations omitted). Absent unusual circumstances, courts within the Third Circuit generally invoke the first-filed rule in cases of concurrent federal jurisdiction to give deference to the first-filed action. *Id.* (citations omitted). This rule "encourages sound judicial administration and promotes comity among federal courts of equal rank. It gives a court 'the power' to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." *Id.*

The first-filed rule "reduces the possibility of dispositive differences between the jurisdictions and ensures that litigants receive a single determination of their controversy, rather than multiple decisions which may conflict and require separate appeals." *Time Warner Cable, Inc. v. GPNE Corp.*, 497 F. Supp. 2d 584, 588 (D. Del. 2007) (granting defendant's motion to dismiss case in favor of the first-filed action in Texas brought by defendant); *E.E.O.C.*, 850 F.2d at 972 (surveying case law and discussing that, while the first-filed rule is discretionary, the "general principle is to avoid duplicative litigation.").

Application of the first-filed rule does not require the exact identity of the parties or issues. *E.E.O.C.*, 850 F.2d at 971 (holding that the first-filed rule applies to the court "which first has possession of the subject matter"); *Time Warner*, 497 F. Supp. 2d at 589; *Alltrade*, 946 F.2d at 622 (affirming district court's finding that the first-to-file rule applied and staying action to allow first-filed action to proceed even when that action involved additional claims and parties; *Centocor, Inc. v. MedImmune, Inc.*, No. C 02-03252 CRB, 2002 WL 31465299, at *3 (N.D. Cal. Oct. 22, 2002). The first-filed rule does not hinge on identity of the parties or issues but rather on "which court first obtains possession of the **subject of the dispute** . . . ." *Advanta Corp. v. Visa U.S.A., Inc.*, No. Civ. A 96-7940, 1997 WL 88906, at *2 (E.D. Pa. Feb. 19, 1997) (emphasis added); *E.E.O.C.*, 850 F.2d at 971 ("[i]n all cases of federal concurrent jurisdiction, the court which first has possession of the subject matter must decide it."); *Hanover Fire & Cas. Ins. Co. v. Sieron*, No. Civ. A. 06-2758, 2007 WL 120058, at * 4 (E.D. Pa. Jan. 9, 2007); *Shire U.S., Inc. v. Johnson Matthey, Inc.*, No. 07-CV-2958, 2008 WL 399333, at *3 (E.D. Pa. Feb. 14, 2008) (finding that "courts within and outside this Circuit have found no requirement that the

parties in the concurrent actions be the same in order for the first-to-file rule to apply."). This serves the goal of the first-filed rule, which is to "prevent a multiplicity of actions and to achieve resolution in a single lawsuit of all disputes from *common matters*." *Time Warner*, 497 F. Supp. 2d at 589.

**B.    Because the California Action Is The First-Filed Action, The Delaware Action Should Be Dismissed, Stayed Or Transferred**

There can be no dispute that the California action is the first-filed action.[7] This combined with an examination of the two complaints, Freedom's attempt at artful drafting aside, demonstrates that the subject of the two actions is the same and that the actions are duplicative. Accordingly, the Court should dismiss, stay or transfer this action to the Northern District of California.

**1.    The Two Actions Are Duplicative**

In the California action, IHE and Irwin Union seek to enforce Freedom's obligation to repurchase particular mortgage loans under the Loan Purchase Agreement and Addendum. In this action, Freedom seeks to establish that it has no obligation to repurchase these loans under the Loan Purchase Agreement and Addendum on the grounds that the Addendum is allegedly void or voidable or the product of fraud. While Freedom characterizes its claims as arising under the Asset Purchase Agreement between Freedom, on the one hand, and IFC and IMC, on the other, the substance of the dispute concerns the Loan Purchase Agreement and Addendum and IHE and Irwin Union's demand that Freedom fulfill its obligations under those contracts. Thus, the subject of the two actions is the same.

While Freedom carefully crafted its complaint to avoid the appearance of bringing a

---

[7] The Northern District of California has personal and subject matter over the dispute and that court is an appropriate venue for claims arising under the Loan Purchase Agreement, which is the crux of this action. Cal. Compl. ¶ 7.

duplicative suit,[8] it has implicitly conceded that the California and Delaware actions are duplicative. In its motion to dismiss the California action, Freedom argues that IHE and Irwin Union's complaint should be dismissed and that the court should compel arbitration because the Arbitration Claim "seek[s] a declaration of all rights concerning this action." Alepin Decl., Ex. C at 5. Without skipping a beat, Freedom then pleads in its Arbitration Claim that the arbitration should be stayed as resolution of the Delaware action would moot any claims that might arise in the arbitration. Arbitration Claim, ¶ 13. By logical extension of its arguments, Freedom has conceded that the Delaware and California actions involve the same subject: a determination of the parties' (IHE and Irwin Union on the one hand, and Freedom on the other hand) obligations under the Loan Purchase Agreement and Addendum.

Given that the two actions are the same, which Freedom has conceded, this action should be dismissed, stayed or transferred in favor of the California action. *See Hanover*, 2007 WL 120058 at *4 (rejecting plaintiff's "inconsistent arguments and baseless distinctions of 'subject matter' 'similar issues' or 'same parties'" in order to apply the first-filed rule to transfer the second-filed suit).

### 2.    A Complete Identity of Parties Is Not Required For Application Of The First-Filed Rule

It is well-established that complete identity of parties between the two actions is not required in order for a court to apply the first-filed rule to dismiss a later-filed action. *See Time Warner*, 497 F. Supp. 2d at 589-90. Instead, application of the first-filed rule hinges upon which court first takes possession of the subject of the dispute, not necessarily the parties to it. *E.E.O.C.*, 850 F.3d at 971 (holding that the first-filed rule applies to the court "which first has possession of the subject matter"); *Hanover*, 2007 WL 120058 at *3-4; *Advanta*, 1997 WL

---

[8] Freedom noted that there were "related proceedings" but attempted to differentiate those proceedings by asserting that neither IFC nor IMC were parties to the California action and that the California action involves a dispute regarding the Loan Purchase Agreement rather than the Asset Purchase Agreement. Compl. ¶¶ 13-17.

88906 at *3; *Abovepeer, Inc. v. Recording Indus. Ass'n of Am., Inc.,* 166 F. Supp. 2d 655, 661-662 (N.D.N.Y. 2001), aff'd, sub. nom. *BuddyUSA, Inc. v. Recording Indus. Ass'n of Am., Inc.,* 21 Fed. Appx. 52 (2d Cir. 2001) ("Parties whose 'interests are clearly aligned' may be treated as if they were the same parties in deciding whether a later-filed action should be stayed in deference to an earlier action.")

In this action Freedom has sued IFC and IMC seeking to compel action by non-parties IHE and Irwin Union based on the relationship between IFC and IMC. While IFC and IMC are not currently parties to the California action pending against Freedom, this cannot prevent application of the first-filed rule given that the subject of the two actions is the same. The fact that IHE and Irwin Union are necessary parties to this action under Fed. R. Civ. P. 19 further supports application of the first-filed rule. Under Fed. R. Civ. P. 19, a party is necessary if:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a).

Freedom seeks to litigate the rights and obligations of Freedom, IHE and Irwin Union under the Loan Purchase Agreement and the Addendum. Compl. ¶¶ 3, 7, 37-46. In particular, Freedom seeks a declaration from this Court that the Addendum is void because of actions taken by *IHE* in connection with the signing of the Addendum. Freedom *actually seeks relief* from IHE: Freedom wants this Court to order IFC to compel IHE

> (a) to abandon further attempts to enforce the Addendum, (b) to acknowledge that the Addendum is void, voidable or rescinded, (c) to concede the IHE Arbitration on the grounds that the Addendum is void, voidable or rescinded, and (d) to reaffirm the terms of the IHE Agreement . . . .

Compl. at ¶¶ 20-21.

Freedom, however, has only named IFC and IMC as defendants. Freedom's allegation that IFC is the 100% shareholder of IHE and Irwin Union does not establish that IFC or IMC

have the legal right to compel IHE or Irwin Union to act, which calls into doubt whether Freedom has sued the correct entities. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) ("mere ownership of a subsidiary does not justify the imposition of liability on the parent."). Just as Freedom could not sue the individual shareholders of a corporation in order to force the corporation to take action, Freedom cannot sue IFC, the shareholder, with the hope that this Court will compel IHE or Irwin Union, the corporation, to take action.

    *Ethypharm S.A. France v. Bentley Pharma., Inc.*, 388 F. Supp. 2d 426 (D. Del. 2005) is instructive. This Court held that a subsidiary of the defendant parent company was a necessary party under Fed. R. Civ. P. 19:

> "[P]laintiffs' interactions were almost entirely with [the subsidiary] and not with defendant. [The subsidiary] will possess the necessary witnesses and information pertinent to determining what acts were performed, by whom, and whether the acts were wrongful. Because of this conduct [the subsidiary] may be the only party liable for the obligations under the agreement. Therefore, complete relief cannot be afforded among the present parties."

388 F. Supp. 2d at 431 (citations omitted).

    As in *Bentley*, Freedom contends that IHE, not IFC, acted improperly in forcing Freedom to execute the Addendum. *See* Compl. ¶¶ 37-43. Specifically, Freedom contends "IHE improperly refused to honor its consent unless and until Freedom has executed the Addendum." *Id.* ¶ 38. Accordingly, IHE and Irwin Union, IFC subsidiaries, are necessary parties. Litigation concerning rights and obligations under the Loan Purchase Agreement and the Addendum will necessarily require the involvement of IHE and Irwin Union, who are the parties to that contract, not IFC. Similarly, questions concerning liability for alleged improper pressure or influence during the execution of the contested Addendum will necessarily involve IHE and Irwin Union witnesses and documents. *Id.* ¶¶ 37-43. Because IHE and Irwin Union are necessary parties to this action, the fact that Freedom did not name them as parties to this action does not preclude

the Court from applying the first-filed rule to dismiss or stay this action in favor of the California action.[9]

### 3.    Minor Variances in Issues Do Not Prevent Application of the First-Filed Rule

It is well-established that, as with parties, a complete identity of issues between the two actions is not required in order for a court to apply the first-filed rule to dismiss a later-filed action. *Hanover*, 2007 WL 120058 at *3-4; *EEOC*, 850 F.2d at 971. Here, although Freedom purports to bring claims under the Assignment Agreement, the crux of its contentions, as is clear from the relief requested, centers upon the Loan Purchase Agreement and the Addendum, which form the basis of the California action. *See* Compl. at 20-21 (requesting declaratory relief ordering that the Addendum is void and that IHE drop the California Action). These claims would have been more properly brought as compulsory counterclaims in the California action.

*Hanover* is instructive. In that case, plaintiff filed suit in the U.S. District Court for the Eastern District of Pennsylvania asserting a host of tort and contract claims against defendant arising out of insurance claims for fire damage to properties insured by plaintiff. 2007 WL 120058 at *1. Defendant moved to dismiss on the grounds of a first-filed action involving plaintiff's denial of coverage that was pending in the Southern District of Illinois. *Id.* Plaintiff opposed this motion arguing that the parties and issues in the two actions were different, particularly since its claims arose under its general agency contract with defendant, and that venue was appropriate in the Eastern District of Pennsylvania because of a forum selection clause in that contract. *Id.* at *2-4. In concluding that the first-filed rule mandated dismissal of the action, the court looked at whether the claims in the second-filed suit could be brought as compulsory counterclaims (*i.e.* whether they arose out of the same transaction or occurrence) in

---

[9] In addition, as noted below, Freedom can assert the substance of the claims asserted in this action as compulsory counterclaims in the California action. Freedom can also assert cross-claims against IFC and IMC and seek to join these entities as parties in the California action. IFC and IMC have already represented they would be amenable to joinder of such claims. *See* Alepin Decl., Ex. D at 1-2, 6.

determining whether the two actions involved the same issue and therefore required application of the first-filed rule. 2007 WL 120058, at *7.

Here, Freedom's claims should have been brought as compulsory counterclaims or cross-claims in the California action.[10] This action should be dismissed, stayed or transferred in favor of the first-filed suit in California.

### 4.    The Circumstances Surrounding The Filing of This Suit Weigh In Favor Of The Dismissal, Stay Or Transfer Of This Action

As discussed *supra*, courts will typically enforce the first-filed rule and give deference to the plaintiff's choice of forum in a first-filed action unless there are special circumstances that warrant departure from this rule.  This inquiry focuses on whether the party who filed first engaged in some behavior or tactics such that the first-filed action should not be accorded deference.  Here, there is no reason not to accord deference to IHE and Irwin Union's first-filed action.  They filed suit only after repeated attempts to get Freedom to repurchase the defective loans failed and selected a forum expressly provided for in the Loan Purchase Agreement.  Freedom, by contrast, has engaged in gamesmanship and forum-shopping.

In an attempt to defeat this motion, Freedom will undoubtedly point to the provision in the Asset Purchase Agreement that provides that venue is proper in this Court for "any action or claim arising out of or relating to the [Asset Purchase Agreement]." Compl. ¶ 12.  However, as discussed *supra*, while Freedom represents that its claims arise under the Asset Purchase Agreement, the subject of these claims is what is required under the Loan Purchase Agreement and Addendum.  Indeed, the relief Freedom seeks centers upon its rights or obligations, or lack thereof under those contracts.  Compl. at 20-21.  Accordingly, a review of the allegations of the Complaint and those in the California action demonstrates that the claims brought by Freedom in this action are more appropriately brought in the California action.

---

[10] This is particularly true given that Freedom seeks to litigate its rights and obligations under the Loan Purchase Agreement — a contract with IHE and Irwin Union that contains a venue provision requiring suit in the state or federal courts located in Contra Costa County, California.

This combined with the fact that, after being sued in California, Freedom sought to achieve the upper hand by (1) attempting to dismiss the California action under the guise of proceeding to arbitration, which was subsequently stayed at Freedom's request; and (2) filing suit in this Court without joining the necessary parties makes dismissal or transfer appropriate under these circumstances.

**5.    The California Action Is Progressing at a Faster Pace Than This Case Prompting Application of the First-Filed Rule**

In addition, the proceedings in California are progressing further than the issues in this case. The parties are litigating whether disputes regarding Freedom's obligations under the Loan Purchase Agreement are subject to arbitration. The Northern District of California has also set this matter for a case management conference on May 1, 2008. If this Court retains jurisdiction, this Court will be forced to hear the same dispute as the California court is about to decide regarding whether counterclaims IHE would bring would be subject to arbitration. *E.E.O.C.*, 850 F.2d at 976 (noting that "courts have rejected the [first-filed] rule when the second-filed action had developed further than the initial suit . . .").

## **CONCLUSION**

For the foregoing reasons, Defendants IFC and IMC respectfully request that the Court

dismiss, stay or transfer this action in deference to the first-filed action pending in the Northern

District of California.

/s/ Raymond J. DiCamillo
Raymond J. DiCamillo (#3188)
dicamillo@rlf.com
Richards, Layton & Finger
920 N. King Street
Wilmington, DE 19899
 (302) 651-7700
*Attorneys for Defendants*

OF COUNSEL:

David J. Berger
Dominique-Chantale Alepin
Wilson Sonsini Goodrich & Rosati, PC
650 Page Mill Road
Palo Alto, California 94304-1050
(650) 493-9300

Jenny L. Dixon
Wilson Sonsini Goodrich & Rosati, PC
One Market Street
Spear Tower, Suite 3300
San Francisco, California 94105
(415) 947-2000

Dated: April 23, 2008

-17-

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2008, I caused to be served by electronic service and

hand delivery the foregoing document and electronically filed the same with the Clerk of Court

using CM/ECF which will send notification of such filing(s) to the following:

> William J. Lafferty
> Theodore Kittila
> Karl G. Randall
> Morris, Nichols, Arsht & Tunnell, LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899

I further certify that on April 23, 2008, the foregoing document was served by electronic

service and Federal Express to the following:

> John K. Crossman
> Frank C. Welzer
> Zukerman Gore & Brandeis, LLP
> 875 Third Avenue
> New York, NY 10022

Raymond J. DiCamillo (#3188)
dicamillo@rlf.com

# EXHIBIT 4
# PART 2
# SUPP. DIXON DEC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FREEDOM MORTGAGE CORPORATION, )
          Plaintiff, )
           )
           )
      v. )          C. A. No. 08-146-GMS
           )
IRWIN FINANCIAL CORPORATION, and )
IRWIN MORTGAGE CORPORATION, )
           )
          Defendants. )

## DECLARATION OF DOMINIQUE-CHANTALE ALEPIN
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, STAY
## OR TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA

OF COUNSEL:

David J. Berger
Dominique C. Alepin
Wilson Sonsini Goodrich & Rosati, PC
650 Page Mill Road
Palo Alto, California 94304-1050
(650) 493-9300

Jenny L. Dixon
Wilson Sonsini Goodrich & Rosati, PC
One Market Street
Spear Tower, Suite 3300
San Francisco, California 94105
(415) 947-2000

Raymond J. DiCamillo (#3188)
dicamillo@rlf.com
Richards, Layton & Finger
920 N. King Street
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Defendants*

Dated: April 23, 2008

RLF1-3276187-1

I, Dominique-Chantale Alepin, declare:

1.      I am an attorney with the law firm of Wilson Sonsini Goodrich & Rosati, a Professional Corporation, counsel of record for Defendants Irwin Financial Corporation and Irwin Mortgage Corporation. I make this declaration in support of Defendants' Motion to Dismiss, Stay or Transfer this action to the Northern District of California. I have personal knowledge of the facts set forth herein, and if called to testify, could and would testify competently thereto.

2.      Attached as Exhibit A is a true and correct copy of excerpts of Irwin Financial Corporation's Form 10-K for the year ending December 31, 2007, as filed with the Securities Exchange Commission on or about March 12, 2008.

3.      Attached as Exhibit B is a true and correct copy of the complaint filed by Irwin Union Bank and Trust Company and Irwin Home Equity Corporation against Freedom Mortgage Corporation in the United States District Court for the Northern District of California on or about January 22, 2008, captioned *Irwin Union Bank and Trust Company and Irwin Home Equity Corporation v. Freedom Mortgage Corporation*, Case No. 08-00472 (PJH) (the "California Action").

4.      Attached as Exhibit C is a true and correct copy of Freedom's Motion to Dismiss or Stay Action and for an Order Compelling Arbitration filed in the California Action on or about March 13, 2008.

5.      Attached as Exhibit D is a true and correct copy of Plaintiffs' Response re: Defendant Freedom Mortgage Corporation's Motion to Dismiss or Stay Action and for an Order Compelling Arbitration filed in the California Action on or about April 9, 2008.

6.      Attached as Exhibit E is a true and correct copy of the Initial Claim for Arbitration, without exhibits, by Freedom Mortgage Corporation against Irwin Union Bank and Trust Company and Irwin Home Equity Corporation filed with the National Arbitration Forum

("NAF") on or about March 12, 2008, captioned *Freedom Mortgage Corporation v. Irwin Union Bank and Trust Company and Irwin Home Equity Corporation*, File No. MX 0803002058323.

       7.      Attached as Exhibit F is a true and correct copy of the letter from NAF dated April 15, 2008 stating that the arbitration proceedings are stayed pending court action.

       I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

       Executed this 23rd day of April, at Palo Alto, California.

                      /s Dominique-Chantale Alepin

                      Dominique-Chantale Alepin

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2008, I caused to be served by electronic service and hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

William J. Lafferty
Theodore Kittila
Karl G. Randall
Morris, Nichols, Arsht & Tunnell, LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

I further certify that on April 23, 2008, the foregoing document was served by electronic service and Federal Express to the following:

John K. Crossman
Frank C. Welzer
Zukerman Gore & Brandeis, LLP
875 Third Avenue
New York, NY 10022

Raymond J. DiCamillo (#3188)
dicamillo@rlf.com

# EXHIBIT A

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
#### Washington, DC 20549

# FORM 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal Year Ended December 31, 2007

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from        to        .

Commission file number 0-6835

# IRWIN FINANCIAL CORPORATION

(Exact name of Corporation as Specified in its Charter)

| | |
|---|---|
| **Indiana** | **35-1286807** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **500 Washington Street Columbus, Indiana** | **47201** |
| (Address of Principal Executive Offices) | (Zip Code) |
| **(812) 376-1909** | **www.irwinfinancial.com** |
| (Corporation's Telephone Number, Including Area Code) | (Web Site) |

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| Title of Class: | **Common Stock\*** |
| Title of Class: | **8.70% Cumulative Trust Preferred Securities issued by IFC Capital Trust VI and the guarantee with respect thereto.** |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934  Yes ☐   No ☑

Indicate by check mark whether the Corporation: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Corporation was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days  Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Corporation's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ☐ | Accelerated filer ☑ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
|---|---|---|---|

(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act)  Yes ☐    No ☑

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant, computed by reference to the closing price for the registrant's common stock on the New York Stock Exchange on June 30, 2007, was approximately $276,290,152.

As of March 7, 2008, there were outstanding 29,600,284 common shares of the Corporation.

* Includes associated rights.

### Documents Incorporated by Reference

| Selected Portions of the Following Documents | Part of Form 10-K Into Which Incorporated |
| --- | --- |
| **Definitive Proxy Statement for Annual Meeting Shareholders to be held May 30, 2008** | **Part III** |

**Exhibit Index on Pages 119 through 122**

Table of Contents

# PART I

### Item 1. *Business*

### General

We are a bank holding company headquartered in Columbus, Indiana with $155 million of net revenues from continuing operations in 2007 and $6.2 billion in assets at December 31, 2007. We focus primarily on the extension of credit to small businesses and consumers as well as providing the ongoing servicing of those customer accounts. Through our direct and indirect subsidiaries, we currently operate three major lines of business: commercial banking, commercial finance, and home equity lending. In 2006, we sold the majority of our conforming conventional first mortgage banking business.

We conduct our commercial and consumer lending businesses through various operating subsidiaries. Our banking subsidiary, Irwin Union Bank and Trust Company, was organized in 1871. We formed the holding company in 1972. Our direct and indirect major subsidiaries include Irwin Union Bank and Trust Company, a commercial bank, which together with Irwin Union Bank, F S B, a federal savings bank, conducts our commercial banking activities; Irwin Commercial Finance Corporation, a commercial finance subsidiary; and Irwin Home Equity Corporation, a consumer home equity lending company. In 2006, we discontinued the majority of operations at Irwin Mortgage Corporation, our mortgage banking company and formerly one of our major subsidiaries.

Our strategy is to position the Corporation as an interrelated group of specialized financial services companies serving niche markets of small businesses and consumers while optimizing the productivity of our capital. We seek to create competitive advantage within the banking industry by serving small businesses and consumers with lending, leasing, deposit, advisory services and specialized mortgage products. Our strategic objective is to create value through well-controlled, profitable growth by attracting, retaining and developing exceptional management teams at our lines of business and parent company who focus on (i) meeting customer needs rather than simply offering banking products or services, (ii) being cost-efficient in our delivery, and (iii) having strong risk management systems. We believe we must continually balance these three factors in order to deliver long-term value to all of our stakeholders. Our lines of business operate as direct and indirect subsidiaries of Irwin Union Bank and Trust (and, in the case of commercial banking, with Irwin Union Bank, F.S.B.). This structure allows us to offer insured deposits and results in regulatory oversight of our business.

Our Internet address is *http://www.irwinfinancial.com*

We make available free of charge through our Internet website our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports as soon as reasonably practicable after we electronically file the material with the Securities and Exchange Commission (SEC). Unless otherwise indicated, our Internet website and the information contained or incorporated in it are not intended to be incorporated into this Annual Report on Form 10-K.

### Major Lines of Business

#### *Commercial Banking*

Our commercial banking line of business provides credit, cash management and personal banking products primarily to small businesses and business owners. We offer commercial banking services through our banking subsidiaries, Irwin Union Bank and Trust Company, an Indiana state-chartered commercial bank, and Irwin Union Bank, F.S.B., a federal savings bank. The commercial banking line of business offers a full line of consumer, mortgage and commercial loans, as well as personal and commercial checking accounts, savings and time deposit accounts, personal and business loans, credit card services, money transfer services, financial counseling, property, casualty, life and health insurance agency services, trust services, securities brokerage and safe deposit facilities. This line of business operates through two charters, each headquartered in Columbus, Indiana:

- *Irwin Union Bank and Trust Company* — organized in 1871, is a full service Indiana state-chartered commercial bank with offices currently located throughout nine counties in central and southern Indiana, as

4

Table of Contents

well as in Grandville (near Grand Rapids), Kalamazoo, Lansing and Traverse City, Michigan; Carson City and Las Vegas, Nevada; and Salt Lake City, Utah.

- *Irwin Union Bank, F.S.B.* — is a full-service federal savings bank that began operations in December 2000. Currently we have offices located in Mesa and Phoenix, Arizona; Costa Mesa and Sacramento, California; Louisville, Kentucky; Clayton (near St. Louis), Missouri; Reno, Nevada; Albuquerque, New Mexico; and Milwaukee, Wisconsin. We opened offices in Ohio and Florida in 2007.

We discuss this line of business further in the "Commercial Banking" section of Management's Discussion and Analysis of Financial Condition and Results of Operation (MD&A) of this report.

### Commercial Finance

Established in 1999, our commercial finance line of business originates small-ticket equipment leases throughout the U.S. and Canada and provides equipment and leasehold improvement financing for franchisees (mainly in the quick service restaurant sector) in the United States. The majority of our leases are full payout (no residual), small-ticket assets secured by commercial equipment. We finance a variety of commercial and office equipment types while limiting the industry and geographic concentrations in our lease and loan portfolios. Loans to franchisees often include the financing of real estate as well as equipment. In 2006, this segment expanded its product line to include professional practice financing and information technology leasing to middle and upper middle market companies throughout the United States and Canada.

We discuss this line of business further in the "Commercial Finance" section of the MD&A of this report.

### Home Equity Lending

We established this line of business when we formed Irwin Home Equity Corporation as our subsidiary in 1994, headquartered in San Ramon, California. Irwin Home Equity became a subsidiary of Irwin Union Bank and Trust in 2001. The Board of Irwin Union Bank and Trust recently approved the merger of Irwin Home Equity into the Bank. This will not affect our operations, but may result in more favorable tax treatment for the Corporation. In conjunction with Irwin Union Bank and Trust, Irwin Home Equity originates, purchases, securitizes and services first mortgages and home equity loans and lines of credit nationwide. Our target customers are principally creditworthy, homeowners with limited equity in their homes as well as lenders/third parties that can benefit from specialized servicing. We market our first mortgage and home equity offering principally through mortgage brokers and correspondent lenders and also direct to consumers.

We discuss this line of business further in the "Home Equity Lending" section of the MD&A of this report.

### Discontinuance of Mortgage Banking

We discontinued our mortgage banking line of business with the sale of the majority of the assets of Irwin Mortgage Corporation. We sold the production and most of the headquarters operations of this segment in September 2006. We sold the bulk of our portfolio of mortgage servicing rights to multiple buyers, transferring these assets in early January 2007. We sold our servicing platform in January 2007. Prior to the sales, Irwin Mortgage, a subsidiary of Irwin Union Bank and Trust Company, had engaged in the origination, purchase, sale and servicing of conventional and government agency-backed residential mortgage loans. Irwin Mortgage also engaged in the mortgage reinsurance business through its subsidiary, Irwin Reinsurance Corporation, a Vermont Corporation, which we have retained. Irwin Mortgage no longer originates loans but continues to manage and service loans that were not included in the transfer of assets and to manage residual liabilities and responsibilities from prior activities. This segment is accounted for as discontinued operations.

### Customer Base

No single part of our lending business is dependent upon a single borrower or upon a very few borrowers nor would the loss of any one loan customer automatically have a materially adverse effect

upon our business.

5

Table of Contents

We have a number of funding sources which are important to our operations, some of which are customers of our institutions (e.g., depositors) and for some of which we are customers (e.g., lenders). For example, we are a member (and customer) of the Federal Home Loan Bank of Indianapolis, we have a significant Canadian dollar funding facility with a single bank domiciled in Canada, and we have a significant deposit relationship with one of our commercial banking branches. In those instances where we have significant single relationships, on the funding side of the balance sheet, we examine each relationship more intensively than others and have developed contingency plans for the loss of these significant customer relationships. The loss of any one of these significant relationships would require changes to our funding program.

## Competition

We compete nationally in the U.S. in each business, except for commercial banking where our market focus is in selected markets in the Midwest and Western states. In our commercial finance line of business, certain of our equipment leasing products are also offered throughout Canada. We compete against commercial banks, savings banks, credit unions and savings and loan associations, and with a number of non-bank companies including mortgage banks and brokers, insurance companies, securities firms, other finance companies, and real estate investment trusts.

Some of our competitors are not subject to the same degree of regulation as that imposed on bank holding companies, state banking organizations and federal saving banks. In addition, many larger banking organizations, mortgage companies, mortgage banks, insurance companies and securities firms have significantly greater resources than we do. As a result, some of our competitors have advantages over us in name recognition, cost of funds, operating costs, and market penetration.

## Employees and Labor Relations

At January 31, 2008 we and our subsidiaries had a total of 1,256 employees, including full-time and part-time employees. We continue a commitment of equal employment opportunity for all job applicants and staff members, and management regards its relations with its employees as satisfactory.

## Financial Information About Geographic Areas

We conduct part of our commercial finance line of business in Canadian markets. Net revenues for the last three years in this line of business attributable to Canadian customers were $18 million in 2007, $17 million in 2006, and $12 million in 2005. The remainder of our revenues comes from customers and operations in the United States.

## Supervision and Regulation

### General

We and our subsidiaries are each extensively regulated under state and federal law. The following is a summary of certain statutes and regulations that apply to us and to our subsidiaries. These summaries are not complete, and you should refer to the statutes and regulations for more information. Also, these statutes and regulations may change in the future, and we cannot predict what effect these changes, if made, will have on our operations.

We are regulated at both the holding company and subsidiary level and are subject to both state and federal examination on matters relating to "safety and soundness," including risk management, asset quality and capital adequacy, as well as a broad range of other regulatory concerns including: insider and intercompany transactions, the adequacy of the reserve for loan losses, regulatory reporting, adequacy of systems of internal controls and limitations on permissible activities.

In addition, we are required to maintain a variety of processes and programs to address other regulatory requirements, including: community reinvestment provisions; protection of customer information; identification of suspicious activities, including possible money laundering; proper identification of customers when performing transactions; maintenance of information and site security; and other bank compliance provisions. In a number of instances board and/or management oversight is required as well as employee training on specific regulations.

6

Table of Contents

Regulatory agencies have a broad range of sanctions and enforcement powers if an institution fails to meet regulatory requirements, including civil money penalties, formal agreements, and cease and desist orders

### Bank Holding Company Regulation

We are registered as a bank holding company with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956, as amended, and the related regulations, referred to as the BHC Act. We are subject to regulation, supervision and examination by the Federal Reserve, and as part of this process, we must file reports and additional information with the Federal Reserve.

#### Minimum Capital Requirements

The Federal Reserve imposes risk-based capital requirements on us as a bank holding company. Under these requirements, capital is classified into two categories:

Tier 1 capital, or core capital, consists of

- common stockholders' equity;
- qualifying noncumulative perpetual preferred stock;
- qualifying cumulative perpetual preferred stock, and subject to some limitations, our Trust Preferred securities; and
- minority interests in the common equity accounts of consolidated subsidiaries;

less

- Accumulated net gains (losses) on cash flow hedges and increase (decrease) recorded in accumulated other comprehensive income (AOCI) for defined benefit postretirement plans under FAS 158
- goodwill;
- credit-enhancing interest-only strips (certain amounts only); and
- specified intangible assets.

Tier 2 capital, or supplementary capital, consists of

- allowance for loan and lease losses;
- perpetual preferred stock and related surplus;
- hybrid capital instruments including, to the extent not included in Tier 1 Capital, Trust Preferred securities;
- unrealized holding gains on equity securities;
- perpetual debt and mandatory convertible debt securities;
- term subordinated debt, including related surplus; and
- intermediate-term preferred stock, including related securities.

The Federal Reserve's capital adequacy guidelines require bank holding companies to maintain a minimum ratio of qualifying total capital to risk-weighted assets of 8 percent, at least 4 percent of which must be in the form of Tier 1 capital. Risk-weighted assets include assets and credit equivalent amounts of off-balance sheet items of bank holding companies that are assigned to one of several risk categories, based on the obligor or the nature of the collateral. The Federal Reserve has established a minimum Tier 1 "leverage" ratio, which is the ratio of Tier 1 capital to total assets (less goodwill and other specified intangible assets), of 3 percent for strong bank holding companies (those rated a composite "1" under the Federal Reserve's rating system). For all other bank holding companies, the minimum Tier 1 leverage ratio is 4 percent. The Federal Reserve considers the Tier 1 leverage ratio in evaluating proposals for expansion or new activities.

7

Table of Contents

As of December 31, 2007, we had regulatory capital in excess of all the Federal Reserve's minimum levels. Our ratio of total capital to risk weighted assets at December 31, 2007 was 12.6% and our Tier 1 leverage ratio was 10.2%.

*Expansion*

Under the BHC Act, we must obtain prior Federal Reserve approval for certain activities, such as the acquisition of more than 5% of the voting shares of any company, including a bank or bank holding company. The BHC Act permits a bank holding company to engage in activities that the Federal Reserve has determined to be so closely related to banking or managing or controlling banks as to be a proper incident to those banking activities, such as operating a mortgage bank or a savings association, conducting leasing and venture capital investment activities, performing trust company functions, or acting as an investment or financial advisor. See the section on "Interstate Banking and Branching" below.

*Dividends*

The Federal Reserve has policies on the payment of cash dividends by bank holding companies. The Federal Reserve believes that a bank holding company experiencing earnings weaknesses should not pay cash dividends (1) exceeding its net income or (2) which only could be funded in ways that would weaken a bank holding company's financial health, such as by borrowing. Also, the Federal Reserve possesses enforcement powers over bank holding companies and their non-bank subsidiaries to prevent or remedy unsafe or unsound practices or violations of applicable statutes and regulations. Among these powers is the ability to prohibit or limit the payment of dividends by banks (including dividends to bank holding companies) and bank holding companies. See discussion of "Dividend Limitations" below.

The Federal Reserve expects us to act as a source of financial strength to our banking subsidiaries and to commit resources to support them. In implementing this policy, the Federal Reserve could require us to provide financial support when we otherwise would not consider ourselves able to do so.

In addition to the restrictions on fundamental corporate actions such as acquisitions and dividends imposed by the Federal Reserve, Indiana law also places limitations on our authority with respect to such activities.

In consideration of the Corporation's recent losses, on February 28, 2008, the Board of Directors elected to defer dividend payments on the Corporation's trust preferred securities and elected to discontinue payment of dividends on its non-cumulative perpetual preferred and common stock. Mindful of regulatory policy and the current economic environment, the Board took these steps to maintain the capital strength of the Corporation at a time of elevated uncertainty in the economy. The Board believes the elevated uncertainty in the current environment demands a greater bias to capital retention on a precautionary basis than distribution of cash from retained earnings for maintenance of historic dividends. The Board will reassess its dividend policy regularly. The ability to pay future dividends is subject to the regulatory restrictions referenced above and in the discussion in the section on *"Dividend Limitations"* below.

*Bank and Thrift Regulation*

Indiana law subjects Irwin Union Bank and Trust and its subsidiaries to supervision and examination by the Indiana Department of Financial Institutions. Irwin Union Bank and Trust is a member of the Federal Reserve System and, along with its subsidiaries, is also subject to regulation, examination and supervision by the Federal Reserve. Each of the principal subsidiaries of Irwin Union Bank and Trust are routinely subject to examination.

Irwin Union Bank, F.S.B., a direct subsidiary of the bank holding company, is a federally chartered savings bank. Accordingly, it is subject to regulation, examination and supervision by the Office of Thrift Supervision (OTS).

The deposits of Irwin Union Bank and Trust and Irwin Union Bank, F.S.B. are insured by the Deposit Insurance Fund of the Federal Deposit Insurance Corporation (FDIC) to the maximum extent permitted by law, which is currently $100,000 per depositor for all accounts in the same title and

capacity, other than individual retirements accounts, certain eligible deferred compensation plans, and so-called Keogh plans or HR 10 plans, which currently

8

Table of Contents

are insured up to a maximum of $250,000 per participant in the aggregate, such maximums in each case to be adjusted for inflation beginning in 2010. As a result, Irwin Union Bank and Trust and Irwin Union Bank, F.S.B. are subject to FDIC supervision and regulation.

Irwin Union Bank and Trust and Irwin Union Bank, F.S.B. must file reports with the Federal Reserve and the OTS, respectively, and with the FDIC concerning their activities and financial condition. Also, before establishing branches or entering into certain transactions such as mergers with, or acquisitions of, other financial institutions, Irwin Union Bank and Trust must obtain regulatory approvals from the Indiana Department of Financial Institutions and the Federal Reserve, and Irwin Union Bank, F.S.B. must obtain approval from the OTS.

*Capital Requirements*

The Federal Reserve imposes requirements on state member banks such as Irwin Union Bank and Trust regarding the maintenance of adequate capital substantially identical to the capital regulations applicable to bank holding companies described in the section on *"Bank Holding Company Regulation — Minimum Capital Requirements."* While retaining the authority to set capital ratios for individual banks, these regulations prescribe minimum total risk-based capital, Tier 1 risk-based capital and leverage (Tier 1 capital divided by average total assets) ratios. The Federal Reserve requires banks to hold capital commensurate with the level and nature of all of the risks, including the volume and severity of problem loans, to which they are exposed.

As with the regulations applicable to bank holding companies, the Federal Reserve requires all state member banks to meet a minimum ratio of qualifying total capital to weighted risk assets of 8 percent, of which at least 4 percent should be in the form of Tier 1 capital.

The minimum ratio of Tier 1 capital to total assets, or the leverage ratio, for banking institutions rated composite "1" under the uniform rating system of banks and not experiencing or anticipating significant growth is 3 percent. For all other institutions, the minimum ratio of Tier 1 capital to total assets is 4 percent. Banking institutions with supervisory, financial, operational, or managerial weaknesses are expected to maintain capital ratios well above the minimum levels, as are institutions with high or inordinate levels of risk. Banks experiencing or anticipating significant growth are also expected to maintain capital, including tangible capital positions, well above the minimum levels. A majority of such institutions generally have operated at capital levels ranging from 1 to 2 percent above the stated minimums. Higher capital ratios could be required if warranted by the particular circumstances or risk profiles of individual banks. The standards set forth above specify minimum supervisory ratios based primarily on broad credit risk considerations. Banks, including ours, are generally expected to operate with capital positions above the minimum ratios.

At December 31, 2007, Irwin Union Bank and Trust had a total risk-based capital ratio of 12.5%, compared to our internal Policy minimum of 12%. Irwin Union Bank and Trust had a Tier 1 capital ratio of 10.7%, and a leverage ratio of 10.6%.

The risk-based capital guidelines also provide that an institution's exposure to declines in the economic value of the institution's capital due to changes in interest rates must be considered as a factor by the agencies in evaluating the capital adequacy of a bank or savings association. This assessment of interest rate risk management is incorporated into the banks' overall risk management rating and used to determine management's effectiveness.

*Insurance of Deposit Accounts*

As FDIC-insured institutions, Irwin Union Bank and Trust and Irwin Union Bank, F.S.B. are required to pay deposit insurance premiums based on the risk they pose to the Deposit Insurance Fund. As a result of the Federal Deposit Insurance Reform Act of 2005, the FDIC adopted a revised risk-based assessment system to determine assessment rates to be paid by member institutions such as Irwin Union Bank and Trust and Irwin Union Bank, F.S.B. Under this revised assessment system, risk is defined and measured using an institution's supervisory ratings with certain other risk measures, including certain financial ratios. The annual rates for 2007 for institutions in risk category I range from 5 to 7 basis points; the rate for institutions in risk category II is 10 basis points; and the rate for institutions in risk category III is 28 basis points. These rates may be offset by a one-time assessment credit held by an institution, based on the assessment base of that institution as of December 31, 1996,

and in the future by

9

dividends that may be declared by the FDIC if the deposit reserve ratio increases above a certain amount. The FDIC may raise or lower these assessment rates based on various factors to achieve a reserve ratio, which the FDIC currently has set at 1.25 percent of insured deposits.

In addition to deposit insurance fund assessments, the FDIC assesses all insured deposits a special assessment to fund the repayment of debt obligations of the Financing Corporation (FICO). FICO is a government-sponsored entity that was formed to borrow the money necessary to carry out the closing and ultimate disposition of failed thrift institutions by the Resolution Trust Corporation. At December 31, 2007, the annualized rate established by the FDIC for the FICO assessment was 1.14 basis points (0.00014%) per $100 of insured deposits.

*Dividend Limitations*

Under Indiana law, certain dividends require notice to, or approval by, the Indiana Department of Financial Institutions, and Irwin Union Bank and Trust may not pay dividends in an amount greater than its net profits then available, after deducting losses and bad debts.

In addition, as a state member bank, Irwin Union Bank and Trust may not, without the approval of the Federal Reserve, declare a dividend if the total of all dividends declared in a calendar year, including the proposed dividend, exceeds the total of its net income for that year, combined with its retained net income of the preceding two years, less any required transfers to the surplus account. As a result of our losses in 2007, the bank cannot declare a dividend to us without regulatory approval until such time that current year earnings plus earnings from the last two years exceeds dividends during the same periods. We sought and were granted such approval for a $15 million dividend in the second quarter of 2007. Our ability to pay dividends on our Trust Preferred, non-cumulative perpetual preferred, and common stock is dependent on our ability to dividend from Irwin Union Bank and Trust, for which prior approval would be necessary.

In consideration of the Corporation's recent losses, on February 28, 2008, the Board of Directors elected to defer dividend payments on the Corporation's trust preferred securities and elected to discontinue payment of dividends on its non-cumulative perpetual preferred and common stock. See the discussion above on *"Dividends"* in the section on *"Bank Holding Company Regulation."*

In most cases, savings and loan associations, such as Irwin Union Bank, F.S.B., are required either to apply to or to provide notice to the OTS regarding the payment of dividends. The savings association must seek approval if it does not qualify for expedited treatment under OTS regulations, or if the total amount of all capital distributions for the applicable calendar year exceeds net income for that year to date plus retained net income for the preceding two years, or the savings association would not be adequately capitalized following the dividend, or the proposed dividend would violate a prohibition in any statute, regulation or agreement with the OTS. In other circumstances, a simple notice is sufficient.

Our ability and the ability of Irwin Union Bank and Trust and Irwin Union Bank, F.S.B. to pay dividends also may be affected by the various capital requirements and the prompt corrective action standards described below under "Other Safety and Soundness Regulations." Our rights and the rights of our shareholders and our creditors to participate in any distribution of the assets or earnings of our subsidiaries also is subject to the prior claims of creditors of our subsidiaries including the depositors of a bank subsidiary.

*Interstate Banking and Branching*

Under federal law, banks are permitted, if they are adequately or well-capitalized, in compliance with Community Reinvestment Act requirements and in compliance with state law requirements (such as age-of-bank limits and deposit caps), to merge with one another across state lines and to create a main bank with branches in separate states. After establishing branches in a state through an interstate merger transaction, a bank may establish and acquire additional branches at any location in the state where any bank involved in the interstate merger could have established or acquired branches under applicable federal and state law.

As a federally chartered savings bank, Irwin Union Bank, F.S.B. has greater flexibility in pursuing interstate branching than an Indiana state bank. Subject to certain exceptions, a federal savings

association generally may

10

Table of Contents

establish or operate a branch in any state outside the state of its home office if the association meets certain statutory requirements.

### Community Reinvestment

Under the Community Reinvestment Act (CRA), banking and thrift institutions have a continuing and affirmative obligation, consistent with their safe and sound operation, to help meet the credit needs of their entire communities, including low- and moderate-income neighborhoods. Institutions are rated on their performance in meeting the needs of their communities. Performance is tested in three areas: (a) lending, which evaluates the institution's record of making loans in its assessment areas; (b) investment, which evaluates the institution's record of investing in community development projects, affordable housing and programs benefiting low or moderate income individuals and business; and (c) service, which evaluates the institution's delivery of services through its branches, ATMs and other activities. The CRA requires each federal banking agency, in connection with its examination of a financial institution, to assess and assign one of four ratings to the institution's record of meeting the credit needs of its community and to take this record into account in evaluating certain applications by the institution, including applications for charters, branches and other deposit facilities, relocations, mergers, consolidations, acquisitions of assets or assumptions of liabilities, and savings and loan holding company acquisitions. Irwin Union Bank and Trust received a "satisfactory" rating, and Irwin Union Bank, F.S.B. received an "outstanding" rating, on their most recent CRA performance evaluations.

### Other Safety and Soundness Regulations

Under current law, the federal banking agencies possess broad powers to take "prompt corrective action" in connection with depository institutions that do not meet minimum capital requirements. The law establishes five capital categories for insured depository institutions for this purpose: "well-capitalized," "adequately capitalized," "undercapitalized," "significantly undercapitalized" and "critically undercapitalized." To be considered "well-capitalized" under these standards, an institution must maintain a total risk-based capital ratio of 10% or greater; a Tier 1 risk-based capital ratio of 6% or greater; a leverage capital ratio of 5% or greater; and not be subject to any order or written directive to meet and maintain a specific capital level for any capital measure. An "adequately capitalized" institution must have a Tier 1 capital ratio of at least 4%, a total capital ratio of at least 8% and a leverage ratio of at least 4%. Federal savings banks must meet three minimum capital standards: an 8% risk-based capital ratio, a 4% leverage ratio (or 3% for those assigned a composite rating of 1), and a 1.5% tangible capital ratio. Federal law also requires the bank regulatory agencies to implement systems for "prompt corrective action" for institutions that fail to meet minimum capital requirements within the five capital categories, with progressively more severe restrictions on operations, management and capital distributions according to the category in which an institution is placed. Failure to meet capital requirements can also cause an institution to be directed to raise additional capital. Federal law also mandates that the agencies adopt safety and soundness standards relating generally to operations and management, asset quality and executive compensation, and authorizes administrative action against an institution that fails to meet such standards.

### Brokered Deposits

Brokered deposits include funds obtained, directly or indirectly, by or through a deposit broker for deposit into one or more deposit accounts. Well-capitalized institutions are not subject to limitations on brokered deposits, while an adequately capitalized institution is able to accept, renew or rollover brokered deposits only with a waiver from the FDIC and subject to certain restrictions on the yield paid on such deposits. Undercapitalized institutions are not permitted to accept brokered deposits. Due to its capital ratios, Irwin Union Bank and Trust and Irwin Union Bank, F.S.B. are permitted to, and do, accept brokered deposits.

### Anti-Money Laundering Laws

Irwin Union Bank and Trust and Irwin Union Bank, F.S.B. are subject to the Bank Secrecy Act and its implementing regulations and other anti-money laundering laws and regulations, including the USA PATRIOT Act of 2001. Among other things, these laws and regulations require Irwin Union Bank and Trust and Irwin Union Bank F.S.B to take steps to prevent the use of each institution for

facilitating the flow of illegal or illicit money, to report

11

Table of Contents

large currency transactions and to file suspicious activity reports. Each bank also is required to develop and implement a comprehensive anti-money laundering compliance program. Banks also must have in place appropriate "know your customer" policies and procedures. Violations of these requirements can result in substantial civil and criminal sanctions. In addition, provisions of the USA PATRIOT Act require the federal financial institution regulatory agencies to consider the effectiveness of a financial institution's anti-money laundering activities when reviewing bank mergers and bank holding company acquisitions.

*Compliance with Consumer Protection Laws*

The lending activities of Irwin Union Bank and Trust and its subsidiaries, Irwin Commercial Finance and Irwin Home Equity, are regulated by the Federal Reserve. Federal Reserve regulations and policies, such as restrictions on affiliate transactions and real estate lending policies relating to asset quality and prudent underwriting of loans, apply to our residential lending activities. The Indiana Department of Financial Institutions has comparable supervisory and examination authority over Irwin Commercial Finance and Irwin Home Equity due to their status as subsidiaries of Irwin Union Bank and Trust.

Our subsidiaries also are subject to federal and state consumer protection and fair lending statutes and regulations including the Equal Credit Opportunity Act, the Fair Housing Act, the Truth in Lending Act, the Truth in Savings Act, the Real Estate Settlement Procedures Act and the Home Mortgage Disclosure Act. In many instances, these acts contain specific requirements regarding the content and timing of disclosures and the manner in which we must process and execute transactions. Some of these rules provide consumers with rights and remedies, including the right to initiate private litigation. Specifically, these acts, among other things:

- require lenders to disclose credit terms in meaningful and consistent ways;

- prohibit discrimination against an applicant in any consumer or business credit transaction;

- prohibit discrimination in housing-related lending activities;

- require certain lenders to collect and report applicant and borrower data regarding loans for home purchases or improvement projects;

- require lenders to provide borrowers with information regarding the nature and cost of real estate settlements;

- prohibit certain lending practices and limit escrow account amounts with respect to real estate transactions; and

- prescribe possible penalties for violations of the requirements of consumer protection statutes and regulations.

In addition, banking subsidiaries are subject to a number of federal and state regulations that offer consumer protections to depositors, including account terms and disclosures, funds availability and electronic funds transfers.

As part of the home equity line of business in conjunction with its subsidiary, Irwin Home Equity, Irwin Union Bank and Trust originates home equity loans through its branch in Carson City, Nevada. Irwin Union Bank and Trust uses interest rates and loan terms in its home equity loans and lines of credit that are authorized by Nevada law, but might not be authorized by the laws of the states in which the borrowers are located. As a state member bank insured by the FDIC, Irwin Union Bank and Trust is authorized by Section 27 of the FDIA to charge interest at rates allowed by the laws of the state where the bank is located, including at a branch located in a state other than the Bank's home state, regardless of any inconsistent state law, and to apply these rates to loans to borrowers in other states. Irwin Union Bank and Trust relies on Section 27 of the FDIA and the FDIC opinion in conducting its home equity lending business described above. Any change in Section 27 of the FDIA or in the FDIC's interpretation of this provision, or any successful challenge as to the permissibility of these activities, could require that we change the terms of some of our loans or the manner in which we conduct our home equity line of business.

Irwin Union Bank and Trust entered into a memorandum of understanding with the Federal Reserve Bank of Chicago as of March 1, 2007 to enhance the consumer compliance function and

compliance oversight programs of the Bank and its subsidiaries. Under the memorandum of understanding, which is considered an informal

# EXHIBIT 4
# PART 3
# SUPP. DIXON DEC

# EXHIBIT B

E-filing

1  COOPER, WHITE & COOPER LLP
   STEPHEN KAUS (SBN 57454)
2    skaus@cwclaw.com
   201 California Street, 17th Floor
3  San Francisco, California 94111
   Telephone:    415.433.1900
4  Facsimile:    415.433.5530

5  BARNES & THORNBURG LLP
   MICHAEL H. GOTTSCHLICH (SBN 155277)
6    michael.gottschlich@BTlaw.com
   11 South Meridian Street
7  Indianapolis, Indiana 46204
   Telephone:    317.236.1313
8  Facsimile:    317.231.7433

9  Attorneys for IRWIN UNION BANK AND
   TRUST COMPANY and IRWIN HOME
10 EQUITY CORPORATION

ORIGINAL
FILED

JAN 22 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ADR

11

12                UNITED STATES DISTRICT COURT

13        NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

14

15  IRWIN UNION BANK AND TRUST          CASE NO. C08-00472
    COMPANY and IRWIN HOME EQUITY
16  CORPORATION,                        COMPLAINT AND DEMAND
                                        FOR JURY TRIAL
17              Plaintiffs,

18      vs.

19  FREEDOM MORTGAGE CORPORATION,

20              Defendant.

PJH

21

22          COMPLAINT AND DEMAND FOR JURY TRIAL

23      1.    This case involves a breach of various duties owed by Defendant Freedom

24  Mortgage Corporation to Plaintiffs in connection with the sale and servicing of numerous

25  mortgage loans.

26                              PARTIES

27      2.    Plaintiff Irwin Union Bank and Trust Company ("Irwin Union") is a corporation

28  organized under the laws of the State of Indiana with its principal place of business in Columbus,

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111

593772.1

COMPLAINT AND DEMAND FOR JURY TRIAL

1  Indiana. Irwin Union is a commercial bank.

2      3.     Plaintiff Irwin Home Equity Corporation ("Irwin Home Equity") is a corporation

3  organized under the laws of the State of Indiana with its principal place of business in San Ramon,

4  California. Irwin Home Equity is a consumer mortgage lender.

5      4.     Defendant Freedom Mortgage Corporation ("Freedom") is a corporation organized

6  under the laws of New Jersey with its principal place of business in New Jersey. According to its

7  web site, Freedom is a licensed mortgage banker in all 50 states with over 100 offices nationwide.

8      5.     Freedom is registered to do business in California as Freedom Home Mortgage

9  Corporation.

### JURISDICTION

10

11      6.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332

12  because both Plaintiffs are citizens of different states than the Defendant and because the amount

13  in controversy exceeds $75,000, exclusive of interest and costs.

### VENUE

14

15      7.     Venue is appropriate in this District under 28 U.S.C. § 1391(a)(1) because

16  Defendant Freedom resides in this District and under 28 U.S.C. § 1391(a)(2) because a substantial

17  part of the events or omissions giving rise to the suit occurred in this District.

### INTRA-DISTRICT ASSIGNMENT

18

19      8.     This case arises in Contra Costa County because it involves a contract containing a

20  Contra Costa County venue provision. (Exhibit A, § 8.11.)

### FACTUAL ALLEGATIONS

21

22      9.     On or about August 7, 2006, Defendant Freedom entered into an agreement to

23  acquire substantially all of the mortgage origination assets of Irwin Mortgage Corporation

24  ("IMC"). IMC is a wholly-owned subsidiary of Irwin Union and a sister company of Irwin Home

25  Equity. Freedom's acquisition of IMC's assets under the above-referenced agreement was

26  completed in September, 2006.

27      10.    Prior to this acquisition, IMC was in the business of making loans to individual

28  borrowers to buy homes or to refinance the existing debt on their homes. These loans ("Mortgage

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111

593772.1                                    2
                     COMPLAINT AND DEMAND FOR JURY TRIAL

1  Loans") were generally evidenced by notes secured by mortgages.

2      11.    Prior to the acquisition, IMC had an agreement with Irwin Union and Irwin Home

3  Equity under which IMC could sell the Mortgage Loans to Irwin Union and Irwin Home Equity if

4  the Mortgage Loans complied with specified guidelines.

5      12.    IMC's agreement with Irwin Union and Irwin Home Equity was memorialized in

6  the December 11, 2003 Correspondent Loan Purchase and Sale Agreement, the Addendum to

7  Correspondent Loan Purchase and Sale Agreement (Third Party Originators) dated January 6,

8  2004, and the Addendum to Correspondent Loan Purchase and Sale Agreement (Non-Standard

9  Loans) dated February 10, 2004 (together, the "Loan Purchase Agreement").

10     13.    A true and accurate copy of the Loan Purchase Agreement (including the two

11  addenda referenced above) is attached as Exhibit A.

12     14.    With respect to each Mortgage Loan sold under the Loan Purchase Agreement,

13  IMC made certain representations and warranties.  (Loan Purchase Agreement, § 5.02(2).)

14     15.    The representations and warranties included that:

15     (a)    Each Loan is valid and was originated in accordance with the loan

16  origination, eligibility and credit underwriting standards of the Purchaser's

17  Underwriting Guidelines then in effect.  (Loan Purchase Agreement, § 5.02(2)(b).)

18     (b)    The origination, servicing and collection practices with respect to each Loan

19  have been conducted in all respects and in accordance with the terms of the

20  Mortgage Note and in compliance with all applicable laws and regulations and in

21  accordance with the proper, prudent and customary practices in the mortgage

22  origination and servicing business.  (Loan Purchase Agreement, § 5.02(2)(o).)

23     (c)    Seller complied with the purchase and post-purchase requirements of the

24  Correspondent Partner Manual with respect to the Mortgage Loans.  (Loan

25  Purchase Agreement, § 5.02(2)(ee).)

26     (d)    The Mortgagor on the Mortgage Loan has reasonably demonstrated an

27  ability to repay the Mortgage Loan on the terms and conditions set forth in the

28  Mortgage Loan Documents.  (Loan Purchase Agreement, § 5.02(2)(gg).)

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111

593772.1

3

COMPLAINT AND DEMAND FOR JURY TRIAL

1      16.    Under the Loan Purchase Agreement, if Irwin Union or Irwin Home Equity

2  purchased a Mortgage Loan that subsequently was deemed to include a "Defect" and this Defect

3  could not be cured, IMC was obligated to repurchase the Defective Mortgage Loan. (Loan

4  Purchase Agreement, § 6.02.)

5      17.    The original definition of "Defect" included a Mortgage Loan for which:

6          [t]he Mortgagor fails to make the first Monthly Payment due to
Purchaser after the Sale Date within thirty (30) days of the Monthly

7          Payment Due Date, regardless of whether such payment is
subsequently paid by the Mortgagor or if any Monthly Payment in

8          the form of a check is returned for insufficient funds thus causing
the delinquency to occur....

9

10  (Loan Purchase Agreement, § 6.01(d).)

11      18.    A "Defect" also includes any Mortgage Loan for which:

12          [a]ny representation or warranty of the Seller contained in this
Agreement, in the reasonable judgment of the Purchaser is untrue or

13          incorrect in a manner that materially and adversely affects the value
or collectability of a Mortgage Loan.

14

15  (Loan Purchase Agreement, § 6.01(c).)

16      19.    In connection with Freedom's purchase of IMC's assets, IMC assigned its interest

17  in the Loan Purchase Agreement to Freedom, and Freedom assumed all of IMC's obligations

18  under the Loan Purchase Agreement.

19      20.    A true and accurate copy of the Assignment and Assumption Agreement dated

20  September 18, 2006 ("Assignment Agreement") is attached as Exhibit B.

21      21.    A true and accurate copy of Irwin Union's and Irwin Home Equity's Consent to

22  Assignment dated September 29, 2006, is attached as Exhibit C.

23      22.    On or about October 2, 2006, Freedom sent a letter to Irwin Union and Irwin Home

24  Equity ("October 2nd Letter") stating that Freedom had assumed all of IMC's obligations with

25  respect to the Loan Purchase Agreement.

26      23.    A true and accurate copy of October 2nd Letter is attached as Exhibit D.

27      24.    The October 2nd Letter specifically states that "Freedom has assumed all

28  obligations with respect [to the Loan Purchase Agreement]...."

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111

593772.1

4

COMPLAINT AND DEMAND FOR JURY TRIAL

1     25.    On or about October 2, 2006, Freedom executed the Addendum to Correspondent

2  Loan Purchase and Sale Agreement (Termination of Non-Standard Loans and Other

3  Modifications) ("Addendum").

4     26.    A true and accurate copy of the Addendum is attached as Exhibit E.

5     27.    The Addendum modified Section 6.01(d) of the Loan Purchase Agreement.  As

6  amended, Section 6.01(d) states:

7           Following the purchase of any Loan by Purchaser pursuant to this
           Agreement, and notwithstanding the review of the Mortgage Loan
8           Documents pursuant to Article II hereof, it will be deemed a
           "Defect" in the Mortgage Loan should any one or more of the
9           following events occur with regard to a Mortgage Loan:

10                                    ***

11          Regardless of whether payment is subsequently paid by the
           Mortgagor, (i) the Mortgage Loan has been thirty (30) or more days
12          delinquent at least once prior to the Sale Date, (ii) the Mortgage
           Loan is thirty (30) or more days delinquent as of the Sale Date, (iii)
13          the Mortgagor fails to make any of the first, second or third
           payment[s] due to the Purchaser after the Sale Date within thirty
14          (30) days of each Monthly Payment Due Date or (iv) any payment
           made in the form of a check is returned for insufficient funds thus
15          causing (i), (ii) or (iii) to occur....

16  (Loan Purchase Agreement, § 6.01; Addendum, ¶ D.)

17    28.    Section 6.01 states that Freedom cannot cure a Defect under Section 6.01(d):

18  "Notwithstanding anything to the contrary, in the event of a Defect under Section 6.01(d)

19  above..., the Seller may not cure such Defect."

20    29.    Pursuant to the Loan Purchase Agreement and amendments, Plaintiffs Irwin Union

21  and Irwin Home Equity purchased certain Mortgage Loans from Freedom and/or IMC.

22    30.    Many of these Mortgage Loans include "Defects" as defined in the Loan Purchase

23  Agreement (the "Defective Mortgage Loans").

24    31.    For example, for some of the Defective Mortgage Loans, the mortgagor failed to

25  make the first, second and/or third payment due to Irwin Union or Irwin Home Equity after the

26  Sale Date within thirty (30) days of the respective Monthly Payment Due Date.  These Defective

27  Mortgage Loans include Defects as defined by Section 6.01(d) of the Loan Purchase Agreement

28  and Addendum.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111

593772 1                                  5
                      COMPLAINT AND DEMAND FOR JURY TRIAL

32. For some Defective Mortgage Loans, the documents submitted for loan underwriting contained untrue statements of material fact and/or omitted material facts required to make the information and statements therein not misleading. These Defective Mortgage Loans include Defects as defined by Section 6.01(c) of the Loan Purchase Agreement.

33. Irwin Union and Irwin Home Equity provided written notice of the Defects to Freedom.

34. True and accurate copies of these written notices are attached as Exhibits F, G, H, I, and J.

35. Under Section 6.02 of the Loan Purchase Agreement, Freedom was obligated to repurchase the Defective Mortgage Loans.

36. Freedom has refused to repurchase the Defective Mortgage Loans.

37. Section 8.10 of the Loan Purchase Agreement allows the prevailing party to recover reasonable attorneys' fees and other costs incurred in an action or proceeding to enforce the agreement.

## COUNT I – BREACH OF CONTRACT

### (Early Payment Defaults)

38. Plaintiffs re-allege the allegations contained in paragraph 1 through 37 as though set forth fully herein.

39. The Loan Purchase Agreement and amendments are valid, enforceable contracts.

40. All conditions precedent to Defendant Freedom's performance have been performed, have occurred, or have been waived.

41. Plaintiffs have performed their duties under the Loan Purchase Agreement except to the extent that they were prevented or excused from performing them.

42. Defendant Freedom materially breached the Loan Purchase Agreement and amendments by failing to repurchase the Defective Mortgage Loans.

43. Plaintiffs Irwin Union and Irwin Home Equity have suffered and continue to suffer damages as a result of Freedom's material breaches.

44. Plaintiffs are entitled to reasonable attorneys' fees and other costs incurred in this

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111

593772.1

6

COMPLAINT AND DEMAND FOR JURY TRIAL

1  action.

2      WHEREFORE, Plaintiffs Irwin Union and Irwin Home Equity request that the Court enter

3  Judgment in their favor on Count I of the Complaint and against Defendant Freedom and award

4  damages, attorneys' fees and other costs incurred in this action, and all other just and appropriate

5  relief.

## COUNT II – BREACH OF CONTRACT

### (Representations and Warranties)

8      45.    Plaintiffs re-allege the allegations contained in paragraphs 1 through 44 as though

9  set forth fully herein.

10     46.    The Loan Purchase Agreement and amendments are valid, enforceable contracts.

11     47.    All conditions precedent to Defendant Freedom's performance have been

12  performed, have occurred, or have been waived.

13     48.    Plaintiffs have performed their duties under the Loan Purchase Agreement except

14  to the extent that they were prevented or excused from performing them.

15     49.    The Loan Purchase Agreement and amendments contained various representations

16  and warranties, including but not limited to, that the documents, instruments and agreements

17  submitted for loan underwriting "contain no untrue statement of material fact or omit to state a

18  material fact required to be stated therein or necessary to make the statements therein not

19  misleading." (Loan Purchase Agreement, Section 5.02(2)(b).)

20     50.    Defendant Freedom violated the Loan Purchase Agreement and amendments by

21  submitting Mortgage Loans to Plaintiffs with materially inaccurate and/or incomplete information.

22     51.    Plaintiffs Irwin Union and Irwin Home Equity have suffered and continue to suffer

23  damages as a result of Defendant Freedom's material breaches.

24     52.    Plaintiffs are entitled to reasonable attorneys' fees and other costs incurred in this

25  action.

26     WHEREFORE, Plaintiffs Irwin Union and Irwin Home Equity request that the Court enter

27  Judgment in their favor on Count II of the Complaint and against Defendant Freedom and award

28  damages, attorneys' fees and other costs incurred in this action, and all other just and appropriate

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111

593772.1

7

COMPLAINT AND DEMAND FOR JURY TRIAL

1  relief.

## COUNT III – NEGLIGENCE

3      53.    Plaintiffs re-allege the allegations contained in paragraph 1 through 52 as though

4  set forth fully herein.

5      54.    Defendant Freedom owed a duty to Irwin Union and to Irwin Home Equity to

6  comply with reasonable, commercial standards when underwriting loans that it intended to sell to

7  Irwin Union and/or Irwin Home Equity.

8      55.    Defendant Freedom breached this duty.  For example, Freedom negligently failed

9  to detect that borrowers did not disclose other properties that they owned; it failed to detect

10 inconsistencies in certain properties' chains of title; and it failed to detect inconsistencies in sales

11 documents.

12     56.    Plaintiffs Irwin Union and Irwin Home Equity have suffered and continue to suffer

13 damages as a result of Defendant Freedom's negligence.

14     WHEREFORE, Plaintiffs Irwin Union and Irwin Home Equity request that the Court enter

15 Judgment in their favor on Count III of the Complaint and against Defendant Freedom and award

16 damages and all other just and appropriate relief.

## DEMAND FOR JURY TRIAL

18     Trial by jury is hereby demanded on any matters where such trial is available.

19

20 DATED: January 22, 2008          COOPER, WHITE & COOPER LLP

21

22                   By:                                    
23                          Stephen Kaus
                         Attorneys for IRWIN UNION BANK AND
24                          TRUST COMPANY and IRWIN HOME
                         EQUITY CORPORATION

25

26

27

28

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111

593772.1

8

COMPLAINT AND DEMAND FOR JURY TRIAL

**EXHIBIT A**

## CORRESPONDENT LOAN PURCHASE AND SALE AGREEMENT

This is a Correspondent Loan Purchase and Sale Agreement (the "Agreement"), dated as of December 11, 2003 by and between IRWIN UNION BANK AND TRUST COMPANY, having an address of 500 Washington Street, Columbus, Indiana 47201 and/or IRWIN HOME EQUITY CORPORATION, having an address at 12677 Alcosta Blvd., Suite 500; San Ramon, California 94583 (individually and collectively; the "Purchaser") and Irwin Mortgage Corporation having an address of 9265 Counselors Row, Suite 200, Indianapolis, IN 46240 ("Seller").

### WITNESSETH

WHEREAS, the Seller desires from time to time to offer for sale to the Purchaser, and the Purchaser desires from time to time to purchase, on the terms and subject to the conditions set forth herein, certain loans ("Loans") owned by the Seller evidenced by notes and secured by mortgages of the agreed-upon priority on real property, owned by the borrowers ("Borrowers").

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and reasonable consideration, the receipt and adequacy of which each party hereby acknowledges hereto, the Seller and the Purchaser hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Whenever used herein, the following words and phrases, unless the context otherwise requires, shall have the following meanings:

Agreement: This Correspondent Loan Purchase and Sale Agreement including all Exhibits and Schedules attached hereto or delivered pursuant hereto, and all amendments hereof and supplements hereto.

Assignment of Mortgage: An assignment of the Mortgage, notice of transfer, or equivalent instrument in recordable form to reflect the sale of the Mortgage, which assignment, notice of transfer or equivalent instrument may not be in the form of one or more blanket assignments.

Broker: Anyone who solicits borrowers or lenders or negotiates loans or collects payments or performs services for borrowers or lenders in connection with loans secured directly or indirectly by liens on real property.

Business Day: Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions, in the State of Indiana or the State of California or the state in which the Purchaser's servicing operations are located, are authorized or obligated by law or executive order to be closed.

Correspondent Partner Manual: The policies and procedures governing the sale and transfer of Loans between Purchaser and Seller, including the Underwriting Guidelines, as may be amended from time to time by Purchaser. Purchaser agrees to provide Seller with thirty (30) days' prior written notice of any changes to the Purchaser's Correspondent Partner Manual.

*IHE Agreement Revised 12/12/03*

Discount Rate: The percent by which the Purchase Price is less than 100% of the outstanding principal balance of a Mortgage Loan as of the Sale Date. Also known as the Negative Service Released Premium.

Due Date: The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any grace period stipulated under the terms of the Mortgage Note.

Escrow Payments: With respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, buy-down funds, optional insurance funds and any other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to the requirements of the Mortgage or any other document.

HELOC:    A Mortgage Loan that is a home equity line of credit or any other arrangement under which the Mortgagor has the right to demand further advances from the mortgagee.

High Cost Loan:    A loan subject to the Home Ownership and Equity Protection Act of 1994 (also known as a "Section 32" or "HOEPA" loan) or such other loan that was defined as a "high cost" mortgage loan under federal, state or local law at the time of origination of such loan.

Maximum Loan Amount:    With respect to each Mortgage Loan that is a HELOC, the maximum principal amount that may be outstanding at any time under the terms of the related Loan Documents.

MERS: Mortgage Electronic Registration Systems, Inc.

Monthly Payment: The scheduled monthly payment of principal and interest on a Mortgage Loan.

Mortgage:  An individual mortgage, deed of trust or other instrument which creates a lien on an estate in fee simple in real property securing the Mortgage Note.

Mortgage Loan: An individual residential mortgage loan, which is the subject of this Agreement. Each Mortgage Loan includes without limitation the Mortgage Loan Documents, the Mortgage Loan File, and all Monthly Payments, Principal Prepayment payable after the Sale Date and amounts in any buydown account, and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

Mortgage Loan Documents: With respect to each Mortgage Loan, the related Mortgage Note, the endorsement of the Note, the Mortgage, the Assignment of Mortgage, all intervening assignments of the Mortgage and the title policy or marked up commitment or binder therefor.

Mortgage Loan File:  A file containing the following documents for each Mortgage Loan:

(a)  The original Mortgage Note signed by the Mortgagor and bearing Seller's endorsement to Purchaser;

(b)  The original recorded Mortgage executed contemporaneously with the Note; or copies thereof certified by Seller if such original have been delivered to a recording office and not yet returned.

(c)  The Assignment of Mortgage and a certified copy of any and all intervening assignments;

2

*IHE Agreement Revised 6/23/03*

(d) The original credit application;

(e) All credit information concerning the Mortgagor or any other person obligated on the Mortgage Loan and all guarantees and other agreements securing such transactions, including all credit reports;

(f) Evidence of application for adequate flood insurance coverage, if applicable, with respect to the Mortgaged Property, with Seller being declared or designated as mortgagee and loss payee or an authorization signed by the Mortgagor to add Seller, its successors and/or its assigns, as mortgagee;

(g) Copies of all disclosure statements required by any federal or state law, rule or regulation, including without limitation the Real Estate Settlement Procedures Act and any truth-in-lending act or similar consumer protection act, and all statements indicating that the Mortgagor has received such required disclosures, including any acknowledgment of receipt of the original statement shown thereon;

(h) The appraisal or property evaluation of the real estate secured by the Mortgage Loan, if required under the Underwriting Guidelines;

(i) A statement showing the unpaid principal balance of the Mortgage Loan, the amount of periodic installments and the date(s) to which principal and interest have been paid and, if required by Purchaser, information in electronic form for all receipts and disbursements from the inception of the Mortgage Loan including the date of each receipt or disbursement;

(j) The title insurance policy, opinion or report with respect to the lien priority of the Mortgage Loan, if required under the Underwriting Guidelines;

(k) All documents relating to any rights of rescission of the Mortgagor; and

(l) Any and all other documents, agreements or instruments related to the origination, closing, enforceability or purchase of the Mortgage Loan as applicable.

Mortgage Note: The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgaged Property: The real property securing repayment of the debt evidenced by a Mortgage Note.

Mortgagor: The obligor on a Mortgage Note.

Note Interest Rate: The annual rate of interest stated on a Mortgage Note.

Premium: The amount equal to the Premium Rate multiplied by the outstanding principal balance of a Mortgage Loan as of the Sale Date.

Premium Rate: The percent by which the Purchase Price exceeds 100% of the outstanding principal balance of a Mortgage Loan as of the Sale Date. Also known as the Service Released Premium.

3

*JHE Agreement Revised 6/23/03*

Principal Prepayment: Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any prepayment penalty or premium thereon, and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Purchase Advice: The document, delivered by the Purchaser to the Seller on or immediately prior to each Sale Date, setting forth certain information regarding the Mortgage Loans, as of the Sale Date specified therein, scheduled to be transferred by the Seller to the Purchaser on such Sale Date. Such Purchase Advice shall be in the form of Exhibit "A" attached hereto.

Purchase Price: The aggregate of the amounts to be paid by the Purchaser to the Seller in exchange for the Mortgage Loans and related Servicing Rights for the related Mortgage Loans as agreed upon by the parties hereto.

Repurchase Date: The date on which the Seller repurchases a Mortgage Loan pursuant to the terms of this Agreement.

Sale Date: The date mutually agreed upon by the Seller and the Purchaser: (a) on which the Seller transfers ownership of the Mortgage Loans to the Purchaser; (b) upon which the receipt of payments, accrual of interest and other charges shall cease for the benefit of the Seller and begin for the benefit of the Purchaser; and (c) on which the Purchaser assumes the actual servicing of the related Mortgage Loans in accordance with the terms hereof.

Servicing Files: The documents, files and other items pertaining to Mortgage Loans and the servicing of such Mortgage Loans that are in the possession of the Seller on the Sale Date.

Servicing Rights: With respect to each Mortgage Loan, any and all of the following: (a) all rights to service the Mortgage Loan; (b) any payments or monies payable or received for servicing the Mortgage Loan; (c) any late fees, prepayment penalties, assumption fees, penalties or similar payments with respect to the Mortgage Loan; (d) all agreements or documents creating, defining or evidencing any such Servicing Rights and all rights of the Seller thereunder, including, but not limited to any clean-up calls and termination options; (e) other payments with respect to the Mortgage Loan and any amounts actually collected with respect thereto; (f) all accounts and other rights to payment related to any of the property described in this paragraph; (g) possession and use of the Servicing File and any files pertaining to the past, present, or prospective servicing of the Mortgage Loan; and (h) all rights, powers and privileges incident to any of the foregoing.

Underwriting Guidelines: Purchaser's loan underwriting guidelines as may be amended from time to time.

## ARTICLE II
## ELIGIBLE LOANS; LOAN REVIEW

Section 2.01    Eligible Loans

Only those Mortgage Loans that comply fully with the Underwriting Guidelines and with all of the terms and conditions of this Agreement and the Correspondent Partner Manual are eligible for purchase under this Agreement. Notwithstanding anything to the contrary in this Agreement, Purchaser has the right, without prior notice to Seller, to cease accepting loan submissions for Loans in jurisdictions

which have enacted laws or in which cases have been decided that Purchaser, in its sole discretion, believes to be unduly burdensome or places Purchaser in high risk.

Section 2.02.    Loan Pre-Approval

From time to time, Seller may present loan applications to Purchaser for Purchaser's preapproval prior to Seller's commitment to extend credit. With respect to each Loan for which Seller desires to obtain Purchaser's preapproval, Seller shall submit to Purchaser: (i) a completed underwriting and transmittal summary in the form required by Purchaser, a sample of which is provided in the Correspondent Partner Manual; (ii) a completed loan application; (iii) a credit report; and (iv) such other documents required by the Purchaser, as stated in the Correspondent Partner Manual. Upon receipt and review of these items by Purchaser, Purchaser may, in its sole discretion, conditionally preapprove the Mortgage Loan and may, at its sole discretion, issue a written commitment for such a preapproved Mortgage Loan. Seller acknowledges and understands that such preapproval is conditional only and that Purchaser shall have no obligation to purchase such Loan unless such Loan is closed and submitted for purchase in accordance with Section 2.03 and Purchaser thereafter elects, in its sole discretion, to purchase such Loan. Furthermore, in order for any commitment issued by Purchaser under this Section 2.02 to apply, the Loan must be closed and submitted to Purchaser in accordance with Section 2.03 within the time specified in such commitment.

Section 2.03    Mortgage Loan Review and Approval

(a) From time to time, Seller will present closed Mortgage Loans to the Purchaser that the Seller proposes to sell to the Purchaser under the terms of this Agreement. Seller shall deliver to Purchaser the Mortgage Loan File related to said Mortgage Loan. The Purchaser shall review said Mortgage Loan File and shall approve or disapprove each such Mortgage Loan for purchase hereunder in accordance with the procedures set forth in the Purchaser's Correspondent Partner Manual.

(b) Seller acknowledges and agrees that Purchaser has no obligation to purchase Mortgage Loans submitted by Seller that do not meet Purchaser's standards as stated in the Correspondent Partner Manual or if Purchaser, in its discretion, believes any Mortgage Loan poses a credit and/or legal risk. Should Purchaser decide not to purchase a Mortgage Loan, Purchaser shall return the Mortgage Loan File and any other documents submitted to it to Seller. Seller may cure any deficiencies noted by Purchaser and may re-submit the Loan to Purchaser.

(c) In the event a Mortgage Loan is submitted for approval under the terms of this Section 2.03 for which Purchaser shall have issued a written preapproval as set forth in Section 2.02, Purchaser shall not be obligated to purchase said Mortgage Loan if such Mortgage Loan at the time it is delivered fails to meet the conditions of the pre-approval or contains any other defect that would cause said loan to fail to meet the standards set forth in the Correspondent Partner Manual.

(d) For any Loans purchased by Purchaser, the examination of the Mortgage Loan File shall not constitute a waiver of any representation, warranty, or covenant by the Seller, the Mortgagor or any other party connected with the Mortgage Loan, with respect to such Mortgage Loan.

5                    *IHE Agreement Revised 6/23/03*

Section 2.04    Notifications of Action Taken

In the event that Seller submits a loan application to Purchaser prior to Seller extending credit to the applicant, and neither Purchaser nor any other creditor extends credit to the applicant or the applicant does not accept or use any credit offered, Seller agrees to deliver to the applicant an adverse action notice in accordance with all applicable state and federal laws and regulations, including, without limitation, Regulation B and the Equal Credit Opportunity Act. Purchaser shall accurately and in a timely manner provide Seller with the information necessary for such notification.

## ARTICLE III
## CONVEYANCE FROM SELLER TO PURCHASER
## ASSUMPTION OF SERVICING BY PURCHASER

Section 3.01    Conveyance of Mortgage Loans and Servicing Rights

On each Sale Date, the Seller will sell, transfer, assign, set over and convey to the Purchaser, all right, title and interest of the Seller in and to the Mortgage Loans set forth in the related Loan Schedule and the Mortgage Loan Documents, Servicing Rights, the Mortgage Loan Files, Servicing Files related to the Mortgage Loans free and clear of all liens, security interests, charges or encumbrances.

Transfer of Title

(a) On each Sale Date, title to each Mortgage shall be conveyed by Seller: (i) delivering to the Purchaser an Assignment of Mortgage in the name of Purchaser or Purchaser's designee for each Mortgage Loan in a form acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located, or (ii) if the Mortgage Loan is registered with MERS, properly registering the transfer in ownership in the MERS system. Seller shall bear the cost and expense of preparing all such Assignments of Mortgages and shall pay the sum of Fifty dollars ($50.00) per Mortgage Loan towards the costs incurred by Purchaser associated with recording the Assignments of Mortgage.

(b) Title to each Mortgage Note shall be delivered by Seller to Purchaser by Seller endorsing each Mortgage Note in the manner specified by the Purchaser.  Seller shall bear the cost and expense of preparing all such endorsements.

## ARTICLE IV
## PAYMENT OF THE PURCHASE PRICE

On the Sale Date, the Purchaser shall pay the Seller, by immediately available funds, the Purchase Price set forth on the Purchase Advice. The Purchase Price shall be determined according to the rate sheets in effect at the time of origination (or Sale Date if rates have changed; see the CPM for rate change guidelines), unless the parties mutually agree to a different Purchase Price for a Mortgage Loan prior to the Sale Date for such Loan.

6                                  *IHE Agreement Revised 6/23/03*

ARTICLE V
REPRESENTATIONS, WARRANTIES AND AGREEMENTS

Section 5.01    Representations, Warranties and Agreements of the Purchaser

The Purchaser, as a condition to the consummation of the transactions contemplated hereby, makes the following representations, warranties and agreements to the Seller as of each Sale Date:

(a) The Purchaser is duly organized, validly existing, and in good standing under the laws of the State of Indiana and has the power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement by the Purchaser and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action; this Agreement evidences the valid, binding and enforceable obligation of the Purchaser; and all requisite corporate action has been taken by the Purchaser to make this Agreement valid, binding and enforceable upon the Purchaser in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization, moratorium and other, similar laws relating to or affecting creditors rights generally or the application of equitable principles in any proceeding, whether at law or in equity;

(b) All actions, approvals, consents, waivers, exemptions, variances, franchises, orders, permits, authorizations, rights and licenses required to be taken, given or obtained, as the case may be, on Purchaser's that are necessary in connection with the execution of this Agreement and the performance of the transactions hereunder have been duly taken, given or obtained, as the case may be, are in full force and effect on the date hereof, are not subject to any pending proceedings or appeals;

(c) The consummation of the transactions contemplated by this Agreement will not result in the breach of any terms or provisions of the charter or by-laws of the Purchaser or result in the breach of any term or provision of, or conflict with or constitute a default under or result in the acceleration of any obligation under, any material agreement, indenture or loan or credit agreement or other material instrument to which the Purchaser or its property is subject, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Seller or its property is subject;

(d) There is no action, suit, proceeding or investigation pending or, to the best of the Purchaser's knowledge, threatened against the Purchaser which, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of the Purchaser or in any material impairment of the right or ability of the Purchaser to carry on its business substantially as now conducted, or in any material liability on the part of the Purchaser or which would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be taken in connection with the obligations of the Purchaser contemplated herein, or which would be likely to impair materially the ability of the Purchaser to perform under the terms of this Agreement.

(e) From and after the Sale Date, Purchaser shall make all advances required to be made under any Mortgage Loan that is a HELOC.

7                                    *IHE Agreement Revised 6/23/03*

<u>Section 5.02     Representations and Warranties of the Seller</u>

1.     Seller, as a condition to the consummation of the transactions contemplated hereby, makes the following representations and warranties to the Purchaser as of the Sale Date. With respect to any representation or warranty of the Seller that is made to the best of the Seller's knowledge, if it is discovered by the Purchaser, that the substance of such representation and warranty was inaccurate as of the Sale Date, as applicable, and such inaccuracy materially and adversely affects the value of the related Mortgage Loan, then notwithstanding the Seller's lack of knowledge with respect to the inaccuracy at the time the representation or warranty was made, such inaccuracy shall be deemed a breach of the applicable representation or warranty:

(a)     Seller is a corporation duly organized and validly existing under the laws of the state of Indiana; it has all licenses necessary to carry on its business as now being conducted and is licensed, qualified and in good standing in each state in which any of the Mortgaged Property is located if the laws of such state require licensing or qualification in order to (i) conduct business of the type conducted by Seller (ii) insure enforceability of each Mortgage Note and Mortgage and (iii) perform its obligations hereunder, and no demand for such qualification has been made upon the Seller by any state having jurisdiction over Seller or any of the Mortgaged Property; Seller has the power and authority to hold each Mortgage Loan and to execute and deliver this Agreement and to perform in accordance herewith and all transactions contemplated hereby; the execution, delivery and performance of this Agreement (including but not limited to all instruments of transfer to be delivered pursuant to this Agreement) by Seller and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action; this Agreement evidences the valid, binding and enforceable obligation of Seller; and all requisite corporate action has been taken by Seller to make this Agreement valid, binding and enforceable upon Seller in accordance with its terms;

(b)     All actions, approvals, consents, waivers, exemptions, variances, franchises, orders, permits, authorizations, rights and licenses required to be taken, given or obtained, as the case may be, by or from any federal, state or other governmental authority or agency, that are necessary in connection with the purchase and sale of the Mortgage Loans and the execution and delivery by Seller of the documents to which it is a party, including but not limited to the Mortgage Loan Documents and this Agreement, have been duly taken, given or obtained, as the case may be, are in full force and effect on the date hereof, are not subject to any pending proceedings or appeals (administrative, judicial or otherwise) and either the time within which any appeal therefrom may be taken or review thereof may be obtained has expired or no review thereof may be obtained or appeal therefrom taken, and are adequate to authorize the consummation of the transactions contemplated by this Agreement and the other documents on the part of Seller and the performance by Seller of its obligations under this Agreement and such of the other documents to which it is a party;

(c)     The origination of the Mortgage Loans, the sale thereof and the consummation of the transactions contemplated by this Agreement will not result in the breach of any terms or provisions of the charter or by-laws of Seller or result in the breach of any term or provision of, or conflict with or constitute a default under or result in the acceleration of any obligation under, any material agreement, indenture or loan or credit agreement or other material instrument to which Seller or its property is subject, or result in the violation or breach of any law, rule, regulation, legal restriction, order, judgment or decree to which Seller or its property is subject;

(d)     Except as disclosed by Irwin Financial Corporation through SEC public filings, there is no action, suit, proceeding or investigation pending or to the best of Seller's knowledge, threatened

8

<em>IHE Agreement Revised 6/23/03</em>

against Seller which is reasonably likely to be adversely determined and if adversely determined, either in any one instance or in the aggregate, would result in any adverse change in the business, operations, financial condition, properties or assets of Seller or in any material impairment of the right or ability of Seller to carry on its business substantially as now conducted, or in any material liability on the part of Seller or which would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be taken in connection with the obligations of Seller contemplated herein, or which would be likely to impair the ability of Seller to perform under the terms of this Agreement;

(e)   Seller is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which default might have consequences that would materially and adversely affect the condition (financial or otherwise) or operations of Seller or its properties or might have consequences that would materially and adversely affect its performance hereunder;

(f)   Seller does not believe, nor has any reason to believe, that it cannot perform each and every covenant contained in this Agreement;

(g)   Seller represents that upon payment of the Purchase Price by the Purchaser under this Agreement, the Purchaser will have good title to each Mortgage Loan free and clear of any lien, claim, charge or encumbrances;

(h)   The transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by Seller pursuant to this Agreement are in the ordinary course of business of the Seller and are not subject to the bulk transfer or fraudulent conveyance laws or any similar statutory provisions in effect in any applicable jurisdiction; and

(i)   The origination and collection practices used by Seller with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, and prudent.

(j)   If Seller intends to offer HELOCs for sale to Purchaser, Seller has complied with Purchaser's then-current eligibility guidelines for sellers of HELOCs.

Representations and Warranties with respect to the Mortgage Loans

2.   Seller hereby represents and warrants with respect to each Mortgage Loan, as of the Sale Date:

(a)   To the best of Seller's knowledge, the information with respect to each Mortgage Loan set forth in the Purchase Advice is true and correct as of the date thereof.

(b)   Each Loan is valid and was originated in accordance with the loan origination, eligibility and credit underwriting standards of the Purchaser's Underwriting Guidelines then in effect. The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. No fraud was committed in connection with the origination of the Mortgage Loan.

(c)   The Seller holds good and indefeasible title to, and is the sole owner of each Mortgage Loan, subject to no liens, charges, mortgages, encumbrances or rights of others. Seller has full right to sell and assign the Mortgage Loan, and the related Servicing Rights to Purchaser pursuant to this Agreement. There has been no assignment, sale or hypothecation thereof by Seller.

9                        *IHE Agreement Revised 6/23/03*

# EXHIBIT 4
# PART 4
# SUPP. DIXON DEC

(d) The transfer and assignment of the Mortgage Note and Mortgage from Seller to Purchaser is valid and sufficient to vest title to the Mortgage Note and Mortgage in Purchaser.

(e) The Mortgage has not been satisfied, canceled or subordinated, in whole or in part, or rescinded. The Mortgaged Property has not been released from the lien of the related Mortgage, and no instrument been executed which would affect such release, cancellation, subordination or rescission. No Mortgagor has been released, in whole or in part, from any obligation secured thereby.

(f) Each Mortgage is a valid, enforceable and subsisting first or second lien of record (as specified by Purchaser) on the Mortgaged Property, the Mortgage, and all subsequent assignments of the original Mortgage, if any have been recorded in the appropriate jurisdictions wherein such recordation is necessary to perfect the lien thereof.

(g) The Mortgaged Property is free and clear of all mechanics' and materialmen's liens or liens in the nature thereof, and no rights are outstanding that under law could give rise to any such lien, nor is Seller aware of any facts which would give rise to any such lien.

(h) There is no delinquent tax or assessment lien on the Mortgaged Property, and each Mortgaged Property is free of material damage and is in at least average repair.

(i) Each Mortgage Loan at the time it was made complied in all respects with applicable state, local, and federal laws and regulations, including, without limitation, usury, Section 32, consumer credit, equal credit opportunity, real estate settlement procedures, privacy, truth-in-lending and disclosure laws, and high cost laws and regulations. Seller has maintained and continues to maintain adequate training programs and written policies and procedures to ensure that all such requirements are met with respect to the Mortgage Loan. The Mortgagor has duly executed appropriate evidence indicating that the Mortgagor has received the disclosure materials as required by applicable laws and regulations.

(j) No Mortgagor on any Loan is the subject of, or is in any way affected by, any pending or, to the knowledge of Seller, threatened legal proceeding which might adversely affect the collectability or enforceability of the Mortgage Loan or the collateral securing same.

(k) Where applicable as specified in the Underwriting Guidelines, the improvements upon each Mortgaged Property are covered by a valid and existing hazard insurance policy with a sound and financially responsible carrier that provides for fire, hazard and extended coverage, duly licensed and qualified to transact business; all such insurance policies contain a standard mortgagee clause naming the Seller, its successors and assigns as mortgagee, such clause being in a form such that it may be endorsed to Purchaser as loss payee as required hereunder; all premiums thereon have been paid; and to the best of Seller's knowledge, there are no facts or circumstances which could provide a basis for revocation of any policies or defense to any claims made thereon.

(l) Each Loan is not subject to any right of rescission, set-off, counterclaim or defense nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right thereunder, render either the Mortgage Note or the Mortgage unenforceable in whole or in part, or subject to any right of rescission, set-off, counterclaim or and no such right of rescission has been asserted with respect thereto.

*IHE Agreement Revised 6/23/03*

(m) To the best of Seller's knowledge, there is no proceeding, pending or threatened, for the total or partial condemnation of the Mortgaged Property, nor is such a proceeding currently occurring, and such property is undamaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado or other casualty, so as to affect adversely the value of the Mortgaged Property as security for the Mortgage Loan or the use for which the premises were intended.

(n) With respect to each Loan, if upon origination (i) the Mortgaged Property is in an area identified as having special flood hazards, which require under applicable law that a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration (or any successor thereto) be obtained and (ii) such flood insurance has been made available for such Mortgaged Property, then such flood insurance policy is in effect; such flood insurance policy contains a standard mortgagee clause naming the Seller, its successors and assigns as mortgagee, such clause being in a form such that it may be endorsed to Purchaser as loss payee as required hereunder; each Mortgage Loan has in place a fully-paid life of loan flood certification from a generally acceptable and duly licensed insurance carrier authorized to issue such policy assigned in care of Seller, which provides for notification to the Seller of changes in designated flood areas which would affect such Mortgage Loan, and each Mortgage Loan is covered by a flood map tracking system which identifies changes in the designated flood areas.

(o) The origination, servicing and collection practices, with respect to each Loan have been conducted in all respects and in accordance with the terms of the Mortgage Note and in compliance with all applicable laws and regulations and in accordance with the proper, prudent and customary practices in the mortgage origination and servicing business.

(p) Each Mortgage and Mortgage Note is genuine, and each is the legal, valid and binding obligation of the maker thereof and is enforceable in accordance with its terms, except only as such enforcement may be limited by bankruptcy, insolvency, reorganization. All parties to the Mortgage Note and the Mortgage and any other related agreement had legal capacity to execute such documents, and such parties have duly and properly executed such documents, which documents have been acknowledged, where required. All certified copies of original documents are true copies of the originals.

(q) To the best of Seller's knowledge, all of the improvements which were included for the purpose of determining the appraised value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of such Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property.

(r) To the best of Seller's knowledge, no improvement located on or being part of the Mortgaged Property is in violation of any applicable zoning law or regulation.

(s) The terms of the Mortgage Note and the Mortgage have not been impaired, altered, waived or modified in any respect, except by a written instrument which has been recorded or is in the process of being recorded, if necessary, to protect the interest of the Purchaser and which are in the Mortgage Loan Documents and have been or will be delivered to the Purchaser all in accordance with this Agreement; the substance of any such alteration, waiver or modification is reflected on the Purchase Advice.

(t) The proceeds of the Mortgage Loan have been fully disbursed either by payment to the Mortgagor or by payment made on Mortgagor's request or approval, and there is no obligation to make future advances thereunder; any and all requirements as to completion of any on-site or off-

11

*IHE Agreement Revised 6/23/03*

site improvements and as to disbursements of any escrow funds therefor have been complied with; all costs, fees, taxes and expenses incurred in making, closing or recording the Mortgage Loans were paid and Mortgagor is not entitled to any refunds of amounts paid or due under the Mortgage Note or Mortgage;

(u) With respect to each Mortgage constituting a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in such Mortgage, and no fees or expenses are or will become payable by the Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(v) Unless the Purchaser has agreed to accept loans originated by a third party by attaching an addendum to this Agreement, each Mortgage Loan was originated by Seller, and not by any other third party, including but not limited to, a Broker. Seller is the original beneficiary or mortgagee in the Mortgage.

(w) The Mortgage contains a customary provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event the related Mortgaged Property is sold or transferred without the prior consent of the mortgagee thereunder;

(x) Each Mortgage contains customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security intended thereby, including but not limited to(i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure; no other exemption exists available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage; the Mortgagor has not notified the Seller and the Seller has no knowledge of any relief requested or allowed to the Mortgagor under the Soldiers and Sailors Civil Relief Act of 1940;

(y) No action of foreclosure has been initiated against, and no judgment of foreclosure been rendered against, any of the Mortgaged Properties; and to the best of Seller's knowledge, no Mortgaged Property is the subject of pending hazard or flood insurance claims;

(z) There are no Mortgage Loans with forced place insurance premiums;

(aa) There are no Mortgage Loans requiring monthly impounds, Escrow Payments, corporate advances, or any similar payments;

(bb) The first Monthly Payment Due Date for each Mortgage Loan is a date that is at least thirty (30) days after the Mortgage Loan funded.

12                    *IHE Agreement Revised 6/23/03*

(cc) There is no default, breach, violation or event of acceleration existing under the Mortgage or the related Mortgage Note or any event which with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration; and Seller has not consented to or waived or permitted to exist any default, breach, violation or event of acceleration under the Mortgage or the related Mortgage Note.

(dd) No Mortgagor is insolvent to the best knowledge of Seller.

(ee) Seller complied with the purchase and post-purchase requirements of the Correspondent Partner Manual with respect to the Mortgage Loans.

(ff) No Mortgage Loan is made within six (6) months of the date of any previous loan made by Seller or an affiliate of Seller secured by a Mortgage on the Mortgaged Property the proceeds of which are used in whole or in part to pay off such previous loan without Purchaser's prior written approval.

(gg) The Mortgagor on the Mortgage Loan has reasonably demonstrated an ability to repay the Mortgage Loan on the terms and conditions set forth in the Mortgage Loan Documents.

(hh) If the Mortgage Loan is a HELOC, the Mortgage is in a form and contains terms sufficient to be an "open-end" mortgage under the laws of the jurisdiction in which the Mortgaged Property is located so as to secure advances made after the initial recording of the Mortgage up to the Maximum Loan Amount with the same priority as advances secured thereby that have been made at the time of recording of the Mortgage.

## ARTICLE VI
## REMEDIES

Section 6.01    Remedies for Breach of Representations and Warranties of the Seller; Definition of the Term "Defect"

It is understood and agreed that the representations and warranties set forth in Article V shall survive for the life of the Mortgage Loans, and shall inure to the benefit of the Purchaser, its successors and assigns.

Any cause of action against the Seller relating to or arising out of the breach of any representations and warranties made in Section 5.02 shall accrue upon (i) discovery of such breach by the Seller or notice thereof by the Purchaser to such party, (ii) failure by the Seller, as applicable, to cure such breach, and (iii) demand upon the Seller, as applicable, by the Purchaser for compliance with this Agreement. The prevailing party in any litigation arising under this Agreement shall be entitled to the recovery of reasonable attorneys' fees. The remedies stated herein are not intended to limit any rights and remedies available at law or equity to Purchaser.

Following the purchase of any Loan by Purchaser pursuant to this Agreement, and notwithstanding the review of the Mortgage Loan Documents pursuant to Article II hereof, it will be deemed a "Defect" in the Mortgage Loan should any one or more of the following events occur with regard to a Mortgage Loan:

13                    *IHE Agreement Revised 6/23/03*

(a) Any document constituting a part of the Mortgage Loan Documents on the Sale Date, in the reasonable judgment of the Purchaser, is demonstrated by Purchaser through reasonable means to have been, defective or inaccurate in any material respect,

(b) Any such document executed by one or more of the parties to the Mortgage Loan is not valid and binding,

(c) Any representation or warranty of the Seller contained in this Agreement, in the reasonable judgment of the Purchaser is untrue or incorrect in a manner that materially and adversely affects the value or collectability of a Mortgage Loan,

(d) The Mortgagor fails to make the first Monthly Payment due to Purchaser after the Sale Date within thirty (30) days of the Monthly Payment Due Date, regardless of whether such payment is subsequently paid by the Mortgagor or if any Monthly Payment in the form of a check is returned for insufficient funds thus causing the delinquency to occur

(e) Notification to the Seller from the Purchaser within one hundred and twenty (120) days from the Sale Date related to that Loan, that a Loan does not materially conform to the characteristics for such Loan set forth in the Purchase Advice, or

(f) Seller's breach of, or failure to perform or observe, any covenant or provision of this Agreement.

(g) If (i) Purchaser determines that the Mortgage Loan is not eligible for purchase by an investor, or, (ii) Purchaser has sold the Mortgage Loan to an investor and is required to repurchase such Mortgage Loan; provided the reason for such ineligibility or repurchase shall be one of the reasons set forth in this Section 6.01.

(h) An original or copy of any document (certified by the recording office) submitted for recordation to the appropriate public recording office is not so delivered to the Purchaser or Purchaser's designee within thirty (30) days following the Sale Date.

The Seller shall cure any Defect within forty-five (45) days from the time of Seller's receipt of Purchaser's written notice to Seller of the existence of such Defect or such shorter period as may be required by applicable law. Notwithstanding anything to the contrary, in the event of a Defect under Section 6.01 (d) above or a Defect with respect to a High Cost Loan, the Seller may not cure such Defect.

Section 6.02    Repurchase of Mortgage Loan

The Seller agrees that, if a Defect occurs under the terms of Section 6.01 and cannot be cured, it will repurchase the Mortgage Loan to which the Defect relates within fifteen (15) days of receipt of written notice from Purchaser or the expiration of the 45-day curing period discussed in Section 6.01, whichever is later, at a price equal to the sum of:

(a) 100% of the unpaid principal balance of such Mortgage Loan at the Repurchase Date; or in the event Purchaser purchased the Mortgage Loan at a Discount Rate, the Purchase Price for such Loan, less the aggregate amount of principal paid to Purchaser on such Mortgage Loan as of the Repurchase Date;

(b) any interest accrued and unpaid up to the Repurchase Date calculated at the Note Interest Rate;

*IHE Agreement Revised 6/23/03*

(c)  any reasonable fees and expenses charged by other third parties and incurred by the Purchaser relating to the repurchase of the Mortgage Loan; and

(d)  Any Premium paid in the Purchase Price by Purchaser to Seller.

Any repurchase pursuant to this Section 6.02 shall be accomplished by wire transfer by the repurchasing party of immediately available federal funds to the account designated by the Purchaser. The option to request or accept repurchase of any Mortgage Loan is at the sole discretion of Purchaser.

Section 6.03    Repurchase of High Cost Loans

In the event that Purchaser purchases a High Cost Loan and: (a) such High Cost Loan is reasonably determined by Purchaser to have violated at the time of origination either the Truth in Lending Act or such other federal, state or local law relating to "high cost" mortgage loans, including without limitation a violation due to Seller's failure to disclose to the borrower the nature of such loan; or (b) Seller failed to disclose to Purchaser prior to the Sale Date that the Mortgage Loan is a High Cost Loan; the Seller, at the Purchaser's option, shall, within ten (10) days after receipt of a repurchase demand from Purchaser, repurchase the High Cost Loan from the Purchaser at the price and in the manner specified in Section 6.02 above.

Section 6.04    Indemnification

In addition to Seller's repurchase obligation, Seller shall indemnify Purchaser and protect, defend and hold Purchaser, its affiliates, officers, directors, employees, agents and successors harmless from and against any and all liability, loss, cost, demand, lawsuits, injury or expense, including without limitation all court costs, expert witness fees, trial preparation fees and attorney's fees, so long as such fees or costs are reasonable in amount, which Purchaser may incur for or by reason of:

(a)  A Defect in any Loan;

(b)  The breach of any warranty or the untruthfulness of any representation made by Seller in this Agreement;

(c)  Seller's breach of, or failure to perform or observe, any covenant or provision of this Agreement; or

(d)  Seller's servicing of the Loans on or at any time prior to the applicable Sale Date of any of the Loans sold to Purchaser.

(e)  Any action taken by Seller or failure to take action by Seller with respect to any Mortgage Loan prior to the Sale Date.

The foregoing provisions of this Section 6.04 shall be subject to the following conditions:

1.    Purchaser must promptly notify Seller upon commencement of any action or assertion of any claim which would give rise to a claim for indemnification if Seller is unaware of the action or assertion; and

2.    No settlement of action against Purchaser shall be made without the consent of Seller so long as indemnification continues to be sought.

15                                        *IHE Agreement Revised 6/23/03*

This indemnification shall survive the Sale Date and shall not be limited by any due diligence or other investigation undertaken by Purchaser.

Section 6.05    Remedy to Ensure Accuracy of Real Estate Appraisals

Purchaser may, within 120 days after the Sale Date and at its own expense, verify the accuracy of drive-by or full appraisals prepared in connection with any Loan by ordering a reappraisal of the Mortgaged Property. In determining the appropriate appraisal value, any review appraiser selected pursuant to this Section 6.03 shall determine the appraised value as of the original appraisal date using comparable sales that were available as of the date of the original appraisal. If the new appraisal obtained by Purchaser indicates a fair market value of more than ten percent (10%) less than the original appraisal value, then upon receipt by Seller of a signed copy of the new appraisal from Purchaser, Seller shall repurchase the Loan at the repurchase price described in Section 6.02 above and reimburse Purchaser for the cost of the appraisal. Notwithstanding the foregoing, if Seller disputes the validity of the appraisal prepared by the Purchaser's appraiser, Seller may at its own expense request Purchaser to obtain a third appraisal. Only if such third appraisal is also more than ten percent (10%) less than the original appraisal value shall the Seller be required to repurchase the Loan. Purchaser shall choose the third appraiser with Seller's approval, which approval shall not be unreasonably withheld, but such appraiser must possess all the necessary licenses and permits to appraise property in the state where the Mortgaged Property is located.

*IHE Agreement Revised 6/23/03*

ARTICLE VII
AGREEMENT NOT TO COMPETE;
PREPAYMENT

Section 7.01    Agreement Not to Compete

(a)  Seller shall not take any action or permit or cause any action to be taken by any of its affiliates or employees directly, to solicit any Mortgagor for the purpose of refinancing or paying off a Mortgage Loan, in whole or in part, or for any other purpose, without the prior written consent of Purchaser for a period of twelve (12) months from the Sale Date.

(b)  Notwithstanding the foregoing, it is understood and agreed that a promotion undertaken by Seller or any affiliate of Seller which is directed to the general public at large, including without limitation mass mailings based on commercially acquired mailing lists and newspaper, radio and television advertisements, general newsletters shall not constitute solicitation under this Article VII.

(c)  It is understood and agreed that all rights and benefits relating to the solicitation of any Mortgagor and the attendant right, title and interest in and to any list of such Mortgagors and data relating to their Mortgages (including insurance renewal dates) shall be transferred to Purchaser pursuant to this Agreement as of the Sale Date, and Seller shall take no action to undermine these rights and benefits.

Section 7.02    Prepayment

In the event a Mortgage Loan is prepaid as a result of a violation by Seller of Section 7.01, Seller shall be obligated to pay the Purchaser, within thirty (30) days of the date of prepayment, an amount equal to the Premium paid by Purchaser for such Mortgage Loan. Seller understands and agrees that if such prepaid Mortgage Loan contains a prepayment penalty, then Purchaser shall be entitled to such prepayment penalty pursuant to the terms and conditions of the Mortgage Note. Any payment pursuant to this Section 7.02 shall be accomplished by wire transfer by the Seller of immediately available federal funds to the account designated by the Purchaser.

Section 7.03    Premium Recapture

(a)  In the event a Mortgage Loan is paid off in full during the first year following the Sale Date of such Loan, Seller shall be obligated to pay the Purchaser, within thirty (30) days of the date of prepayment, a portion of the Premium paid by Purchaser for such Loan as follows: One-twelfth (1/12) of the Premium paid for each full or partial month remaining in the one-year period following the Sale Date. This premium recapture requirement shall not apply to any Mortgage Loan that is paid off pursuant to a refinance loan made to the borrower by Purchaser. Seller understands and agrees that if such prepaid Mortgage Loan contains a prepayment penalty, then Purchaser shall be entitled to such prepayment penalty pursuant to the terms and conditions of the Mortgage Note. The Purchaser agrees to recapture the Premium from the proceeds of the prepayment penalty first and then from the Seller if there is any deficient balance, according to the refund calculation specified above.

17                     *JHE Agreement Revised 6/23/03*

(b)     Within the first twelve (12) months after the Sale Date of Any Mortgage Loan, in the event a Mortgagor fails to make a Monthly Payment on such Mortgage Loan within ninety (90) days of its Payment Due Date, Seller is obligated to reimburse the Purchaser for the full amount of the Premium paid to Seller for such Loan.

Any payment pursuant to this Section 7.03 shall be accomplished by wire transfer by the Seller of immediately available federal funds to the account designated by the Purchaser.

Section 7.04    Refinancings by Seller to be Sold to Purchaser

In the event a Mortgagor refinances a Mortgage Loan with Seller or any affiliate of Seller, and such refinanced Mortgage Loan is then owned or serviced Purchaser or Purchaser otherwise retains a financial interest in the Mortgage Loan, Seller may offer such refinanced Mortgage Loan to Purchaser for purchase. If Purchaser purchases the refinancing loan, the Premium paid by Purchaser shall be based on only new monies advanced to the Mortgagor over and above the original principal balance of the Mortgage Loan.

# ARTICLE VIII
## MISCELLANEOUS PROVISIONS

Section 8.01    Costs

Each party hereto shall each pay any commissions due to their respective salespersons and, except as otherwise indicated in this Agreement, the legal fees and expenses of their respective attorneys. Seller shall pay the costs associated with the physical transfer of the Mortgage Loan Documents and the Mortgage Loan Files including all recording costs. The Purchaser shall pay all other costs incurred by the Purchaser.

Section 8.02    Cooperation

To the extent reasonably possible, the parties hereto shall cooperate with and assist each other, as requested, in carrying out the purposes of this Agreement, and each shall comply with all material laws and regulations governing the Mortgage Loans and Servicing Rights. The Seller hereby grants to the Purchaser the right to obtain all reasonable and relevant information concerning the Mortgage Loans being purchased which is in the possession of the Seller. The Seller shall provide to the Purchaser, in a format mutually acceptable to the Seller and the Purchaser, any information which is not contained in the Seller's computer records and which is reasonably necessary to effect transfer of the loan file data onto the Purchaser's computer system, and Seller shall make its personnel available to assist in the transfer of the Mortgage Loans and Servicing Rights including but not limited to assistance in field to field mapping. The Mortgage servicing files shall be converted from the Seller's computer system to the Purchaser's computer system prior to the Sale Date. The Seller agrees to provide information in a mutually agreeable format according to the Purchaser's specifications including test tapes as the Purchaser may request. Any inaccuracy in the information provided by Seller pursuant to this Section shall trigger the applicable remedies set forth in Article VI.

18                    *IHE Agreement Revised 6/23/03*

Section 8.03    Inspection of Records and Documents and On-Site Audit

Seller shall provide Purchaser access for inspection of its books, documents and records as Purchaser shall reasonably request from time to time. Purchaser will be allowed to conduct, from time to time, financial and operational audits at Seller's office during normal business hours and upon at least ten (10) Business Days' notice. Seller shall reasonably cooperate with Purchaser in its audit activities, and Purchaser shall cooperate to minimize any disruption of Seller's ongoing operations.

Section 8.04    Protection of Confidential Information

Each party hereto shall keep confidential and shall not divulge to any party, without the other party's prior written consent, the purchase price paid for the Mortgage Loans and Servicing Rights, any information pertaining to the Mortgage Loans or any borrower thereunder, except to the extent permitted by law that it is appropriate for such party to do so in working with legal counsel, auditors, affiliates, taxing authorities or other governmental agencies, or as required by law. So long as any Mortgage Loan remains outstanding, neither Purchaser nor Seller or their respective affiliates, employees, agents or representatives shall divulge or disclose, directly or indirectly, any information, knowledge or data concerning the business practices of the other party to this Agreement, other than information which has been published or otherwise made available to the general public prior to the date hereof, or information as it relates to a Mortgagor which is given to the Mortgagor or at the Mortgagor's request to a third person unless required by law or court order. If a party hereto is required by law or court order to divulge or disclose any such information, such party shall divulge or disclose only such information as is required and shall immediately upon discovery of such requirement notify the other party of the same.

*IHE Agreement Revised 6/23/03*

<u>Section 8.05    Notices</u>

　　　All demands, notices and communications hereunder shall be in writing and shall be deemed to
have been duly given if mailed, by registered or certified mail, return receipt requested, or, if by other
means, when received by the other party at the address shown below, or such other address as may
hereafter be furnished to the other party by like notice.  Any such demand, notice or communication
hereunder shall be deemed to have been received on the date delivered to or received at the premises of
the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return
receipt).

　　　All such demands or notices shall be made under the terms indicated above to:

Purchaser:
Spencer J. Carlsen
Vice President, Irwin Union Bank and Trust Company
C/O IRWIN HOME EQUITY CORPORATION
12677 Alcosta Blvd., Suite 500
San Ramon, CA  94583

with copies to:

Gary Iorfido
Vice President, Irwin Union Bank and Trust Company
C/O IRWIN HOME EQUITY CORPORATION
12677 Alcosta Blvd., Suite 500
San Ramon, CA  94583

Seller:

Raymond J Webber
Vice President, Irwin Mortgage Corporation
10500 Kincaid Dr.
Fishers, IN 46038

*IHE Agreement Revised 6/23/03*

Section 8.06    Severability Clause

Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or enforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or enforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law, which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to develop a structure the economic effect of which is as close as possible to the economic effect of this Agreement without regard to such invalidity.

Section 8.07    Counterparts

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 8.08    Termination; Suspension

(a)    This Agreement may be terminated by either party at any time upon written notice; provided, however, that such termination shall not be effective for those Mortgage Loans that Purchaser has committed to purchase. The termination shall be effective upon delivery of written notice by the terminating party to the other party. Termination of this Agreement shall not in any way affect either party's obligations, representations, warranties or indemnifications with respect to Mortgage Loans already purchased by Purchaser.

(b)    In addition to the termination rights set forth above, in the event that Purchaser reasonably demonstrates or believes in good faith that (i) there has been any deception, fraud, concealment, material misrepresentation; or (ii) breach of any representation or warranty by Seller in performing any of its duties, obligations, responsibilities or actions undertaken in connection with this Agreement or in connection with any Mortgage Loan sold to Purchaser pursuant to this Agreement; or (iii) that Seller will be unable to fulfill any of its obligations under the Agreement or the Correspondent Partner Manual, Purchaser may, in its sole and absolute discretion, immediately and without notice (i) terminate its obligations under this Agreement, or (ii) suspend this Agreement. Purchaser agrees to send a written notice to Seller within twenty-four (24) hours of such termination or suspension. Upon termination or during the suspension period, Purchaser shall not accept any new Mortgage Loan submissions from Seller or take any further action on Loans submitted by Seller prior to termination or suspension. Furthermore, Purchaser shall immediately return to Seller any Mortgage Loans subject to a commitment, and Seller shall accept such Mortgage Loans. Any suspension shall last until Purchaser, in its sole discretion, determines to reactivate Seller or terminate this Agreement.

21                    *IHE Agreement Revised 6/23/03*

Section 8.09    Arbitration

Upon written request by either party that is submitted according to the applicable rules for arbitration, any claim, demand or cause of action, which arises out of or is related to this Agreement (collectively "Claims"), may be resolved by binding arbitration in the State of California, in accordance with (i) the Federal Arbitration Act;  (ii) the Code of Procedure ("Code") of the National Arbitration Forum ("Administrator" or "NAF") and (iii) this Agreement which shall control any inconsistency between it and the Code.  The decision of an arbitrator on any Claims submitted to arbitration shall follow applicable substantive law and be in writing setting forth the findings of fact and law and the reasons supporting the decision.  Such decision shall be final and binding upon the parties, subject to the right of appeal described below.  Judgment upon any arbitration award may be entered in any court having jurisdiction.  The arbitrator has exclusive authority to resolve any dispute relating to the applicability or enforceability of this Agreement, including the provisions of this section.  Either party shall have the right to appeal to the appropriate court any errors of law in the decision rendered by the arbitrator.  After a demand for arbitration is made, each party may conduct a limited number of depositions (including the production of documents) by mutual agreement or as permitted by the arbitrator.

Section 8.10    Attorney Fees

If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

Section 8.11    Forum; Governing Law

All questions regarding the validity, interpretation, or performance of any of the terms of this Agreement or of any rights or obligations of the parties shall be governed by and construed in accordance with California law.  Any action between the parties relating to or arising under this Agreement shall be tried in the federal or state courts located in Contra Costa County, California.

Section 8.12    Further Agreements

The Seller and the Purchaser each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be requested from time to time by either party, as may be necessary or appropriate to effectuate the purposes of this Agreement (including but not limited to updates of Exhibits and Schedules to be attached hereto and incorporated herein).

22                      *IHE Agreement Revised 6/23/03*

Section 8.13     Successors and Assigns; Assignment of Agreement

This Agreement shall bind and inure to the benefit of and be enforceable by the Purchaser and the Seller and the respective successors and assigns of the Purchaser and the Seller. No party hereto may transfer this Agreement without consent of others hereto.

Section 8.14     No Third Party Beneficiary

No provision of this Agreement shall be deemed or construed to be for the benefit of any third party.

Section 8.15     Waivers

No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

Section 8.16     Exhibits; Schedules

The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 8.17    General Interpretive Principles

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)    accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)    references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)    a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)    the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)    the term "include" or "including" shall mean by reason of enumeration:

*IHB Agreement Revised 6/23/03*

Section 8.18    Reproduction of Documents

    This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

    IN WITNESS THEREOF, the Purchaser and Seller have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

IRWIN UNION BANK AND TRUST COMPANY
(Purchaser)

By: _____

Name:  Brenda Nirenstein

Title:  AVP, Home Equity Lending

Date:  1-6-04

Attest: _____
           Assistant Secretary

_____
(Seller)

By: _____

Name:  Raymond J Webber

Title:  VP Product Development

Date:  12/12/2003

JHE Agreement Revised 6/23/03

## ADDENDUM TO CORRESPONDENT LOAN PURCHASE AND SALE
## AGREEMENT
### (Third Party Originators)

This Addendum amends, modifies, and revises that certain Correspondent Loan Purchase and Sale Agreement dated _12/16/2003_ (the "Agreement") by and between IRWIN UNION BANK AND TRUST COMPANY, having an address of 500 Washington Street, Columbus, Indiana 47201 and/or IRWIN HOME EQUITY CORPORATION, having an address at 12677 Alcosta Blvd., Suite 500, San Ramon, California 94583 (individually and collectively, the "Purchaser") and _Irwin Mortgage Corporation_ ing an address of _10580 Kincaid, Fishers IN 46038_ ("Seller").

WHEREAS, Seller desires from time to time to offer for sale to the Purchaser Loans that were not originated by Seller;

WHEREAS, Seller has been approved by Purchaser to offer such Loans for sale;

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and reasonable consideration, the receipt and adequacy of which each party hereby acknowledges hereto, the Seller and the Purchaser hereby agree as follows:

A.   The following terms shall be added to Article 1:

      Ineligible List: The list of persons that are ineligible to do business with Purchaser, as such list is published by Purchaser from time to time.

      Third-Party Originator: Any person, including a Broker, other than the Seller who originates a Mortgage Loan.

B.   The following representation and warranty shall be added to Section 5.02 (1):

    (e)   Seller has complied with Purchaser's then-current eligibility guidelines for sellers of third-party originated Mortgage Loans.

C.   The following representations and warranties shall be added to Section 5.02 (2):

    (ff)   All parties which have had any interest in the Mortgage Loan, whether as mortgagee, assignee, pledgee, Third-Party Originator or otherwise, are (or, during the period in which they held and disposed of such interest, were) (i) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (ii)(A) qualified to do business in such state, or (B) not doing business in such state so as to require qualification or licensing;

RECEIVED

DEC 17 2003

(gg)    Any and all requirements of any federal, state or local law including, but not limited to, usury, Section 32, consumer credit, equal credit opportunity, real estate settlement procedures, privacy, truth-in-lending and disclosure laws applicable to the Mortgage Loan have been complied with by the Third-Party Originator of such Mortgage Loan;

(hh)    The origination practices of the Third-Party Originator with respect to each Mortgage Loan are in accordance with the proper, prudent and customary practices in the mortgage origination business;

(ii)    No person listed on the Purchaser's then-current Ineligible List was involved, directly or indirectly, in originating the Mortgage Loan;

D.   The following shall be added to Section 6.04:

(f)    Any action taken by Third-Party Originator or failure to take action by Third-Party Originator with respect to any Mortgage Loan.

E.   The following shall be added to Section 8.08:

(c)    The Addendum may be terminated by either party at any time; provided however, that such termination shall not be effective for those Mortgage Loans that Purchaser has committed to purchase. The termination shall be effective upon delivery of written notice by the terminating party to the other party. Termination of this Addendum shall not in any way affect each party's obligations, representations, warranties or indemnifications under the Agreement and with respect to Mortgage Loans already purchased by Purchaser.

(d)    In the event that Purchaser reasonably demonstrates or believes in good faith that: (i) there has been any deception, fraud, concealment, material misrepresentation by the Third-Party Originator, its officers, directors, or employees; (ii) that there has been a breach of any representation or warranty by Seller in performing any of its duties, obligations, responsibilities or actions undertaken in connection with the Addendum or in connection with any Mortgage Loan sold to Purchaser pursuant to the Addendum; or (iii) that Seller will be unable to fulfill any of its obligations under the Addendum; Purchaser may, in its sole and absolute discretion, immediately and without notice (i) terminate its obligations under the Addendum, (ii) suspend the Addendum, (iii) terminate its obligations under the Agreement, or (iv) suspend the Agreement. Purchaser agrees to send a written notice to Seller

2

within twenty-four (24) hours of such termination or suspension. Upon termination or during the suspension period, Purchaser shall not accept any new Loan submissions from Seller or take any further action on Loans submitted by Seller prior to termination or suspension. Furthermore, Purchaser shall immediately return to Seller any Mortgage Loans subject to a commitment, and Seller shall accept such Mortgage Loans. Any suspension shall last until Purchaser, in its sole discretion, determines to reactivate Seller or terminate this Agreement.

5.    Any capitalized words or phrases used and not defined in this Addendum shall have the meanings ascribed to them in the Agreement.

6.    All provisions of the Agreement, except as modified by this Addendum, shall remain in full force and effect. In the event of any conflict, inconsistency, or incongruity between any provision of this Addendum and any provision of the Agreement, the provisions of this Addendum shall govern and control.

IN WITNESS THEREOF, the Purchaser and Seller have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

IRWIN UNION BANK AND TRUST COMPANY
(Purchaser)

By: _____

Name: Brenda Nirenstein

Title: AVP, Home Equity Lending

Date: 1-6-04

Attest: _____
          Assistant Secretary

Irwin Mortgage Corp
(Seller)

By: _____

Name: Raymond J. Weber

Title: V.P. Product Development

3

EXHIBIT A

ADDENDUM TO CORRESPONDENT LOAN PURCHASE AND SALE
AGREEMENT
(Non-Standard Loans)

This Addendum amends, modifies, and revises that certain Correspondent Loan Purchase
and Sale Agreement dated December 11, 2003 (the "Agreement") by and between
IRWIN UNION BANK AND TRUST COMPANY, having an address of 500
Washington Street, Columbus, Indiana 47201 and/or IRWIN HOME EQUITY
CORPORATION, having an address at 12677 Alcosta Blvd., Suite 500, San Ramon,
California 94583 (individually and collectively, the "Purchaser") and IRWIN
MORTGAGE CORPORATION having an address at 9265 Counselors Row, Suite 200,
Indianapolis, IN 46240 ("Seller").

WHEREAS, Seller desires for a limited period of time to offer for sale to the Purchaser
Loans that may not meet the credit underwriting standards of Purchaser's Underwriting
Guidelines (the "Non-Standard Loans");

WHEREAS, Seller has been approved by Purchaser to offer such Loans for sale subject
to the terms of this Addendum;

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth,
and for other good and reasonable consideration, the receipt and adequacy of which each
party hereby acknowledges hereto, the Seller and the Purchaser hereby agree as follows:

A.    Section 5.02(2)(b) is deleted in its entirety and replaced with the following :

> Except as otherwise disclosed to Purchaser in writing as a Non-Standard
> Loan, each Loan is valid and was originated in accordance with the loan
> origination, eligibility and credit underwriting standards of the Purchaser's
> Underwriting Guidelines then in effect; provided, however, that the total
> aggregate amount of the Purchase Price paid by Purchaser for Non-Standard
> Loans will not exceed FIVE MILLION US DOLLARS ($5,000,000.00). The
> documents, instruments and agreements submitted for loan underwriting were
> not falsified and contain no untrue statement of material fact or omit to state a
> material fact required to be stated therein or necessary to make the
> information and statements therein not misleading.  No fraud was committed
> in connection with the origination of the Mortgage.

B.    Any capitalized words or phrases used and not defined in this Addendum shall
have the meanings ascribed to them in the Agreement.

02/10/04

EXHIBIT A

C.    All provisions of the Agreement, except as modified by this Addendum, shall remain in full force and effect. In the event of any conflict, inconsistency, or incongruity between any provision of this Addendum and any provision of the Agreement, the provisions of this Addendum shall govern and control.

IN WITNESS THEREOF, the Purchaser and Seller have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

IRWIN UNION BANK AND TRUST COMPANY
(Purchaser)

By: _____

Name: EDWIN K CORBIN

Title: VICE PRESIDENT

Date: 2/16/04

Attest: _____
ASST. SECRETARY

IRWIN MORTGAGE CORPORATION
(Seller)

By: _____

Name: Raymond J. Webber

Title: VP. Product Development

Date: 2/12/04

2                        02/10/04

# EXHIBIT 4
# PART 5
# SUPP. DIXON DEC

EXHIBIT B

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of September 18, 2006 (the "Effective Date"), by and between IRWIN MORTGAGE CORPORATION ("Seller") and FREEDOM MORTGAGE CORPORATION ("Buyer").

Seller and Buyer have entered into an Asset Purchase Agreement dated August 7, 2006, as amended by that certain Letter Agreement among Seller, Buyer and Shareholder dated as of September 18, 2006 (the "Purchase Agreement"). Capitalized terms used in this Agreement without definition shall have the respective meanings given to them in the Purchase Agreement.

NOW, THEREFORE, pursuant to the Purchase Agreement, and for good and valuable consideration, the receipt and sufficiency of which is acknowledged, as of the Effective Date, Seller hereby assigns to Buyer all of the Operating Assets, including Assigned Contracts other than those directly associated with the Warehouse Assets ("Assigned Operating Contracts"), and all of Seller's right, title and interest thereunder and Buyer hereby assumes all of the Assumed Liabilities other than the Warehouse Obligations, including all obligations after the Closing Date under the Assigned Operating Contracts, except to the extent such obligations (A) would have been paid, performed or otherwise discharged on or prior to the Closing Date but for a breach or default by the Seller or (B) arise out of any breach or default by Seller, provided, however, that if any Assigned Operating Contract requires the approval, consent or waiver by another Person, the assignment by Seller and the assumption by Buyer of such Assigned Operating Contract shall be effective as of the later of such Person's approval, consent or waiver, as applicable, or the Effective Date.

Nothing contained in this Agreement shall in any way supersede, modify, replace, amend, change, rescind, waive or otherwise affect any of the provisions set forth in the Purchase Agreement, including the representations, warranties, covenants and agreements set forth therein, this Agreement being intended only to effect the transfer of the Operating Assets by Seller to Buyer.

This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Delaware without regard to the conflicts of law principles thereof.

[Remainder of Page Intentionally Left Blank]

This Assignment and Assumption Agreement is signed as of the date first written above.

BUYER:
FREEDOM MORTGAGE CORPORATION

By: _____
Name: Brian Simon
Title: Senior VP


SELLER:
IRWIN MORTGAGE CORPORATION


By: _____
Name:
Title:

This Assignment and Assumption Agreement is signed as of the date first written above.

BUYER:
FREEDOM MORTGAGE CORPORATION

By: _____
     Name:
     Title:

SELLER:
IRWIN MORTGAGE CORPORATION

By: _____
     Name:
     Title:

**EXHIBIT C**

## CONSENT TO ASSIGNMENT

The undersigned consent to the assignment by IRWIN MORTGAGE CORPORATION ("Assignor") to FREEDOM MORTGAGE CORPORATION ("Assignee") of all of Assignor's right, title, and interest in and to that certain Correspondent Loan Purchase and Sale Agreement dated December 11, 2003 (the "Agreement"), as amended as of the effective date of this consent. This consent is effective as of September 18, 2006, subject to Assignee's written assumption of all of Assignor's duties and obligations under the Agreement as of September 18, 2006.

IRWIN UNION BANK AND TRUST COMPANY
IRWIN HOME EQUITY CORPORATION

By: _____

Name: Edwin K. Corbin

Title: Vice President-Home Equity Lending - IUBT
Senior Vice President - IHE

Date: 9/29/06

Attest: _____
Assistant Secretary

**EXHIBIT D**





## FREEDOM MORTGAGE

10500 Kincaid Drive, Suite 300 • Fishers, IN 46037 • Office 317.594.0900 • Fax 317.598.7700
Send mail to: PO Box 8001 • Fishers, IN 46038-8001

October 2, 2006

Edwin Corbin, Vice President, IUBT
c/o Irwin Home Equity
12677 Alcosta Blvd., Suite 500
San Ramon, CA 94583

RE:    Correspondent Loan Purchase and Sale Agreement dated December 11, 2003 (the "Agreement")

Dear Edwin:

Pursuant to the consent to assignment provided by your company, this letter is to advise you that Irwin Mortgage Corporation has assigned all rights in the above-referenced Agreement to Freedom Mortgage Corporation ("Freedom"). Freedom has assumed all obligations with respect thereto, pursuant to the Assignment and Assumption Agreement dated as of September 18, 2006. A copy is enclosed for your file.

Please change all contact information for this Agreement to:

Freedom Mortgage Corporation
**OVERNIGHT DELIVERY ONLY**            **ALL OTHER MAIL**
10500 Kincaid Drive                            PO Box 8001
Suite 300                                              Fishers, IN 46038-8001
Fishers, IN 46037

All phone numbers and business contacts remain the same. Note that email addresses are now firstname.lastname@FreedomMortgage.com.

If you have any questions regarding this assignment, please call me at 317-537-3409 or email me at Aimee.Hill@FreedomMortgage.com.

Sincerely,

Aimee R. Hill
Associate Counsel

cc: Lorraine Sumulong,

**EXHIBIT  E**

# ADDENDUM TO CORRESPONDENT LOAN PURCHASE AND SALE AGREEMENT
### (Termination of Non-Standard Loans and Other Modifications)

This Addendum amends, modifies, and revises that certain Correspondent Loan Purchase and Sale Agreement dated December 11, 2003 (the "Agreement"), as amended, by and between IRWIN UNION BANK AND TRUST COMPANY, having an address of 500 Washington Street, Columbus, Indiana 47201 and/or IRWIN HOME EQUITY CORPORATION, having an address at 12677 Alcosta Blvd., Suite 500, San Ramon, California 94583 (individually and collectively, the "Purchaser") and Freedom Mortgage Corporation (assignee of IRWIN MORTGAGE CORPORATION) having an address at 907 Pleasant Valley Avenue, Suite 3, Mount Laurel, NJ 08054 ("Seller").

WHEREAS, Irwin Mortgage Corporation has assigned the Agreement to Freedom Mortgage Corporation effective as of September 18, 2006 (the "Closing Date"), and Freedom Mortgage Corporation has assumed all rights and obligations under the Agreement following the Closing Date; and

WHEREAS, Purchaser has consented to such assignment and assumption effective as of September 18, 2006; and

WHEREAS, Irwin Mortgage Corporation and Purchaser signed an Addendum to Correspondent Loan Purchase and Sale Agreement (Non-Standard Loans) ("Non-Standard Loans Addendum"), a copy of which is attached as Exhibit A; and

WHEREAS, Seller and Purchaser wish to amend the Agreement by terminating the Non-Standard Loans Addendum and making additional modifications;

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and reasonable consideration, the receipt and adequacy of which each party hereby acknowledges hereto, the Seller and the Purchaser hereby agree as follows:

A.     This Addendum shall be effective as of September 18, 2006 ("Effective Date") and apply to all Mortgage Loans funded on or after the Effective Date.

B.     The Non-Standard Loans Addendum is terminated in its entirety and shall be of no further force and effect as of the Effective Date.

C.     The definition for "Underwriting Guidelines" in Article I is modified in its entirety to read as follows:

Underwriting Guidelines:    The loan underwriting guidelines mutually agreed upon by Seller and Purchaser and attached as Exhibit B.

D.     Section 6.01(d) is modified in its entirety to read as follows:

Regardless of whether payment is subsequently paid by the Mortgagor, (i) the Mortgage Loan has been thirty (30) or more days delinquent at least once prior to the Sale Date, (ii) the Mortgage Loan is thirty (30) or more days delinquent as of the Sale Date, (iii) the Mortgagor fails to make any of the first, second or third payment due to the Purchaser after the Sale Date within thirty (30) days of each Monthly Payment Due Date or (iv) any payment made in the form of a check is returned for insufficient funds thus causing (i), (ii) or (iii) to occur;

E.    Section 7.03(a) is modified in its entirety to read as follows:

In the event a Mortgage Loan is paid off in full during the first ninety (90) days following the Sale Date of such Loan, Seller shall be obligated to pay the Purchaser, within thirty (30) days following Seller's receipt of reasonable documentation confirming the prepayment, the Premium paid by Purchaser for such Loan; provided, however, this Premium recapture requirement shall not apply to any Mortgage Loan that is paid off pursuant to a refinance loan made by Purchaser or its affiliates. Seller understands and agrees that if such prepaid Mortgage Loan contains a prepayment penalty, then Purchaser shall be entitled to such prepayment penalty pursuant to the terms and conditions of the Mortgage Note. The Purchaser agrees to recapture the Premium from the proceeds of the prepayment penalty first and then from the Seller if there is any deficient balance.

F.    Any capitalized words or phrases used and not defined in this Addendum shall have the meanings ascribed to them in the Agreement.

G.    All provisions of the Agreement, except as modified by this Addendum, shall remain in full force and effect. In the event of any conflict, inconsistency, or incongruity between any provision of this Addendum and any provision of the Agreement, the provisions of this Addendum shall govern and control.

[Signature page follows.]

IN WITNESS THEREOF, the Purchaser and Seller have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

IRWIN UNION BANK AND TRUST COMPANY
IRWIN HOME EQUITY CORPORATION
(Purchaser)

By: _____

Name: Edwin K. Corbin

Title: Vice President-Home Equity Lending - IUBT
Senior Vice President - IHE

Date: 9/26/06

Attest: _____
Assistant Secretary

FREEDOM MORTGAGE CORPORATION
(Seller)

By: _____

Name: _____

Title: _____

Date: _____

IN WITNESS THEREOF, the Purchaser and Seller have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

IRWIN UNION BANK AND TRUST COMPANY
IRWIN HOME EQUITY CORPORATION
(Purchaser)

By:_____

Name:_Edwin K. Corbin_____

Title:_Vice President-Home Equity Lending - IUBT_
            Senior Vice President - IHE

Date:_____

Attest:_____
            Assistant Secretary


FREEDOM MORTGAGE CORPORATION
(Seller)

By:_____

Name:_April Schneider_____

Title:_Sr. VP, Capital Markets_____

Date:_1/2/06_____

**EXHIBIT F**

February 21, 2007

Sheila Hawkins
Freedom Mortgage Company
10500 Kincaid Drive #300
Fishers, Indiana 46037

Re:        Invoice #: 22007

Dear Sheila:

This letter will serve as a written request for Freedom Mortgage to repurchase the above referenced mortgage loans under the terms of the Correspondent Loan Purchase and Sale Agreement dated as of December 11, 2003, as amended by that certain Addendum with an effective date as of September 1, 2006.

A prior request for research of these loans was sent to you on February 2, 2007. This letter and invoice represent the remaining population after the research was conducted.

Irwin Union Bank purchased said loans on between October 13, 2006 and November 11, 2006. Subsequent to the purchase of the loans, the following Defect under the terms of Article VI of the Agreement occurred: the Mortgagor fails to make any of the first, second or third payment due to the Purchaser after the Sale Date within thirty (30) days of each Monthly Payment Due Date. This is deemed a breach of warranty/covenant under Article VI, Section 6.01 (d). There is no cure for an initial payment default.

The amount to repurchase these loans is set forth in the attached Excel spreadsheet.

If the payoff is not received by March 1, 2007, additional interest per day will be due. The additional per diem cost is included in the Excel spreadsheet.

Please remit funds via a wire to:
  ABA:074902341
  Bank Name: Irwin Union Bank and Trust
  Account #: 5344385900
  Account Name: Irwin Home Equity
  Reference: IHE 53-4385-900

Please contact Christie Wells at (925) 790-5819 or the undersigned at (925) 790-4418 if you have any questions.

Sincerely,

Carolyn Dabrowiak

Irwin Home Equity
ID#:

Cc: C. Wells, W. Throgmorton, D. Rossetter, C. Robinson

**Irwin Home Equity**
12677 Alcosta Blvd. #500
San Ramon, CA 94583

22007

**INVOICE**

| Customer | |
|---|---|
| Name | Freedom Mortgage |
| Address | 10500 Kincaid Drive #300 |
| City | Fishers        State IN      ZIP 46037 |

39213
2/20/07

| Date | Project | Amount Due | Total |
|---|---|---|---|
| 2/20/07 | Early Payment Default | $1,772,102.08 | $1,772,102.08 |
| | See attached for detail | | |
| | | | |
| | Please wire funds to: | | |
| | ABA:074902341 | | |
| | Bank Name: Irwin Union Bank and Trust | | |
| | Account #: 5344385900 | | |
| | Account Name: Irwin Home Equity | | |
| | Reference: IHE 53-4385-900 | | |
| | | | $1,772,102.08 |

| | Current UPB | Interest Rate | Interest Due | Premium | Late Charges | Recoding Fee | Recoverable Fee | Suspense Fee | Total | If not received by 3/1, additional per diem |
|---|---|---|---|---|---|---|---|---|---|---|
| .00 | 60,840.00 | 13.875 | 3,516.98 | 677.15 | 71.46 | | | | 65,105.61 | 23.11 |
| .00 | 124,000.00 | 9.9 | 6,110.34 | 1,240.00 | 107.90 | | | | 130,458.24 | 33.69 |
| 21 | 119,828.47 | 11.0 | 1,008.41 | 1,507.21 | | | | | 122,032.09 | 38.10 |
| 00 | 59,607.74 | 11.825 | 1,731.65 | -520.60 | | | | | 60,813.73 | 18.99 |
| 83 | 289,883.83 | 10.82 | 10,609.62 | 8,998.51 | 138.58 | 38.60 | | | 318,000.02 | 87.12 |
| 28 | 48,908.28 | 12.6 | 1,044.45 | 857.50 | 28.72 | | | | 310,918.26 | 17.16 |
| 6B | 41,270.92 | 10.5 | 361.12 | -475.00 | | | | | 41,156.65 | 11.87 |
| 65 | 30,726.65 | 11.125 | 284.86 | -48.00 | | | | | 30,985.42 | 9.34 |
| 83 | 53,742.82 | 12.075 | 640.09 | -14.22 | | | | | 60,499.03 | 21.07 |
| 69 | 50,571.69 | 12.125 | 1,532.50 | 587.47 | | | | | 52,691.00 | 16.78 |
| 00 | 16,302.46 | 12.375 | 168.94 | 160.06 | | 30.50 | | | 10,741.86 | 6.65 |
| 00 | 265,850.00 | 13.875 | 15,362.07 | 2,919.49 | 17.00 | 12.00 | 15.00 | -280.46 | 283,950.56 | 100.08 |
| 05 | 52,964.05 | 11.26 | 1,489.10 | 643.64 | | 10.00 | | | 54,824.23 | 19.31 |
| 38 | 67,973.38 | 10.57 | 2,393.51 | 880.00 | | | | | 71,046.89 | 19.65 |
| 00 | 25,200.00 | 14.825 | 1,535.15 | 239.81 | | | | | 26,994.96 | 10.00 |
| 74 | 75,744.80 | 12.826 | 780.08 | 98.29 | | | | | 74,431.09 | 28.00 |
| 00 | 57,080.00 | 13.375 | 3,617.95 | 1,300.72 | | | | | 82,226.67 | 25.75 |
| 00 | 49,607.00 | 13.375 | | 501.00 | | | | | 46,788.00 | 16.60 |
| 00 | 27,985.00 | 12.32 | 574.64 | 280.00 | | | | | 28,339.54 | 9.44 |
| 00 | 63,250.00 | 11.5 | 3,028.78 | 670.45 | | | | | 66,949.23 | 19.80 |
| 00 | 37,641.00 | 13.625 | 1,709.01 | 378.29 | | | | | 39,728.30 | 14.04 |
| 00 | 63,976.26 | 13.875 | 1,466.18 | 846.08 | | | | | 65,288.53 | 23.50 |
| 86 | 1,693,908.85 | | | 21,253.86 | | | | | 1,772,102.00 | |

Total Due

**EXHIBIT  G**

Irwin Home Equity
12677 Alcosta Blvd
Suite 500
San Ramon, CA 94583-4427
925.277.2001
925.277.2009 Fax

April 19, 2007

April Schneider
Senior Vice President, Capital Markets
Freedom Mortgage Company
10500 Kincaid Drive
Fishers, IN 46037


Irwin
Home Equity

Re:        Invoice #: 42007

Dear April:

This letter will serve as a written request for Freedom Mortgage to repurchase the above referenced mortgage loans under the terms of the Correspondent Loan Purchase and Sale Agreement dated as of December 11, 2003, as amended by that certain Addendum with an effective date as of September 18, 2006.

Irwin Union Bank purchased said loans on between November 7, 2006 and December 29th, 2006. Subsequent to the purchase of the loans, the following Defect under the terms of Article VI of the Agreement occurred: the Mortgagor fails to make any of the first, second or third payment due to the Purchaser after the Sale Date within thirty (30) days of each Monthly Payment Due Date. This is deemed a breach of warranty/covenant under Article VI, Section 6.01 (d). There is no cure for an initial payment default.

The amount to repurchase these loans is set forth in the attached Excel spreadsheet.

If the payoff is not received by May 4, 2007, additional interest per day will be due. The additional per diem cost is included in the Excel spreadsheet.

Please remit funds via a wire to:
   ABA:074902341
   Bank Name: Irwin Union Bank and Trust
   Account #: 5344385900
   Account Name: Irwin Home Equity
   Reference: IHE 53-4385-900

Please contact me with any questions.

Sincerely,

Christie Wells
Director, Corporate Development
Irwin Home Equity
(925)790-5819

cc: C. Wells, S. Shuck

an Irwin Financial Company

**Irwin Home Equity**
12677 Alcosta Blvd. #500
San Ramon, CA 94583

42007

## INVOICE

| Customer | |
|----------|--|
| Name | Freedom Mortgage |
| Address | 10500 Kincaid Drive #300 |
| City | Fishers    State IN    ZIP 46037 |

39211
4/19/07

| Date | Project | Amount Due | Total |
|------|---------|------------|-------|
| 2/20/07 | Early Payment Default | $1,052,598.12 | $1,052,598.12 |
| | See attached for detail | | |
| | | | |
| | Please wire funds to: | | |
| | ABA:074902341 | | |
| | Bank Name: Irwin Union Bank and Trust | | |
| | Account #: 5344365900 | | |
| | Account Name: Irwin Home Equity | | |
| | Reference: IHE 53-4385-900 | | |
| | | | $1,052,598.12 |

Freedom Repurchase Invoice April 19, 2007

| THE LOAN NUMBER | FREEDOM LOAN NUMBER | LAST NAME | ACQUISITION OR SALE IDENTIFIER | ACQUISITION DATE | NEXT PAYMENT DUE DATE | ACQUIRED PRINCIPAL BALANCE | Current UPB | Interest Rate | Interest Due | Premium | Escrow/ Impound Overdraft | Late Charges | Recording Fee | Recon/ Reconv'd MI Fee | Suspense Fee | Total | Net received by BFS additions purchase |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 51000248 | 8111154xx | Franklin | FRE1112005 | 11/07/2006 | 01/01/2007 | 23,600.00 | 23,172.46 | 14.835% | $ 1,413.84 | $ 715.31 | | | | | | $ 23,472.73 | $ 6.53 |
| 61000286 | 8190513x | Thomas | FRE112005 | 11/10/2006 | 01/01/2007 | 154,123.51 | 154,721.99 | 9.315% | $ 2,876.26 | $ 5,102.00 | $ 1,740.70 | | $ 174.50 | | | $ 163,716.91 | $ 27.33 |
| 51000240 | 8143253x | Gonzalez | FRE112005 | 11/10/2006 | 01/01/2007 | 66,732.93 | 66,728.33 | 13.325% | $ 1,516.67 | $ 708.93 | | $ 69.20 | | | | $ 74,541.93 | $ 28.04 |
| 51000247 | 8118410x | Hall | FRE112005 | 11/14/2006 | 01/01/2007 | 138,915.14 | 138,915.14 | 11.625% | $ 2,511.88 | $ 3,421.70 | | $ 128.83 | | | | $ 145,931.00 | $ 44.30 |
| 61000206 | 8144417x | Reese | FRE112005 | 12/26/2006 | 02/01/2007 | 148,000.00 | 148,000.00 | 11.250% | $ 2,443.31 | $ 3,200.00 | | $ 59.71 | | | | $ 153,312.53 | $ 41.41 |
| 51000219 | 8192460x | Roberts | FRE112007 | 01/08/2007 | 03/01/2007 | 61,903.27 | 61,162.81 | 14.000% | $ 1,207.47 | $ 450.74 | | $ 31.69 | | | | $ 66,717.41 | $ 29.33 |
| 61000621 | 8193103x | Harris | FRE112007 | 01/15/2007 | 03/01/2007 | 78,830.20 | 78,830.20 | 14.135% | $ 1,936.21 | $ 630.30 | | $ 31.80 | | $ 110.00 | | $ 78,478.51 | $ 22.20 |
| 51000541 | 8150461x | Love | FRE112007 | 01/18/2007 | 03/01/2007 | 13,000.00 | 13,000.00 | 14.735% | $ 449.63 | $ 93.24 | | $ 42.12 | | $ 7.57 | | $ 12,672.56 | $ 4.94 |
| 51000547 | 8140413x | Moore | FRE112007 | 01/19/2007 | 03/01/2007 | 14,000.00 | 14,000.00 | 14.000% | $ 1,078.63 | $ 219.42 | | $ 7.17 | | $ 6.00 | | $ 15,363.70 | $ 5.04 |
| 51000545 | 8152313x | Smith | FRE112007 | 01/21/2007 | 03/01/2007 | 30,122.69 | 30,122.69 | 14.335% | $ 728.50 | $ 310.60 | | $ 8.15 | | $ 5.00 | | $ 33,616.05 | $ 11.10 |
| 51000814 | 8193981x | Fuller | FRE112007 | 01/29/2007 | 03/01/2007 | 281,153.00 | 281,153.41 | 13.015% | $ 5,011.34 | $ 1,951.68 | | | | | | $ 281,711.82 | $ 94.33 |

| | | | | | | 1,691,167.39 | 1,002,153.24 | | 30,111.90 | 8,318.69 | | 400.18 | 135.50 | 135.00 | 0.00 | 1,052,598.12 | |

11

Total Due   1   1,032,598.12

# EXHIBIT 4
# PART 6
# SUPP. DIXON DEC

**EXHIBIT  H**

Irwin Union Bank
500 Washington Street
Box 929
Columbus, IN 47202-0929
812.372.0111
812.376.1705 Fax
www.irwinunion.com

May 11, 2007

April Schneider
Senior Vice President, Capital Markets
Freedom Mortgage Company
10500 Kincaid Drive
Fishers, IN 46037

 **Irwin Union Bank**

Re:    Invoice #: 51107

Dear April:

This letter will serve as a written request for Freedom Mortgage to repurchase the above referenced mortgage loans under the terms of the Correspondent Loan Purchase and Sale Agreement dated as of December 11, 2003, as amended by that certain Addendum with an effective date as of September 18, 2006.

Irwin Union Bank purchased said loans on between October 13, 2006 and February 2, 2007.  Subsequent to the purchase of the loans, the following Defect under the terms of Article VI of the Agreement occurred: the Mortgagor fails to make any of the first, second or third payment due to the Purchaser after the Sale Date within thirty (30) days of each Monthly Payment Due Date.  This is deemed a breach of warranty/covenant under Article VI, Section 6.01 (d). There is no cure for an initial payment default.

The amount to repurchase these loans is set forth in the attached Excel spreadsheet.

If the payoff is not received by May 31, 2007, additional interest per day will be due. The additional per diem cost is included in the Excel spreadsheet.

Please remit funds via a wire to:
  ABA:074902341
  Bank Name: Irwin Union Bank and Trust
  Account #: 5344385900
  Account Name: Irwin Home Equity
  Reference: IHE 53-4385-900

Please contact me with any questions.

Sincerely,

Christie Wells
Director, Corporate Development
Irwin Home Equity
(925)790-5819

cc:  S. Shuck

an Irwin Financial Company

**Irwin Home Equity**
12677 Alcosta Blvd. #500
San Ramon, CA 94583

51107

════ **INVOICE** ════

Customer

| | |
|---|---|
| Name | Freedom Mortgage |
| Address | 10500 Kincaid Drive #309 |
| City | Fishers     State IN    ZIP 46037 |

51107
5/11/07

| Date | Project | Amount Due | Total |
|---|---|---|---|
| 5/11/07 | Early Payment Default<br><br>See attached for detail | $1,896,313.11 | $1,896,313.11 |
| | Please wire funds to:<br>ABA:074902341<br>Bank Name: Irwin Union Bank and Trust<br>Account #: 5344385900<br>Account Name: Irwin Home Equity<br>Reference: IHE 53-4385-900 | | |
| | | | $1,896,313.11 |

*Freedom Repurchase Invoice May 11, 2007

| FHS LOAN NUMBER | FREEDOM LOAN NUMBER | LAST NAME | ACQUISITION OR SALE SECURITIES | ACQUISITION DATE | NEXT PAYMENT DUE DATE | ACQUIRED PRINCIPAL BALANCE | Current UPB | Interest Rate | Interest Due | Premium | Recov of Impound Overdraft | L&G Charges | Recording Fee | Recoverable Fee | Suspense Fee | Total | Fee received by 5/31 additional amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | | | | | | 1,224,174.90 | 1,210,180.68 | | 60,110.43 | 23,270.62 | | 1,893.84 | 48.00 | 1,103.00 | 0.00 | 1,048,242.11 | 946.23 |
| | | | | | | | | | | | | | | | Total Due | 1,048,242.11 | |

**EXHIBIT  I**

June 14, 2007

Suzanne Shuck
1st VP Operations/Risk Management
Freedom Mortgage Company
10500 Kincaid Drive
Fishers, IN 46037

Re:     Invoice #: 61407

Dear Suzanne:

This letter will serve as a written request for Freedom Mortgage to repurchase the above referenced mortgage loans under the terms of the Correspondent Loan Purchase and Sale Agreement dated as of December 11, 2003, as amended by that certain Addendum with an effective date as of September 18, 2006.

Irwin Union Bank purchased said loans on between November 13, 2006 and February 2, 2007. Subsequent to the purchase of the loans, the following Defect under the terms of Article VI of the Agreement occurred: the Mortgagor fails to make any of the first, second or third payment due to the Purchaser after the Sale Date within thirty (30) days of each Monthly Payment Due Date. This is deemed a breach of warranty/covenant under Article VI, Section 6.01 (d). There is no cure for an initial payment default.

The amount to repurchase these loans is set forth in the attached Excel spreadsheet.

If the payoff is not received by June 30, 2007, additional interest per day will be due. The additional per diem cost is included in the Excel spreadsheet.

Please remit funds via a wire to:
ABA:074902341
Bank Name: Irwin Union Bank and Trust
Account #: 5344385900
Account Name: Irwin Home Equity
Reference: IHE 53-4385-900

Please contact me with any questions.
Sincerely,

Christie Wells
Director, Corporate Development
Irwin Home Equity
(925)790-5819

cc: Stacy Blackwell

## Freedom Repurchase Invoice June 14, 2007

| IHE LOAN NUMBER | FREEDOM LOAN NUMBER | LAST NAME | ACQUISITION OR SALE IDENTIFIER | ACQUISITION DATE | NEXT PAYMENT DUE DATE | ACQUIRED PRINCIPAL BALANCE | Current UPB | Interest Rate | Interest Due | Premium | Escrow/Impound Overdraft | Late Charge | Recasting Fee | Recoverable Fee | Suspense Fee | Total | if not recovered by 60/60 settlement per diem |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0051060214 | 61110983 | PEREIRA | FRE112008 | 11/10/2008 | 04/01/2008 | 68,938.28 | 68,938.28 | 14.000 | $ 2,721.87 | $ 081.61 | | $ 104.42 | $ 10.00 | | | $ 82,420.48 | $ 22.60 |
| 0051060300 | 61113283 | LEWIS | FRE112008 | 11/10/2008 | 04/01/2008 | 63,411.05 | 62,228.51 | 13.219 | $ 2,724.07 | $ 609.45 | | $ 103.38 | $ 10.00 | | | $ 63,630.48 | $ 23.84 |
| 0051060340 | 61113188 | LENO | FRE113008 | 12/01/2008 | 04/01/2008 | 29,035.83 | 29,045.09 | 13.219 | $ 1,418.71 | $ (80.80) | | $ 41.83 | $ 10.00 | | | $ 30,516.74 | $ 10.70 |
| 0051060340 | 61120103 | NOEL | FRE01207 | 12/29/2006 | 04/01/2008 | 117,452.44 | 117,901.40 | 13.219 | $ 4,234.80 | $ 265.49 | | $ 205.22 | $ 10.00 | | | $ 123,424.10 | $ 44.19 |
| 0051060340 | 61120107 | WILSON | FRE01207 | 12/29/2006 | 04/01/2008 | 16,574.44 | 16,574.44 | 11.600 | $ 665.49 | $ (17.50) | | $ 28.51 | $ 28.00 | | | $ 18,018.82 | $ 5.53 |
| 0051060781 | 61233782 | AGUILAR | FRE01207 | 12/29/2006 | 04/01/2008 | 41,237.41 | 41,305.90 | 12.800 | $ 1,700.37 | $ 398.54 | | $ 60.18 | $ 10.00 | | | $ 45,476.93 | $ 14.13 |
| 0051060781 | 61237334 | BADILA | FRE02107 | 01/31/2007 | 04/01/2008 | 135,635.67 | 135,103.39 | 12.800 | $ 5,202.50 | $ 1,052.18 | | $ 223.88 | $ 10.00 | | | $ 149,381.53 | $ 47.89 |
| 0051060578 | 61273778 | SANTIAGO | FRE02107 | 02/05/2007 | 05/01/2008 | 34,468.88 | 34,501.34 | 10.750 | $ 1,617.57 | $ 422.31 | | $ 32.72 | $ 10.00 | | | $ 29,302.79 | $ 10.31 |
| 0051060386 | 61243977 | BURNETT | FRE02107 | 01/12/2007 | 07/01/2007 | 289,865.00 | 249,884.11 | 13.269 | $ 16,450.76 | $ 6,941.67 | | $ 24.00 | $ 12.00 | | | $ 322,820.65 | $ 10.07 |
| 0051060048 | 61221918 | ANTHONY | FRE02107 | 01/12/2007 | 08/01/2007 | 20,064.13 | 20,094.42 | 14.750 | $ 1,060.27 | $ 202.70 | | $ 0.00 | $ 12.00 | | | $ 23,485.88 | $ 7.09 |
| 0051060878 | 61233774 | KOSTCZYNSKI | FRE02107 | 01/12/2007 | 09/01/2007 | 19,764.00 | 10,751.88 | 12.500 | $ 1,039.42 | $ (0.11) | | $ 10.53 | $ 10.00 | | | $ 20,777.27 | $ 0.78 |
| 0051060879 | 61272313 | CORBIN | FRE02107 | 01/22/2007 | 07/01/2007 | 16,646.00 | 15,672.50 | 12.875 | $ 715.59 | $ 187.87 | | $ 0.10 | $ 0.00 | | | $ 17,441.46 | $ 6.63 |
| 0051060998 | 61231934 | MARKS | FRE03107 | 01/22/2007 | 08/01/2007 | 132,000.00 | 131,006.11 | 11.000 | $ 3,692.26 | $ 1,416.20 | | $ 0.00 | $ 10.00 | | | $ 138,562.83 | $ 39.72 |
| | | | | **13** | | **987,820.35** | **988,935.57** | | **44,045.81** | **$ 12,430.70** | | **659.70** | **142.00** | | **0.00** | **0.00** | **Total Due: $1,044,484.03** | **248.68** |

| | | | | | | | | | | | | | | | | **Total** | |

**Irwin Home Equity**
12677 Alcosta Blvd. #500
San Ramon, CA 94583

61407

## INVOICE

| Customer | | |
|---|---|---|
| Name | Freedom Mortgage | |
| Address | 10500 Kincaid Drive #300 | |
| City | Fishers | State IN    ZIP 46037 |

6/14/07

| Date | Project | Amount Due | Total |
|---|---|---|---|
| 6/14/07 | Early Payment Default | $1,044,484.03 | $1,044,484.03 |
| | See attached for detail | | |
| | | | |
| | Please wire funds to: | | |
| | ABA:074902341 | | |
| | Bank Name: Irwin Union Bank and Trust | | |
| | Account #: 5344385900 | | |
| | Account Name: Irwin Home Equity | | |
| | Reference: IHE 53-4385-900 | | |
| | | | $1,044,484.03 |

**EXHIBIT J**



Irwin Financial Corporation
500 Washington Street
P.O. Box 929
Columbus, IN 47202-0929
812.376.1909
812.376.1709 Fax
www.irwinfinancial.com

**Irwin Financial**

January 11, 2008
*Via Express Mail*

David Altman, Esquire
Freedom Mortgage Corporation
907 Pleasant Valley Avenue, Suite 3
Mt. Laurel, NJ 08054

      RE:    <u>Correspondent Loan Purchase and Sale Agreement dated December 11,
2003 (the "Agreement") – Notice of Breach</u>

Dear Mr. Altman:

Pursuant to Sections 6.01 and 6.02 of the Agreement, Irwin Union Bank and Trust Company and
Irwin Home Equity Corporation (collectively, "Irwin") hereby provide notice that Freedom
Mortgage Corporation ("Freedom") has breached certain representations and warranties made in
Section 5.02 of the Agreement with respect to the loans detailed in <u>Exhibit A</u>. These breaches
qualify as Defects under Section 6.01, including under subparts (a) and (c).

Irwin believes that most, if not all, of these Defects are incurable. Irwin therefore demands that
Freedom repurchase these loans.

We look forward to your prompt response.

Sincerely,

Steven R. Schultz
First Vice President and General Counsel
Irwin Financial Corporation

cc:    Michael H. Gottschlich, Barnes & Thornburg
        Christopher Stimac, Enterprise Recovery and Repurchase Manager, Irwin Financial

Attachment b 1.11.08 Altman I.O.XLS

| IRE Loan Number | Freedom Loan # | Borrower Last Name | Date IRE Funded Freedom | Interest Rate | Curr outstanding PB As of 12/03/07 | Premium paid to Freedom $ | Accrued Interest to 12/31/07 | Loss chgs Due | Recording/reg fee's Due | Recovery/reg's Due | TOTAL | Reason for Repurchase Request |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

Attachment to 1.11.08 Akmali LUALS

| | | | | | | | | Comments |
|---|---|---|---|---|---|---|---|---|
| 51000085 | 51281170 | Ouill | 2/2/2007 | 13.12500% | $125,237.58 | $2,529.83 | $248.60 | Borrower purchased additional property same time as subject, did not disclose PTU on 1003 |
| 51000011 | 51281166 | Rapira | 12/7/2006 | 11.61500% | $58,017.48 | $619.32 | $1,620.62 | $127,870.00 ... SIP set sold for $132,200 on 10/23/04. Comps 2 & 3 used in this appraisal were both over 1.50 miles form the SIP. Comps above comps ignored by appraiser, which re... |
| | | | | | | | | $55,326.80 ... Borrower purchased additional property same time as subject, did not disclose PTU on 1003 |
| 51000095 | 51171298 | Ross | 1/12/2007 | 14.55000% | $77,603.43 | $804.29 | $114.16 | Appraisal was "subject to", no completion report provided. |
| 51000125 | 51212013 | Bentley | 2/2/2007 | 11.87500% | $160,838.41 | $2,179.06 | $245.00 | $84,215.16 ... Adjustments to comps exceeds guidelines. Loan was a Non-Arms Length transaction, not eligible under our program |
| 51000127 | 51130877 | Mey | 11/10/2006 | 19.50000% | $43,147.60 | $497.92 | $64.54 | $17,093.81 ... Borrower purchased additional property same time as subject, did not disclose PTU on 1003 |
| 51000128 | 51131318 | Donelle | 11/7/2006 | 19.50000% | $21,864.87 | $(583.90) | $423.29 | $49,485.60 ... Borrower did not occupy as 1003, Lender was Flatiron Mtg. |
| | | | | | | | $0.53 | $74,030.80 ... NNIA loss. 1003 indicated present residence was sold. Reported above borrowers still owns it, and obtained the property prior to our loan closed. New mortgage not disclosed or included in DTI. |
| 51000080 | 51100249 | Thomas | 2/2/2007 | 12.87125% | $31,651.24 | $351.84 | $971.44 | $23,692.52 ... Borrower purchased additional property same time as subject, did not disclose PTU on 1003 |
| 51000037 | 51164450 | Thea | 11/7/2006 | 12.37125% | $39,853.41 | $438.40 | $3,522.85 | $78.04 | $49,903.91 ... disclose PTU on 1003 |
| 51000039 | 51101491 | Walander | 12/1/2006 | 11.78675% | $42,507.24 | $229.60 | $3,331.45 | $151.00 | $49,003.31 ... 2 full appraisals found beyond 1% purchase limitations |
| 51000055 | 51078104 | Von Dyke | 11/10/2006 | 13.25000% | $34,533.86 | $247.61 | $3,044.50 | $118.60 | $37,992.30 ... DTI exceeds 70%, never did audits owned with mortgage not included in DTI at time of loan |
| 51000010 | 51117533 | Wagner | 11/10/2006 | 11.91000% | $43,523.80 | $448.68 | $1,704.62 | $26.24 | $45,411.13 ... HOA is incorrectly disclosed |

Total: 40 | $2,170,010.03 | $19,439.33 | $154,128.56 | $6,339.53 | $3,652,495.28

# EXHIBIT C

1  JASON J. CURLIANO, ESQ. (SBN 167509)
   KHALED TAQI-EDDIN, ESQ. (SBN 220923)
2  BUTY & CURLIANO LLP
   555 12th Street, Suite 1280
3  Oakland, California 94607
   Telephone: (510) 267-3000
4  Facsimile: (510) 267-0117
   Email: jasonc@butycurliano.com
5
   JOHN CROSSMAN[1]
6  ZUKERMAN GORE & BRANDEIS, LLP
   875 Third Avenue
7  New York, New York 10022
   Telephone: (212) 223-6700
8  Facsimile: (212) 223-6433
   Email: john@johncrossman.com
9
   Attorneys for Defendant
10 FREEDOM MORTGAGE CORPORATION

11

12                 UNITED STATES DISTRICT COURT

13      NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

14

15

16 IRWIN UNION BANK AND TRUST            )  No.: C 08-00472 PJH
   COMPANY and IRWIN HOME EQUITY         )
17 CORPORATION,                          )  Action Filed: January 22, 2008
                                         )
18              Plaintiffs,              )  NOTICE OF MOTION AND
                                         )  MOTION OF DEFENDANT
19       vs.                             )  FREEDOM MORTGAGE
                                         )  CORPORATION TO DISMISS OR
20 FREEDOM MORTGAGE CORPORATION,         )  STAY ACTION AND FOR AN
                                         )  ORDER COMPELLING
21              Defendant.               )  ARBITRATION
                                         )  [FRCP RULE 12(b)]
22                                       )  [9 U.S.C. §§ 3-4]
                                         )
23                                       )  Date:      April 23, 2008
                                         )  Time:      9:00 a.m.
24                                       )  Courtroom: 3
                                         )  Judge:  Phyllis J. Hamilton
25                                       )
                                         )
26 _____  )

27  [1]   Application for admission *pro hac vice* pending.
                                1
28

BUTY & CURLIANO LLP
ATTORNEYS AT LAW
555 12™ ST., SUITE 1280
OAKLAND CA 84607
510.267.3000

1      PLEASE TAKE NOTICE that on April 23, 2008, at 9:00 a.m., or as soon thereafter as this

2   matter may be heard in Courtroom 3 of the above-entitled Court located at 450 Golden Gate Ave.,

3   San Francisco, California 94102, Defendant FREEDOM MORTGAGE CORPORATION

4   ("FREEDOM") will and does hereby move the Court for an order (1) dismissing this action with

5   prejudice or, in the alternative, staying this action pending the completion of the binding

6   arbitration, and (2) compelling Plaintiffs IRWIN UNION BANK AND TRUST COMPANY and

7   IRWIN HOME EQUITY CORPORATION (the "IRWIN ENTITIES") to arbitrate all causes of

8   action alleged in their Complaint against FREEDOM, filed on January 22, 2008.

9      This motion and petition are made pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal

10   Rules of Civil Procedure, Sections 3 and 4 of the Federal Arbitration Act (9 U.S.C. §§ 1-16) and

11   the California Arbitration Act (Cal.C.Civ.Pro. §§ 1280-1294.2), on the grounds that the claims in

12   this action relate to a contract, to which the IRWIN ENTITIES and FREEDOM are parties, and

13   which contains a valid and enforceable arbitration clause estopping the IRWIN ENTITIES from

14   avoiding arbitration by bringing this suit against FREEDOM for claims relating to that contract.

15      This motion and petition is based on this notice and motion, the concurrently filed

16   memorandum of points and authorities, declaration of David Altman and exhibits thereto, the

17   pleadings and records on file herein, and such other and further argument as may be presented and

18   allowed by the Court at the time of the hearing.

19   Dated: March 13, 2008                    BUTY & CURLIANO, LLP

20

21                                    By: _Khaled_____
22                                        KHALED TAQI-EDDIN
                                          Attorneys for Defendant
23                                        FREEDOM MORTGAGE CORPORATION

24

25

26

27

28

BUTY & CURLIANO LLP
ATTORNEYS AT LAW
555 12ᵗʰ ST., SUITE 1280
OAKLAND CA 94607
510.287.3000

NOTICE OF MOTION AND MOTION OF FREEDOM MTG. CORP. TO DISMISS OR STAY ACTION AND FOR
AN ORDER COMPELLING ARBITRATION [FRCP RULE 12(b)] [9 U.S.C. §§ 3-4]
CASE NO. C08-00472 PJH

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3           Defendant Freedom Mortgage Corporation ("Freedom") respectfully requests this Court to

4    issue an order dismissing this action (or in the alternative, staying this action), and an order

5    compelling Plaintiffs Irwin Union Bank And Trust Company ("Irwin Union") and Irwin Home

6    Equity Corporation ("IHE") (and collectively, the "Irwin Entities") to arbitrate all of the claims

7    asserted in the Complaint filed by them on January 22, 2008 (the "Complaint") before the National

8    Arbitration Forum, based on the provisions of the contract upon which all of those claims are

9    based.  That contract, entitled "Correspondent Loan Purchase and Sale Agreement" and dated

10    December 11, 2003 (the "IHE Agreement"), to which both Freedom and the Irwin Entities are

11    parties, provides that the parties to it have the right to demand that any claims arising out of or

12    relating to the IHE Agreement be resolved by binding arbitration in California.  Under these

13    circumstances, Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Sections 3 and

14    4 of the Federal Arbitration Act (9 U.S.C. §§ 1-16) and the California Arbitration Act

15    (Cal.C.Civ.Pro. §§ 1280-1294.2) dictate that (1) this action be dismissed (or in the alternative,

16    stayed), and (2) the Irwin Entities be compelled to arbitrate their claims in this action in binding

17    arbitration.

18    **II.    STATEMENT OF ISSUES TO BE DECIDED**

19           This motion presents two issues to be decided by the Court:

20           (1) whether this action should be dismissed with prejudice or, in the alternative, stayed

21    pending the completion of binding arbitration; and

22           (2) whether the IRWIN ENTITIES should be compelled to arbitrate all causes of action

23    alleged in their Complaint against FREEDOM.

24    **III.    ARGUMENT**

25           **A.    Factual and Procedural Background**

26           On or about December 11, 2003, the Irwin Entities entered into the IHE Agreement with

27    their sister company, Irwin Mortgage Corporation ("IMC").  IMC is a wholly-owned subsidiary of

28

3

NOTICE OF MOTION AND MOTION OF FREEDOM MTG. CORP. TO DISMISS OR STAY ACTION AND FOR
AN ORDER COMPELLING ARBITRATION [FRCP RULE 12(b)] [9 U.S.C. §§ 3-4]
CASE NO. C08-00472 PJH

1    Irwin Financial Corporation ("IFC"), and a member of the Irwin family of companies founded by

2    IFC.

3        The IHE Agreement confers upon IMC the right to sell mortgage loans to the Irwin Entities

4    under the terms and subject to the conditions set forth therein. The IHE Agreement obliges (1) the

5    Irwin Entities to purchase those loans per the Agreement's terms and conditions, and (2) IMC to

6    repurchase certain of the mortgage loans under conditions specified in the Agreement. The parties

7    to the IHE Agreement entered into two addenda modifying it on January 6, 2004 and February 12,

8    2004 (the "2004 Addenda"). (See the IHC Agreement, followed by the 2004 Addenda, attached as

9    Exhibit A to the Declaration of David Altman in support of this motion, dated March 12, 2008 and

10   filed herewith (the "Altman Decl.")).

11       The IHE Agreement provides in Article VIII, § 8.09, as follows:

12         Section 8.09    Arbitration

13           Upon written request by either party that is submitted according to
         the applicable rules for arbitration, any claim, demand or cause of
14           action, which arises out of or is related to this Agreement [], may be
         resolved by binding arbitration in the State of California, in
15           accordance with (i) the Federal Arbitration Act; (ii) the Code of
         Procedure [] of the National Arbitration Forum [] and (iii) this
16           Agreement which shall control any inconsistency between it and the
         Code.

17   (Altman Decl. Exh. A at 22.) In addition, the IHE Agreement provides that California law governs

18   all questions concerning the interpretation and performance of its terms. (Id., Article VIII, Section

19   8.11 "Forum; Governing Law".)

20       On August 7, 2006, Freedom, IMC and IFE entered into an Asset Purchase Agreement by

21   which Freedom purchased from IMC and IFE substantially all of IMC's assets comprising one of

22   IMC's businesses, including the IHE Agreement. In September 2006, IMC and Freedom executed

23   an Assignment and Assumption Agreement relating to the assets Freedom had purchased dated as

24   of September 18, 2006. (See Altman Decl. Exh. B, Assignment and Assumption Agreement dated

25   as of September 18, 2006.) On September 29, 2006, the Irwin Entities executed a Consent to the

26   assignment of the IHE Agreement, making Freedom a party to the IHE Agreement as modified by

27   the 2004 Addenda. (See Altman Decl. Exh. C, Consent to Assignment executed on September 29,

28

4

EUTY & CURIANO LLP
ATTORNEYS AT LAW
555 12TH ST., SUITE 1280
OAKLAND CA 94607
510.287.3000

NOTICE OF MOTION AND MOTION OF FREEDOM MTG. CORP. TO DISMISS OR STAY ACTION AND FOR
AN ORDER COMPELLING ARBITRATION [FRCP RULE 12(b)] [9 U.S.C. §§ 3-4]
CASE NO. C08-00472 PJH

1    2006). There is a purported 2006 Addendum to the IHE Agreement, which is in dispute, but it does

2    not affect the IHE Agreement's arbitration provision. (See Altman Decl. Exh. D).

3        The Complaint alleges that the Addendum modified the terms of the IHE Agreement, and

4    that under such modified terms Freedom is obligated to repurchase loans that the Irwin Entities

5    have deemed to have "Defects" as that term is defined by the two documents, for an amount

6    exceeding $8.3 million. (Complaint, at 2:22-6:14.) Each of the claims in the Complaint – two for

7    breach of the IHE Agreement and one for negligence – derive from these allegations. (See *id.* at

8    6:15-8:16.)

9        Simultaneously with this motion, pursuant to the IHE Agreement Freedom is filing a claim

10    with the National Arbitration Forum (the "NAF"), the arbitration forum designated in the IHE

11    Agreement. In the arbitration, Freedom seeks an order declaring the purported Addendum void and

12    unenforceable because it was procured by fraud and economic duress, and because it is not

13    supported by consideration. Freedom's claim will annex the Complaint and seek a declaration of

14    all rights concerning this action.

15        **B.    This Court Should Dismiss this Action.**

16        Under the circumstances present here, a dismissal or stay of this case is appropriate because

17    Freedom has a direct right under the IHE Agreement to compel Defendants to arbitrate all of the

18    claims raised in the Complaint. Freedom therefore moves the Court for an order dismissing this

19    action or, in the alternative, staying this action in favor of the arbitration process.

20        A motion to dismiss, or in the alternative, to stay the action, is an appropriate response to a

21    complaint. "A trial court may … note the inadequacy of a complaint and dismiss it for failure to

22    state a claim" under Rule 12(b)(6) when an "arbitration clause [is] broad enough to bar all of the

23    plaintiff's claims …" *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 638 (9th Cir., 1988) (citation

24    omitted); *see also, Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir., 1992)

25    ("The weight of authority clearly supports dismissal of the case when all of the issues raised in the

26    district court must be submitted to arbitration."); *24 Hour Fitness, Inc. v. Superior Court*, 66

27

28

5

BUTY & CURLIANO LLP
ATTORNEYS AT LAW
635 12ᵗʰ ST., SUITE 1250
OAKLAND CA 94607
510.287.3000

1    Cal.App.4th 1199, 1208 (1998) ("Because the only issue presented ... was covered by the

2    arbitration agreement, it was not error to dismiss the suit.").

3        There is no compelling reason for this Court to retain jurisdiction over this case and it

4    should be dismissed. *See Alford*, 975 F.2d at 1164; *24 Hour Fitness*, 66 Cal.App.4th at 1208.

5    However, if the Court declines to dismiss for any reason, the Court should stay this action pending

6    the completion of arbitration of the issues implicated in the Complaint. *See* 9 U.S.C. § 3;

7    Cal.C.Civ.Pro. § 1281.4.

8        **C.    This Court Should Compel the Irwin Entities To Arbitrate the Claims Asserted**

9        **in Their Complaint.**

10       Sections 3 and 4 of the Federal Arbitration Act (9 U.S.C. §§ 1-16) and the California

11   Arbitration Act (Cal.C.Civ.Pro. §§ 1280-1294.2) dictate that the Irwin Entities be compelled to

12   arbitrate their claims, which fall squarely within the IHE Agreement's arbitration provision. Under

13   the FAA, written agreements to arbitrate are "valid, irrevocable and enforceable" (9 U.S.C. § 2),

14   and the United States Supreme Court has directed federal courts to "rigorously enforce" arbitration

15   agreements. *Dean Witter Reynolds, Inc. v. Byrd.*, 470 U.S. 213, 221 (1985). "By its terms, the

16   [Federal Arbitration] Act leaves no place for the exercise of discretion by a district court, but

17   instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to

18   which an arbitration agreement has been signed." *Id.* at 218. Likewise, "[w]here parties have

19   agreed to arbitrate their differences, it is the clear intent of the California arbitration statute that

20   courts should enforce the performance of that agreement." *Government Employees Ins. Co. v.*

21   *Brunner*, 191 Cal.App.2d 334, 340 (1961) (citation omitted).

22       The arbitration provision in the IHE Agreement constitutes a valid, enforceable and

23   irrevocable written agreement to submit to arbitration the issues raised in the Complaint, and the

24   Irwin Entities should be precluded from further pursuing those claims in this Court. *See* 9 U.S.C. §

25   2; Cal.C.Civ.Pro. § 1281.

26   ////

27   ////

28                                         6


BUTY & CURLAND LLP
ATTORNEYS AT LAW
555 12ᵗʰ ST., SUITE 1280
OAKLAND CA 94607
510.267.3000

NOTICE OF MOTION AND MOTION OF FREEDOM MTG. CORP. TO DISMISS OR STAY ACTION AND FOR
AN ORDER COMPELLING ARBITRATION [FRCP RULE 12(b)] [9 U.S.C. §§ 3-4]
CASE NO. C08-00472 PJH

IV.    **CONCLUSION**

For the reasons set forth herein, Freedom respectfully requests that the Court issue an order dismissing this action (or in the alternative, staying it in its entirety) and compelling the Irwin Entities to arbitrate all causes of action in the Complaint.

Dated: March 13, 2008             BUTY & CURLIANO, LLP


By: _Khaled_ _____

KHALED TAQI-EDDIN
Attorneys for Defendant
FREEDOM MORTGAGE CORPORATION

7

BUTY & CURLIANO LLP
ATTORNEYS AT LAW
555 12ᵗʰ ST., SUITE 1280
OAKLAND CA 94507
510.267.3000

NOTICE OF MOTION AND MOTION OF FREEDOM MTG. CORP. TO DISMISS OR STAY ACTION AND FOR
AN ORDER COMPELLING ARBITRATION [FRCP RULE 12(b)] [9 U.S.C. §§ 3-4]
CASE NO. C08-00472 PJH

# EXHIBIT D

1  DAVID J. BERGER (Bar No. 147645)
   DOMINIQUE-CHANTALE ALEPIN (Bar No. 241648)
2  WILSON SONSINI GOODRICH & ROSATI
   650 Page Mill Road
3  Palo Alto, CA 94304
   Telephone: (650) 493-9300
4  Facsimile: (650) 493-6811
   dalepin@wsgr.com
5
   JENNY L. DIXON (Bar No. 192638)
6  WILSON SONSINI GOODRICH & ROSATI
   One Market Street
7  Spear Tower, Suite 3300
   San Francisco, CA 94105
8  Telephone: (415) 947-2000
   Facsimile: (415) 947-2099
9  jldixon@wsgr.com

10 Attorneys for Plaintiffs
   IRWIN UNION BANK AND TRUST COMPANY
11 and IRWIN HOME EQUITY CORPORATION

12

13              UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION
14

15 IRWIN UNION BANK AND TRUST          )   CASE NO.: C08-00472-PJH
   COMPANY AND IRWIN HOME EQUITY       )
16 CORPORATION,                        )   Action filed: January 22, 2008
                                       )
17          Plaintiffs,                )   **PLAINTIFFS' RESPONSE RE:**
                                       )   **DEFENDANT FREEDOM**
18      v.                             )   **MORTGAGE CORPORATIONS**
                                       )   **MOTION TO DISMISS OR STAY**
19 FREEDOM MORTGAGE COMPANY,           )   **ACTION AND FOR AN ORDER**
                                       )   **COMPELLING ARBITRATION**
20          Defendants.                )
                                       )
21                                     )   Date:    April 30, 2008
                                       )   Time:    9:00 a.m.
22                                     )   Courtroom: 3
                                       )   Hon. Phyllis J. Hamilton
23                                     )
                                       )
24 _____)

25

26

27

28

PLAINTIFFS' RESPONSE RE: DEF'S MOT.                          3332893_2.DOC
TO DISMISS OR STAY AND FOR ORDER
COMPELLING ARBITRATION
CASE NO. C08-00472-PJH

# INTRODUCTION

This case arises out of Defendant Freedom Mortgage Corporation's ("Freedom") breach of its obligation to repurchase numerous mortgage loans under a contract with Plaintiffs Irwin Union Bank and Trust Company ("Irwin Union") and Irwin Home Equity Corporation ("IHE"). When Freedom purchased certain assets from another Irwin entity, Irwin Mortgage Corporation ("IMC"), which is not a party to this action, it assumed that contract and liabilities for loans underwritten by Freedom after the asset purchase. By its motion, Freedom purports to seek a dismissal or stay of this action in order to compel the arbitration of Plaintiffs' claims. However Freedom's papers fail to disclose certain key facts to this Court: that it has already sought to stay the arbitration proceeding it seeks to compel by this motion and that it filed a separate, related case in federal district court in Delaware against two other Irwin entities, IMC and Irwin Financial Corporation ("IFC" or "Irwin Financial"), the direct or ultimate parent corporation of each of IHE, Irwin Union and IMC.

Freedom's Delaware complaint essentially seeks to resolve (in a different forum) the same issues present in this case—specifically, Freedom seeks to litigate the issue of whether it is obligated to repurchase the loans under its contract with IHE and Irwin Union. Most significantly, Freedom's Delaware complaint requests an order that IFC compel the Plaintiffs in this action to abandon their claims against Freedom. *See, e.g.*, Freedom Compl. at 20. (A copy of the complaint filed by Freedom in the Delaware action is attached as Exhibit 1 to the Declaration of Jenny L. Dixon ("Dixon Decl.") filed herewith.)

Plaintiffs believe that Freedom's claims in the Delaware action and this action should be consolidated before one court, and litigated together. Freedom will undoubtedly point to the fact that its claims against IFC and IMC in the Delaware action purportedly arise under a different contract, which makes federal court in Delaware an appropriate venue and does not contain an arbitration provision. Freedom Compl. ¶¶ 13-16. The parties have engaged in informal discussions concerning consolidation, and Plaintiffs, IFC and IMC are amenable to consolidation and willing to have all of the claims go to arbitration if that is Freedom's preferred forum.

1    However, Plaintiffs respectfully submit that it is contrary to judicial economy and common sense

2    to have multiple, overlapping actions in different forums.

3        Accordingly, Plaintiffs respectfully request that if the Court is inclined to refer this case

4    to arbitration, Freedom be directed to bring its claims against any other Irwin entity involving

5    these same facts in the same forum because the Irwin entities are willing to agree to a change of

6    forum. Alternatively, if Freedom is unwilling to bring its claims in arbitration, then Plaintiffs

7    respectfully request that Freedom's motion be denied. Further, in the event that Freedom is

8    unwilling to have these cases consolidated, IFC and IMC intend to file a motion to dismiss, stay

9    or transfer the Delaware action to the Northern District of California on or before April 23, 2008

10   because of this first-filed parallel action. What Freedom should not be permitted to do is defeat

11   this first-filed action and then stay indefinitely the resolution of Plaintiffs' claims as it presently

12   intends to do.

13                              **BACKGROUND**

14       **A.    The Parties**

15       Plaintiff Irwin Union is a commercial bank based in Indiana, founded more than 130

16   years ago. *See* Compl. ¶ 2. Plaintiff IHE is a consumer mortgage lender. *Id* ¶ 3. Irwin Union

17   owns IHE and is a wholly owned subsidiary of Irwin Financial Corporation. Freedom's Mem. of

18   Points & Auth. ISO Motion to Dismiss or Stay Action ("Freedom's Mot.") at 3-4. Irwin Union

19   also owns IMC. *See* Compl. ¶ 9.

20       Defendant Freedom is a licensed mortgage banker. *Id* ¶ 4. Freedom entered into an

21   agreement with Irwin Financial and IMC to acquire IMC's mortgage origination assets.

22   Freedom's Mot. at 4. Irwin Financial was a party to the Asset Purchase Agreement because, as

23   the parent corporation of Irwin Union (which owns IMC), Irwin Financial is the indirect owner

24   of IMC's outstanding stock.

25       **B.    The Transactions at Issue**

26       In May 2006, Freedom and IMC signed a letter of intent and Freedom began conducting

27   due diligence on IMC's business. Freedom Compl. ¶ 19. After completing its due diligence,

28   Freedom purchased certain assets, and assumed certain liabilities, from IFC and IMC in

PLAINTIFFS' RESPONSE RE: DEF'S MOT.          -2-                    3332893_2 DOC
TO DISMISS OR STAY AND FOR ORDER
COMPELLING ARBITRATION
CASE NO. C08-00472-PJH

1  accordance with the Asset Purchase Agreement dated as of August 7, 2006. *Id.* ¶¶ 22-23.

2  Among the assets assigned to Freedom under the Asset Purchase Agreement was a previously

3  existing Correspondent Loan Purchase and Sale Agreement (the "Loan Purchase Agreement")

4  between IHE and Irwin Union, on the one hand, and IMC, on the other hand, pursuant to which

5  mortgage loans were sold to IHE and Irwin Union from time to time. Compl. ¶¶ 19-24.

6       The Loan Purchase Agreement required IMC (and subsequently, Freedom) to repurchase

7  loans which were "defective." *Id.* ¶¶ 16-18. "Defective" loans included, among others, those on

8  which the first payment had not been made. *Id.* In October 2006, after the asset purchase closed,

9  Freedom executed an Addendum to the Loan Purchase Agreement that expanded the definition

10  of "defective" loans to include those on which the first, second and/or third payments had not

11  been made. *Id.* ¶¶ 25-28. Numerous loans that Freedom originated and sold to IHE and Irwin

12  Union after purchasing IMC's assets and assuming the Loan Purchase Agreement were defective

13  for one or more reasons. *Id.* ¶¶ 29-32. IHE and Irwin Union requested that Freedom repurchase

14  these loans. *Id.* ¶¶ 33-36. Freedom has refused to do so and contends that the 2006 Addendum

15  is void and unenforceable under a variety of theories.

16       **C.    This Action and the Related Proceedings**

17       On January 22, 2008, IHE and Irwin Union filed the present action asserting two claims

18  for breach of contract – the Loan Purchase Agreement – and a claim for negligence. After

19  requesting and receiving several extensions of time, Freedom responded to the Complaint on

20  March 13, 2008 by way of this motion to dismiss or stay action and for an order compelling

21  arbitration.

22       In its moving papers, Freedom represented that "[s]imultaneously with this motion,

23  pursuant to the [Loan Purchase Agreement] Freedom is filing a claim with the National

24  Arbitration Forum." Freedom's Mot. at 5. What Freedom neglected to mention, however, was

25  that its Initial Claim for Arbitration also contains a request for stay of arbitration. *See* Dixon

26  Decl., Exhibit 2 (Freedom's Initial Claim for Arbitration dated March 12, 2008) at 12-13.

27  Freedom's moving papers in this Court also failed to state that the purpose of the stay is so

28  Freedom can obtain a resolution of its "action in the U.S. District Court, District of Delaware

PLAINTIFFS' RESPONSE RE: DEF'S MOT.                    -3-                        3332893_2 DOC
TO DISMISS OR STAY AND FOR ORDER
COMPELLING ARBITRATION
CASE NO. C08-00472-PJH

1  (the "Injunction Action"), against [IHE and Irwin Union's] parent Irwin Financial, and IMC"

2  that was filed on March 12, 2008. *See* Dixon Decl., Exhibit 2 at 4.

3      In its arbitration claim, Freedom characterizes its claims in the Delaware action as

4  "seek[ing] specific performance compelling Irwin Financial to direct . . . IHE and [Irwin Union]

5  to cease pursuing the claims that are the subject of [this] action." *Id.* Freedom goes on to

6  explain that the outcome of the Injunction Action in Delaware should result in the dismissal of

7  the arbitration proceeding. *Id.*

8                                    **ARGUMENT**

9      The Loan Purchase Agreement contains a permissive arbitration provision, which

10  provides in part that "[u]pon written request by either party . . . any claim, demand or cause of

11  action, which arises out of or is related to this Agreement . . . *may* be resolved by binding

12  arbitration in the State of California . . . . Compl., Ex. A at 22 (emphasis added). The Loan

13  Purchase Agreement goes on to provide that the "[a]ny action between the parties relating to or

14  arising under this Agreement shall be tried in the federal or state courts located in Contra Costa

15  County, California." *Id.*

16      A number of courts have held that contract provisions containing permissive language

17  such as the term "may" can serve as the basis to compel arbitration in light of the presumption in

18  favor of arbitration of disputes as set forth in the Federal Arbitration Act. *See United States v.*

19  *Bankers Ins. Co.*, 245 F.3d 315, 320-21 (4th Cir. 2001) (discussing case law interpreting

20  arbitration provisions using the word "may"); *Erickson v. Aetna Health Plans of California*, 71

21  Cal. App. 4th 646, 654-55 (1999) (same). Here, the arbitration provision is not as unequivocal as

22  Freedom contends. Plaintiffs believe that the clear language and intent of the Loan Purchase

23  Agreement, which mandates that "[a]ny action between the parties relating to or arising under

24  this Agreement" be tried in this Court or the Contra Costa County Superior Court, demonstrates

25  that the parties' intent was to have the option to arbitrate *or* seek resolution before the specified

26  courts. This calls into doubt Freedom's contention with respect to the arbitration provision that

27  Freedom had no role in negotiating—it just assumed the contract as part of its acquisition of

28  IMC's assets.

PLAINTIFFS' RESPONSE RE: DEF'S MOT.                  -4-                    3332893_2.DOC
TO DISMISS OR STAY AND FOR ORDER
COMPELLING ARBITRATION
CASE NO. C08-00472-PJH

1    However, Plaintiffs respectfully submit that here there is a competing, and greater, policy

2    issue at stake than that contained in the Federal Arbitration Act: the notion of judicial economy.

3    Numerous courts have repeatedly recognized that importance of judicial economy and the

4    problems that may arise when cases containing common facts and parties are litigated in

5    different forums. *See Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94-95 (9th Cir.

6    1982); *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 625 (9th Cir. 1991). For this

7    reason, courts routinely transfer, stay or dismiss cases brought in multiple forums so that all the

8    cases can be litigated together, before a single judge in a single forum. *See Alltrade*, 946 F.2d at

9    622 (affirming district court's finding that the first-to-file rule applied and staying this action to

10   allow first-filed action to proceed even when that action involved additional claims and parties).

11   Courts also give deference to the plaintiff's choice of forum in a first-filed action absent special

12   circumstances. *See Centocor, Inc. v. MedImmune, Inc.*, No. C 02-03252 CRB, 2002 WL

13   31465299, at *3-*4 (N.D. Cal. Oct. 22, 2002) (rejecting plaintiffs' argument that the first-to-file

14   doctrine does not apply because the second action named additional parties in the first filed

15   action and they would be prejudiced by adjudication of that action: "[P]laintiffs' argument

16   ignores the fact that courts generally do not require identical issues or parties so long as the

17   actions involve closely related questions or common subject matter."); *Time Warner Cable, Inc.*

18   *v. GPNE Corp.*, 497 F. Supp. 2d 584 (D. Del. 2007) (granting defendant's motion to dismiss case

19   in favor of a first-filed action in Texas). Freedom may contend that the arbitration provision at

20   issue in this action should take precedent over the first-filed doctrine. This contention is

21   undermined, however, by Freedom's attempt to stay the arbitration it seeks to compel and to

22   instead proceed with litigating substantially the same issues against related parties in a different

23   forum.

24

25

26

27

28

1        Plaintiffs believe that the importance of judicial economy and the benefits of having all of

2  the issues litigated in a single forum are equally present in this case.[1]  Plaintiffs originally filed

3  their complaint in this Court and with these parties because Plaintiffs believed that these were the

4  essential parties to this dispute, and that the forum selection clause for the contract at issue here

5  provided that this case was to be brought in this Court.  Plaintiffs continue to believe that this is

6  still the right forum for this dispute, and that these parties are sufficient.  Indeed, the substance of

7  Freedom's claims in the Delaware action—that the 2006 Addendum is void—could have been

8  (and should have been) asserted as cross-claims and litigated in this action.  However, to the

9  extent that Freedom believes other Irwin entities should be added, those entities would have been

10  (and are) willing to consent to Freedom adding them by way of counter-claim, so that all of the

11  issues could be heard in this Court.

12        Instead, Freedom chose to try to get this case moved to arbitration and stayed, and chose

13  to file a similar action in Delaware.  Freedom's forum-shopping should not be rewarded or

14  countenanced.  If Freedom wants to have all of the issues in dispute arbitrated, that is acceptable

15  to Plaintiffs in this case (as well as IFC and IMC).  Alternatively, if Freedom believes that the

16  case should proceed in federal court, then Plaintiffs respectfully request that Freedom's motion

17  to stay or transfer this action be denied, and that Freedom bring the claims in its Delaware case

18  as counterclaims in this case (as noted above, IFC and IMC intend to make a similar motion in

19  the Delaware action on or before April 24, 2008).  What should not occur, however, is for this

20  case to be transferred to arbitration and then have that arbitration stayed or moving forward at the

21  same time as the Delaware action filed by Freedom, with the potential for conflicting results and

22  the unnecessary burdens incurred as a result of litigating overlapping (and indeed some identical)

23  issues in multiple forums.

24

25

26      [1] Plaintiffs, Irwin Financial and IMC believe that Freedom's claims in the Delaware action

27  are without merit.  Nonetheless, resolution of these claims in the same forum as Plaintiffs' will
be most efficient and conserve judicial resources.

28

PLAINTIFFS' RESPONSE RE: DEF'S MOT.     -6-             3332893_2 DOC
TO DISMISS OR STAY AND FOR ORDER
COMPELLING ARBITRATION
CASE NO. C08-00472-PJH

**CONCLUSION**

1       For the foregoing reasons, Plaintiffs respectfully request that the Court either defer ruling

2 on this motion until the Delaware court has addressed the motion to transfer that action to the

3 Northern District of California or take other such action to ensure that the parties and courts do

4 not have to face multiple actions in different forums over the issues raised in this case.

Dated: April 9, 2008                  WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
David J. Berger (Bar No. 147645)
Jenny L. Dixon (Bar No. 192638)
Dominique-Chantale Alepin (Bar No. 214648)


By: _____/s/_____
          David J. Berger

          650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Facsimile: (650) 493-6811

Attorneys for Plaintiffs Irwin Union Bank and
Trust Company and Irwin Home Equity
Corporation

      I, Jenny L. Dixon, am the ECF User whose identification and password are being used to

file this PLAINTIFFS' RESPONSE RE: DEFENDANT FREEDOM MORTGAGE

CORPORATIONS MOTION TO DISMISS OR STAY ACTION AND FOR AN ORDER

COMPELLING ARBITRATION. In compliance with General Order 45.X.B, I hereby attest that

David J. Berger has concurred in this filing.

Dated April 9, 2008             WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: Jenny L. Dixon_____
      Jenny L. Dixon

*Attorneys for Plaintiffs Irwin Union Bank and
Trust Company and Irwin Home Equity
Corporation*

**EXHIBIT 4
PART 7
SUPP. DIXON DEC**

# EXHIBIT E



NATIONAL ARBITRATION
# FORUM

| Name, address, and phone number for **Claimant(s)** | **CLAIM FORM** |

Freedom Mortgage Corporation
907 Pleasant Valley Avenue, Suite 3
Mt. Laurel, New Jersey  08054
(856) 626-2316

File Number:_____
(To be assigned by the Forum)

Name, address, and phone number for
**Respondents**

Irwin Home Equity Corporation
12677 Alcosta Boulevard
Suite 500
San Ramon, CA  94583
(925) 277-2001

Filing Date:_____
(To be assigned by the Forum)

Irwin Union Bank and Trust Company
500 Washington Street
Columbus, Indiana  47201
(812)372-0111

---

**NOTICE TO RESPONDENT(S):** This is an arbitration Claim filed against you with the National Arbitration Forum for money or other relief. You have <u>thirty (30) days</u> to Deliver to the Claimant(s) and file with the Forum a Written Response and/or file a Counter Claim, Cross-claim or Third Party Claim in accord with the Code of Procedure. If you <u>do not</u> Deliver to the Claimant(s) and file with the Forum a Written Response within thirty (30) days, an Award may be entered against you. You can obtain a free copy of the Code of Procedure from the Claimant or the Forum.

**Claimant(s) states:**  SEE ATTACHED INITIAL CLAIM DATED MARCH 12, 2008

## Calculating the Total Claim Amount:

| | | |
|---|---|---|
| **List Monetary Claim Amount** | See Initial Claim at 12. | Specify amount of money being sought. |
| **List Attorney Fees Amount** | See Initial Claim at 12. | If Requested, specify the dollar amount of attorney fees. See Rule 12B of the Code of Procedure. |
| **List Interest Amount** | See Initial Claim at 12. | If Requested, specify the dollar amount of interest accrued. |
| **List Non-Monetary Claim Amount** | See Initial Claim at 12. | If Requested, specify the value of non-monetary relief sought. |
| **Add the above figures** | See Initial Claim at 12. | **Total Claim Amount** |

## Calculating the Filing Fee:

If you have requested non-monetary relief, your Claim involves at least one (1) Consumer Party as defined by Rule 2L, and your total Claim amount is $74,999 or less, your Filing Fee is $240.00.

If you have not requested non-monetary relief or if your total Claim amount is $75,000 or larger, see the Fee Schedule to determine the Filing Fee based on your total Claim amount.

List the Filing Fee Amount $1750.00.

Select the Method of Payment for the Filing Fee:   ☐ Check   XX  Credit Card

Account Type: ☐ Visa      ☐ MasterCard      ☐ Discover      XX  American Express

Account Number: 3783-606219-41048      Exp. Date: 08/09

If you are an indigent Consumer Party, you may Request a waiver of Common Claim fees pursuant to Rule 45.

## Arbitration Award:

Do you Request that the arbitration Award include recovery of Filing Fees and other fees and costs incurred during the arbitration process?   XX Yes   ☐ No

If there is no Response to the Initial Claim, the Claim will be reviewed by an Arbitrator and an Award may be issued. If a Response is submitted, the Forum will advise the Parties of the Hearing.

**Representation Information:**

If you are represented and want the Representative to receive all correspondence, list the information below:

**Representatives:**

BUTY & CURLIANO LLP
Jason J. Curliano
383—4th Street, Third Floor
Oakland, California 94607
Telephone:     510/267-3000
Facsimile:     510/267-0117
Email:         JasonC@ButyCurliano.com

ZUKERMAN GORE & BRANDEIS, LLP
John K. Crossman
Frank C. Welzer
875 Third Avenue
New York, New York 10022
Telephone:    212/223-6700
Facsimile:    212/2223-6433
Email: jcrossman@zgbllp.com


**Claimant's Affidavit of Authenticity:**  SEE ATTACHED INITIAL CLAIM at 14.

BUTY & CURLIANO LLP
Jason J. Curliano
383—4th Street, Third Floor
Oakland, California  94607
Telephone:     510/267-3000
Facsimile:      510/267-0117
Email:          JasonC@ButyCurliano.com

ZUKERMAN GORE & BRANDEIS, LLP
John K. Crossman
Frank C. Welzer
875 Third Avenue
New York, New York 10022
Telephone:     212/223-6700
Facsimile:      212/2223-6433
Email:          jcrossman@zgbllp.com

*Attorneys for Claimant*
*Freedom Mortgage Corporation*


## BEFORE THE NATIONAL ARBITRATION FORUM

```
-- ------------------------------------------------ x
                                                    :
FREEDOM MORTGAGE CORPORATION,                       :
                                                    :
                      Claimant,                     :
                                                    :
        - against -                                 :     INITIAL CLAIM
                                                    :     FOR ARBITRATION
                                                    :
IRWIN HOME EQUITY CORPORATION and                   :
IRWIN UNION BANK AND TRUST COMPANY,                 :
                                                    :
                      Respondents.                  :
-- ------------------------------------------------ x
```

NOTICE TO RESPONDENTS:

        This is an arbitration Claim filed against you with the National Arbitration Forum for

money or other relief.  You have thirty (30) days to deliver to the Claimant and file with the

Forum a Written Response and/or file a Counter Claim, Cross-claim or Third Party Claim in

accord with the Code of Procedure. If you <u>do not</u> Deliver to the Claimant and file with the

Forum a Written Response within thirty (30) days, an Award may be entered against you. You

can obtain a free copy of the Code of Procedure from the Claimant or the Forum.

### Summary of the Dispute

1.    Claimant Freedom Mortgage Corporation ("Freedom" or "Claimant") is the victim of

a bait and switch. Respondent Irwin Home Equity ("IHE") is a member of the Irwin family of

companies. That family also includes Irwin Mortgage Corporation ("IMC") and Irwin Financial

Corporation ("Irwin Financial"). Freedom contracted with IMC and Irwin Financial to buy

substantially all of the assets of a business of IMC, including assignment of valuable rights under

a contract between IMC and IHE as it existed on the date of closing (the "IHE Agreement" or

sometimes the "pre-'Addendum' IHE Agreement"). However, unbeknownst to Freedom, prior

to the assignment, IHE and IMC had secretly agreed to modify the IHE Agreement to deprive

Freedom of its essential benefits, through a so-called "Addendum" that IHE later would force

upon Freedom through unfair means. Freedom seeks an order declaring the "Addendum" void,

voidable and rescinded.

### The Parties

2.    Claimant Freedom Mortgage Corporation is a corporation organized under the laws

of the State of New Jersey, having an address at 907 Pleasant Valley Avenue, Suite 3, Mt.

Laurel, New Jersey, 08054. Freedom is an assignee of the rights of Irwin Mortgage Corporation

("IMC"), which is a signatory to the IHE Agreement. The IHE Agreement contains an

arbitration clause, which is set forth below.

2

3.    Respondent Irwin Home Equity Corporation ("IHE") is a corporation organized under the laws of the State of Indiana, having an address at 12677 Alcosta Blvd., Suite 500, San Ramon, California, 94583. IHE is a signatory to the IHE Agreement.

4.    Respondent Irwin Union Bank and Trust Company ("IUB") is a corporation organized under the laws of the State of Indiana, having an address at 500 Washington Street, Columbus, Indiana, 47201. IUB is a signatory to the IHE Agreement.

## The Arbitration Agreement

5.    This arbitration claim is based on the agreement of the parties to arbitrate as found in the IHE Agreement, which states in part as follows:

Section 8.09    Arbitration

Upon written request by either party that is submitted according to the applicable rules for arbitration, any claim, demand or cause of action, which arises out of or is related to this Agreement (collectively "Claims"), may be resolved by binding arbitration in the State of California, in accordance with (i) the Federal Arbitration Act; (ii) the Code of Procedure ("Code") of the National Arbitration Forum ("Administrator" or "NAF") and (iii) this Agreement which shall control any inconsistency between it and the Code.

(IHE Agreement, attached as Exhibit A, at § 8.09).

6.    The claims asserted herein arise out of and relate to the IHE Agreement, and are therefore arbitrable at Freedom's election.

## Related Lawsuits

7.    On January 22, 2008, IHE and IUB (collectively "Respondents" or "Irwin") filed a Complaint in the U.S. District Court, Northern District of California (the "IHE Action"). Irwin's Complaint asserts that Freedom breached the IHE Agreement. A copy of Irwin's Complaint in the IHE Action is attached as Exhibit B.

3

8. Simultaneously with the filing of this Claim, Freedom is moving in the IHE Action for dismissal and/or stay of that action on the grounds of the arbitration clause, and to compel arbitration herein, in the IHE Arbitration.

9. Also simultaneously with the filing of the Claim, Freedom is commencing an action in the U.S. District Court, District of Delaware (the "Injunction Action"), against Irwin's parent, Irwin Financial, and IMC. In that action, Freedom seeks specific performance compelling Irwin Financial to direct its wholly-controlled subsidiaries, IHE and IUB, to cease pursuing the claims that are subject of the IHE Action. Freedom also seeks an order compelling Irwin Financial to buy back loans that Respondents are demanding Freedom repurchase. A copy of Freedom's Complaint in the Injunction Action (without exhibits) is attached as Exhibit C.

10. The Injunction Action seeks to compel Irwin Financial to require its wholly-controlled subsidiaries to abandon the IHE Action and to concede the IHE Arbitration on grounds that the "Addendum" is void. Accordingly, at the outset of this arbitration, Freedom will request that the Panel abstain from conducting further proceedings until the Injunction Action is resolved. The outcome of the Injunction Action should result in the dismissal of this proceeding.

## Factual Allegations

### The IHE Agreement

11. On or about December 11, 2003, Respondents entered into the IHE Agreement with Irwin Mortgage Corporation ("IMC"). IMC is a member of the Irwin family. Like IHE and IUB, IMC is controlled by its parent, Irwin Financial.

4

12. The IHE Agreement (Exhibit A, which does not include, and is not defined herein to include, the so-called "Addendum") is a correspondent loan purchase and sale agreement. It confers upon IMC the right to sell mortgage loans to IHE under the terms and subject to the conditions set forth therein.

13. The IHE Agreement contains several valuable commercial terms which IMC could not obtain from any other mortgage loan purchasers or "investors" in the market. One of these terms relates to the limited ability of Respondents to demand that IMC repurchase a loan, under a condition referred to in the industry as an "early payment default" or "EPD." In specific, Article VI of the IHE Agreement provides that

> Following the purchase of any Loan by [Respondents] pursuant to this Agreement, and notwithstanding the review of the Mortgage Loan Documents pursuant to Article II hereof, it will be deemed a "Defect" in the Mortgage Loan should any one or more of the following events occur in regard to a Mortgage Loan:
>
> (d) The Mortgagor fails to make the first Monthly Payment due to [Respondents] after the Sale Date within thirty (30) days of the Monthly Payment Due Date, regardless of whether such payment is subsequently paid by the Mortgagor or if any Monthly Payment in the form of a check is returned for insufficient funds thus causing the delinquency to occur

IHE Agreement, Section 6.01(d). (Exh. A at pp. 13-14).

14. Section 6.10(d) of the pre-"Addendum" IHE Agreement is a material term that confers tremendous value upon IMC. It benefits IMC by only treating EPDs during the first 30 days (i.e., the first monthly payment) after sale of the underlying property as "defects" triggering repurchase. The EPD provision in the IHE Agreement was more favorable to IMC than EPD provisions offered by other investors, which sometimes treat EPDs during the first 90 days (i.e., the first, second or third monthly payments) after sale as defects requiring repurchase.

5

15.    The pre-"Addendum" IHE Agreement also requires Respondents to purchase certain mortgage loans which had been underwritten according to underwriting guidelines which were not "industry standard" guidelines. The underwriting guidelines contained in the IHE Agreement were more favorable to IMC than industry standard guidelines.

**The Irwin Companies' Secretive Negotiations and Agreement**

16.    In or about January 2006, Irwin Financial and IMC began to look for potential purchasers for IMC's business of originating and selling mortgage loans through retail, wholesale, direct lending and correspondent divisions.

17.    Upon information and belief, in or about that same time period, IHE and IMC talked privately about making large-scale changes to key terms of the IHE Agreement. As a result, IHE and IMC reached an informal "understanding" -- not disclosed to Freedom -- that Section 6.01(d) would be amended to permit IHE to require IMC to buy back EPDs beyond the first 30 days after the sale of the underlying property. Such later EPDs would be considered as "defects" triggering IMC's repurchase obligation. They agreed to amend Section 6.01(d) to include EDPs within a time period of at least 90 days from the sale date.

18.    This change would significantly increase the number of loans that IHE could reject as defective. As a result, the amendment would materially change the terms of the IHE Agreement; it would considerably reduce the value of the IHE Agreement to IMC and, consequently, to any assignee of IMC's rights and obligations, including Freedom.

**Irwin's Sale to Freedom**

19.    In April 2006, Freedom entered into discussions with IMC's parent, Irwin Financial, concerning an acquisition of IMC -- discussions which would lead eventually to Freedom's

purchase of IMC's Business (as later defined in the asset purchase agreement), and the assignment to Freedom of IMC's rights under the IHE Agreement.

20. On May 15, 2006, Freedom and Irwin Financial entered into a Letter of Intent for a sale of the Business. Thereafter, Freedom undertook due diligence. During due diligence, IHE and IMC informed Freedom that IHE had never demanded a repurchase of any mortgage loan sold to it by IMC and represented that there were no IMC records concerning any such repurchase demands, and IHE and IMC failed to disclose their informal "understanding" set forth in paragraph 17.

21. On August 7, 2006, Freedom, IMC and Irwin Financial entered into an Asset Purchase Agreement (the "APA") by which Freedom purchased from IMC and Irwin Financial substantially all of the assets of the Business, as defined in the APA. A copy of the APA Agreement (without most schedules) is attached as Exhibit D.

22. The closing of the sale pursuant to the APA (the "Sale") took place in two stages: The first closing of the Sale, which concerned the Operating Assets of the Business (as defined in the APA), took place effective as of September 18, 2006. The second closing of the Sale, which concerned the Warehouse Assets (as defined in the APA), took place effective as of September 26, 2006.

23. The IHE Agreement was one of the assets included in Freedom's purchase of the Business. The IHE Agreement was specifically listed (without reference to the "Addendum") as a "Purchased Asset" on schedule 1.1(b)(iii). Pursuant to the APA, Freedom was to be assigned all of IMC's rights under the IHE Agreement. As referenced in the APA, the terms of the IHE Agreement included neither the "Addendum," nor the informal "understanding" reached by IHE and IMC earlier in 2006.

24.    The APA required that IMC obtain the approval and consent of third parties, including IHE, and that pending such approval and consent Freedom shall be entitled to all of the benefits of the assigned contracts including the IHE Agreement.  APA Sections 6.3(b), 9.1(g).

25.    During the entire time that IMC, Irwin Financial and Freedom were negotiating the sale, IMC continued to submit loans (totaling millions of dollars of unpaid principal balances) to IHE for purchase pursuant to the IHE Agreement.  IMC submitted to IHE the original collateral documents ("Collateral Documents"), which any purchaser would require before funding a loan.

**The Irwin Companies' Misrepresentations**

26.    In the APA, IMC (identified as the "Seller") and Irwin Financial (the "Shareholder") made numerous representations and warranties to the effect that the IHE Agreement had not been amended, and that they had not instituted or permitted any material change in the conduct of the Business.  See, e.g., APA Sections 4.5, 4.8 (c), 4.10 (b), 4.19 (d), 4.19 (f), 4.20, 4.25 and 4.26.

27.    IMC and its parent represented and warranted that they had not omitted any material fact required to make the statements in the APA not misleading (APA Section 4.26).

28.    For the time period between August 7, 2006, to the date of the Closing, the APA required IMC to "use its commercially reasonable efforts to preserve its business intact ... and to preserve current relationships with ... others having business dealing with it."  (APA Section 6.1(b)(iv)).

29.    On September 18, 2006, IMC closed its sale of the Business operations to Freedom.

30.    Prior to closing, without notice to Freedom, executives at IHE and IMC committed to reduce to writing, in a so-called "Addendum," their agreement to modify the terms of the IHE Agreement to the benefit of IHE and to the detriment of IMC.  At the time, both IHE and IMC knew that this would prejudice Freedom as assignee of IMC's rights.

8

31.  On or about September 26, 2006, Edwin Corbin, Senior Vice President at IHE and Vice President Home Equity Lending at IUB, executed the "Addendum."

**The Pressure Mounts On Freedom**

32.  On September 28, 2006, the date of the Second Closing, Carolyn Dabrowski of IHE sent an email to Tim Nierste at Freedom indicating that "because [IMC] is now Freedom and we do not have a signed contract with Freedom," IHE had ceased providing weekly rate changes pertaining to pricing of mortgage loans.

33.  By this time, Freedom was awaiting IHE's response to the loans which had been submitted to IHE by IMC. Freedom also wanted to submit additional loans to IHE for purchase, per the IHE Agreement.

34.  IHE was abnormally slow to complete its loan review process. IHE appeared to be stalling. This was a serious concern to Freedom. Freedom's life-blood is funding, from a purchaser such as IHE, in order to continue the cycle of acquiring mortgage loans and packaging them for sale to investors.

35.  In light of IHE's delays, Freedom determined that it would seek to sell the loans to investors other than IHE. Freedom sought the return of the Collateral Documents in order for it to sell the loans to other investors.

36.  IHE ignored Freedom's demands that IHE return the Collateral Documents. Upon information and belief, IHE advised Freedom personnel that IHE would not return the Collateral Documents until it had received an executed copy of the "Addendum."

37.  By refusing to return the Collateral Documents, IHE prevented Freedom from selling the loans to other investors. Moreover, even if IHE had returned the Collateral Documents to enable a resale to another investor, Freedom was exposed to losses on pricing.

9

Freedom had priced its loans to borrowers based upon IHE's pricing, which at the time was better than that available in the general market. The market was becoming volatile. This put Freedom in a precarious position due to variables inherent in the mortgage loan market, including fluctuating interest rates and revisions to underwriting guidelines. As these factors reduced the value of the loans on the market, IHE exposed Freedom to increasingly substantial losses.

38.    As a result of IHE's refusal to "fund or return," Freedom faced a liquidity crisis. The loans submitted to IHE consumed a portion of Freedom's warehouse line of credit. Freedom anticipated that IHE would purchase the loans, per the IHE Agreement, but because IHE would not fund them, IHE bottled up Freedom's line of credit. Freedom could not repay warehouse lines for these loans, and Freedom could not fund new loans.

39.    Time was not available to take any course of action other than to capitulate.

**The "Addendum" Is Forced Upon Freedom**

40.    On October 2, 2006, April Schneider, Freedom's Senior Vice President for Capital Markets, was presented with the "Addendum" by Wayne Throgmorton. Until September 18, Throgmorton was IMC's First Vice President. On September 18, Throgmorton became Freedom's First Vice President. Throgmorton indicated that he had received it from Wade Hinkle, who, as of September 18, 2006, was Associate Counsel at Freedom. Prior to that date, Hinkle worked for IMC.

41.    On information and belief, faced with a stoppage of business unless the "Addendum" was signed, Ms. Schneider signed the "Addendum." Ms. Schneider signed the "Addendum" under sheer duress.

10

42.   IHE sent Freedom letters dated February 21, 2007, April 19, 2007, May 11, 2007, June 14, 2007 and January 11, 2008, demanding that Freedom repurchase mortgage loans with unpaid principal balances totaling approximately $ 8.3 million, pursuant to the IHE Agreement "as amended by that certain Addendum..." (Copies of the demand letters are attached as Exhibits F, G, H, I and J to Irwin's Complaint in the IHE Action, which is attached as Exh. B).

43.   Freedom has demanded that IHE honor the IHE Agreement as it existed as of the time of Closing, without reference to the so-called "Addendum."

44.   In the event that the Panel denies Freedom's request to have the arbitration stayed pending the Injunction Action, Freedom asserts the following claims.

### Claim For Declaratory Judgment

45.   Freedom seeks a judgment declaring the "Addendum" to be declared void, voidable, and rescinded for the following reasons:

        a.   IHE obtained Ms. Schneider's signature on the "Addendum" through economic duress. Cal. Civ. Code § 1689(b)(1).

        b.   IHE obtained Ms. Schneider's signature on the "Addendum" by fraud. (Cal. Civ. Code § 1689(b)(1)).

        c.   IHE obtained Ms. Schneider's signature on the "Addendum" by negligent misrepresentation. (Cal. Civ. Code § 1689(b)(1))

46.   Freedom seeks a judgment that the "Addendum" is void because it was not supported by adequate consideration. (Cal. Civ. Code § 1698).

11

### Alternative Claims

47.   In the alternative, by pressuring and tricking Freedom into executing the

"Addendum," IHE breached the covenant of good faith and fair dealing implied in the IHE

Agreement that it would not frustrate Freedom's ability to exercise its rights under the IHE

Agreement.

48.   IHE's misconduct amounts to misrepresentation and fraud.

49.   As a result, Freedom has sustained damages in an amount to be determined and

reasonably believed to exceed $8 million.

### Third Claim

50.   IHE is wholly controlled by Irwin Financial, its parent, and is accordingly bound to

accede to its parent's contractual obligations to Freedom under the APA.


### DEMAND FOR RELIEF

51.   Claimant Freedom seeks: (a) a declaration that the "Addendum" is rescinded, or a

declaration declaring the "Addendum" to be null and void; (b) damages in an amount to be

determined and reasonably believed to exceed $8 million; (c) prejudgment interest and

postjudgment interest as provided by law; (d) costs and attorneys' fees as provided under Section

8.10 of the IHE Agreement and by law; and (e) any and all other relief which the National

Arbitration Forum deems just and proper.


### REQUEST FOR STAY OF ARBITRATION

52.   On March 12, 2008, Freedom filed a Complaint in the United States District Court,

District of Delaware, seeking an order enjoining Irwin Financial Corporation to compel its

wholly-controlled subsidiaries to cease pursuing the claims that are subject of the IHE Action.
(See Complaint, attached as Exh. C). The outcome of that action could, and should, render this
arbitration moot. As a result, in the interests of efficiency and judicial economy, Freedom seeks
an order holding this arbitration in abeyance pending the outcome of the action currently pending
in Delaware between Freedom and Respondents' parent company.


Dated:   New York, New York
         March 12, 2008

                          Respectfully Submitted,

                          ZUKERMAN GORE & BRANDEIS, LLP


                          By: _____
                              John K. Crossman
                              Frank C. Welzer
                              875 Third Avenue
                              New York, New York 10022
                              212.223.6700

                              - and -

                              BUTY & CURLIANO LLP
                              Jason J. Curliano
                              383—4th Street, Third Floor
                              Oakland, California 94607
                              Telephone:510/267-3000
                              Facsimile: 510/267-0117

                              *Attorneys for Claimant*
                              *Freedom Mortgage Corporation*

---
[1]    Application for admission *pro hac vice* pending.

### Claimant's Affidavit of Authenticity

I, Brian Simon, am Chief Operating Officer for claimant Freedom Mortgage Corporation. I have read the foregoing Initial Claim for Arbitration, which was prepared with the assistance of counsel. I am familiar with the contents, and subject to the right to supplement or amend should further information become available, I assert under penalty of perjury, that the facts supporting the Claim, the supporting Documents and the Arbitration Agreement are accurate and correct to the best of my knowledge, information and belief.

_____
Brian Simon

Sworn to before me
this 12 day of March, 2008

/Notary Public

Nicole M. DiCamillo
Notary Public of New Jersey
My Commission Expires Febuary 12, 2012

14

# EXHIBIT F

## NATIONAL ARBITRATION
# FORUM.

April 15, 2008

Wilson Sonsini Goodrich & Rosati PC
David J. Berger & Jenny L. Dixon
650 Page Mill Rd
Palo Alto, CA 94304

Buty & Curliano LLP
Jason J. Curliano
383-4th St
Third Floor
Oakland, CA 94607
VIA EMAIL

Zukerman Gore & Brandeis LLP
John K. Crossman & Frank C. Welzer
875 Third Ave
New York, NY 10022
VIA EMAIL

Wilson Sonsini Goodrich & Rosati PC
David J. Berger & Jenny L. Dixon
One Market Street
Spear Tower, Suite 3300
San Francisco, CA 94105

**RE: Freedom Mortgage Corporation v Irwin Home Equity Corporation & Irwin Union Bank and Trust Company**
**File Number: MX0803002058323**

Dear Parties:

The Forum is in receipt of a Notice from the Claimant stating that a court action has been filed regarding the above referenced matter.

Pursuant to Rule 9F(2) of the Code of Procedure, the above case is now Stayed with the Forum pending the resolution of the court action. The Parties are directed to keep the Forum apprised of the outcome of the court action.



The Parties are reminded that all correspondence submitted to the Forum must also be delivered to all Parties in accord with Code of Procedure Rule 6D.

Sincerely,

Brock Peterson
Case Coordinator
1-800-474-2371 x6614
Fax: 1-866-695-1907

# EXHIBIT 4
# PART 8
# SUPP. DIXON DEC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FREEDOM MORTGAGE CORPORATION, )
          Plaintiff, )
           )
           )
    v. )          C. A. No. 08-146-GMS
           )
IRWIN FINANCIAL CORPORATION, and )
IRWIN MORTGAGE CORPORATION, )
           )
          Defendants. )

## **DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**

Pursuant to Federal Rule of Evidence 201, Defendants Irwin Financial Corporation ("IFC") and Irwin Mortgage Company ("IMC"), by and through its attorneys, hereby request that the Court take judicial notice of the following documents, which are attached as Exhibits A-F to the Declaration of Dominique-Chantale Alepin in Support of Defendants' Motion to Motion to Dismiss, Stay or Transfer to the Northern District of California:

1.    Excerpts of IFC's Form 10-K for the year ended December 31, 2007 filed with the Securities and Exchange Commission ("SEC") on or about March 12, 2008 (Alepin Decl. Ex. A).

2.    The complaint filed by Irwin Union Bank and Trust Company and Irwin Home Equity Corporation against Freedom Mortgage Corporation in the United States District Court for the Northern District of California on or about January 22, 2008, captioned *Irwin Union Bank and Trust Company and Irwin Home Equity Corporation v. Freedom Mortgage Corporation*, Case No. 08-00472 (PJH) (the "California action") (Alepin Decl. Ex. B).

3.    The Motion to Dismiss or Stay Action and for an Order Compelling Arbitration filed by Freedom Mortgage Corporation in the California action on or about March 13, 2008 (Alepin Decl. Ex. C).

4.      Plaintiffs Irwin Union Bank and Trust Company and Irwin Home Equity Corporation's Response re: Defendant Freedom Mortgage Corporation's Motion to Dismiss or Stay Action and for an Order Compelling Arbitration filed in the California action on or about April 9, 2008 (Alepin Decl. Ex. D).

5.      The Initial Claim for Arbitration by Freedom Mortgage Corporation against Irwin Union Bank and Trust Company and Irwin Home Equity Corporation filed with the National Arbitration Forum ("NAF") on or about March 12, 2008, captioned *Freedom Mortgage Corporation v. Irwin Union Bank and Trust Company and Irwin Home Equity Corporation*, File no. MX 0803002058323 (Alepin Decl. Ex. E).

6.      The letter from NAF dated April 15, 2008 (Alepin Decl. Ex. F).

Judicial notice of these documents is proper under Federal Rule of Evidence 201.  This Court may take judicial notice of documents filed with the SEC as matters of public record.  *See* Alepin Decl. Ex. A.  Courts may take judicial notice of documents that are "capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  When documents are "required by law to be filed, and actually filed, with federal or state officials," those documents are deemed inherently reliable and the Court may take judicial notice of those documents on a motion to dismiss.  *See DiLorenzo v. Edgar*, No. 03-841, 2004 WL 609374, at *2 (D. Del. Mar. 4, 2004).  As such, courts routinely take judicial notice of SEC filings even when those filings are not specifically referenced in the complaint.  *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (approving judicial notice of "documents filed with the SEC, but not relied upon in the [c]omplaint").

The SEC filings at issue here are all "required by law to be filed with the SEC, and no serious questions as to their authenticity can exist."  *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)) (taking judicial

-2-

notice of Forms 4 filed with the SEC). Therefore, this Court may take judicial notice of Irwin Financial Corporation's Form 10-K filed with the SEC.

This Court may take judicial notice of matters of public record including pleadings or documents filed in state or federal court and other related court records. *See Nash v. Beard*, 2006 WL 2988941 at * 1 (M.D. Pa. 2006) (taking judicial notice of "related official court filings") (citing Fed. R. Evid. 201)). This Court may therefore take judicial notice of the complaint and pleadings filed in the Northern District of California. This Court may also take judicial notice of the claim and actions in the arbitration proceedings. *See Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1325 (8th Cir. 1994). This Court may also take judicial notice of documents incorporated by reference in the Complaint. *See Buck v. Hampton Tp. School Dist.*, 452 F.2d 256, 260 (3d Cir. 2006). Both the Northern District of California action and arbitration action are referred to in the Complaint at ¶¶ 13-17 and are thus the proper subject of judicial notice. *Id.*

OF COUNSEL:

David J. Berger
Dominique C. Alepin
Wilson Sonsini Goodrich & Rosati, PC
650 Page Mill Road
Palo Alto, California 94304-1050
(650) 493-9300

Jenny L. Dixon
Wilson Sonsini Goodrich & Rosati, PC
One Market Street
Spear Tower, Suite 3300
San Francisco, California 94105
(415) 947-2000

Raymond J. DiCamillo (#3188)
dicamillo@rlf.com
Richards, Layton & Finger
920 N. King Street
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Defendants*

Dated: April 23, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2008, I caused to be served by electronic service and hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> William J. Lafferty
> Theodore Kittila
> Karl G. Randall
> Morris, Nichols, Arsht & Tunnell, LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899

I further certify that on April 23, 2008, the foregoing document was served by electronic service and Federal Express to the following:

> John K. Crossman
> Frank C. Welzer
> Zukerman Gore & Brandeis, LLP
> 875 Third Avenue
> New York, NY 10022

Raymond J. DiCamillo (#3188)
dicamillo@rlf.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FREEDOM MORTGAGE CORPORATION, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | C. A. No. 08-146-GMS |
| | ) | |
| IRWIN FINANCIAL CORPORATION, and<br>IRWIN MORTGAGE CORPORATION, | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, STAY OR TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA

The Court, having considered Defendants' Motion to Dismiss, Stay or Transfer to the Northern District of California (the "Motion"), and good cause having been shown therefore,

**IT IS HEREBY ORDERED** this _____ day of _____, 2008 that the Defendants' Motion is GRANTED.

_____
U.S. District Court Judge